**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES HAYES, et al.,                      )
                                            )
            Plaintiffs,                     )
                                            )        Civil Action No. 06-234 Erie
    v.                                      )
                                            )
ERIE COUNTY OFFICE OF CHILDREN              )
AND YOUTH, et al.,                          )
                                            )
            Defendants.                     )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District J.,

        Plaintiffs, Charles Hayes and Victoria L. Hayes, bring this suit as Administrators of the Estate of

Brittany Legler, a mentally disabled 15 year-old girl who was killed at the hands of her adoptive mother,

Lisa Iarussi, in 2004.  The Defendants are the Erie County Office of Children and Youth ("OCY"), its

Executive Director, and various supervisors, caseworkers, and employees of the agency, all of whom are

sued in their individual and official capacities.  Among the claims that Plaintiffs have asserted against

these individuals and OCY are claims under 42 U.S.C. § 1983[1] for the alleged violation of Brittany Legler's

federal substantive due process rights, claims under Pennsylvania state law for negligence *per se* and

gross negligence, and a survival action under Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302.  We have

jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

        Defendants have filed a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).  For the

reasons set forth below, this motion will be granted in part and denied in part.

---

[1] Section 1983 states, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation
of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the
party injured in an action at law, suit in equity, or other proper proceeding for redress. ...

42 U.S.C. § 1983.

## I. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a complaint to be dismissed for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The rule seeks to screen out claims for which there is clearly no remedy or which the plaintiff has no right to assert; thus, a complaint should not be dismissed under the rule "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  K.J. ex rel. Lowry v. Division of Youth and Family Services, 363 F. Supp. 2d 728, 737-38 (D.N.J. 2005) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims.  Id. at 738 (citation omitted).  In reviewing a motion brought under Rule 12(b)(6), we are required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom and view them in the light most favorable to the plaintiff.  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) (citation omitted).  With the foregoing standard in mind, we recite the relevant factual allegations as set forth in the Complaint.

## II. BACKGROUND

Brittany Legler, a mentally disabled girl, was removed from her parents' home by OCY officials and placed in foster care because the agency had concerns about whether the girl's parents had the means to care for Brittany and her siblings.  (Complaint ¶¶ 18-19.)  Brittany was borderline mentally retarded and she attended the "life skills" program at her local school district, which is designed for children with an IQ of 70 or less.  (Id. at ¶ 40.)  Subsequently, OCY was involved in placing Brittany with her adoptive mother, Lisa Iarussi, a mentally challenged adult.  (Id. at ¶¶ 19, 21.)  Prior to OCY's placement of Brittany with Iarussi, various individuals, including Brittany's foster mother and her relatives, had expressed concerns about Iarussi's fitness as a parent.  (Id. at ¶¶ 21, 41.)

On May 9, 2004, Brittany died in the home of Iarussi as the result of cumulative physical abuse.  (Complaint at ¶ 4.)  An autopsy revealed that Brittany had sustained 212 cuts and bruises, a cauliflower ear with chronic scarring caused by repeated trauma, scarred tissue to the lower lip caused by repeated trauma, a previously broken rib, and internal damage.  At the funeral home, people who knew Brittany did not recognize her.  (Id. at ¶ 29.)  Iarussi pleaded no contest to charges of aggravated assault and endangering the welfare of children in connection with the events leading to Brittany's death.  Her

paramour, Linda Fisher, who also resided at the home, pleaded guilty to endangering the welfare of a child. (Id. at ¶¶ 53-54.)

In the thirteen months leading up to Brittany's death, various individuals – including nurses, teachers, aides, and other Millcreek School District employees – had contacted OCY or a child-abuse hotline at least ten times concerning incidents of suspected physical abuse of Brittany. (Complaint ¶ 22.) Among the concerns reported were bruises, frequent absenteeism, a chronically split lip, a cut to the back of the head, and heavy makeup meant to mask black and blue marks to her face. (Id. at ¶ 23.)

OCY received the first report of suspected abuse in April 2003, and the investigation as to this report was closed in June of 2003. (Complaint ¶ 24.) Thereafter, OCY received eight confirmed complaints of abuse concerning Brittany, prompting a second OCY investigation which commenced on February 10, 2004. (Id. at ¶ 25.) Following the commencement of this second investigation, OCY received two other confirmed reports of suspected abuse, one of which occurred approximately a month before Brittany's death. (Id. at ¶ 26.) The final report of suspected abuse occurred prior to April 27, 2004, when the second investigation was closed. (Id. at ¶ 27.) Despite these reported incidents, OCY personnel failed to ever conduct a face-to-face interview or meet with the school district personnel who had made the reports. (Id. at ¶ 28.)

In 2000, the consulting firm of Hornby Zeller Associates, Inc. was commissioned by the County of Erie at a cost of $99,000.00 to perform a study of OCY's operations. (Complaint ¶ 42.) The report, issued in September 2000, stated in part as follows:

> This is ... an agency where staff feel as though they are in **crisis**. They describe their caseloads as insupportably high, they worry that the workload will get worse as turnover increases and they feel they are receiving inadequate support from the superiors. It is an agency where there is a great deal of respect for the director but where respect for anyone else has been eroded by the small jealousies and rivalries that often characterize closely knit families.
>
> In sum, OCY is any agency whose current performance is more than adequate but whose future capacity may be in doubt.
>
> The larger problems lie ... not with casework performance but with the way staff treat each other and with their overall attitude toward the agency. A large proportion of the staff have been at the agency a very long time. This is especially true of the more senior staff. As one observes the interactions, it sometimes appears as though they treat each other like family members, with the affection, the jealousies and the animosity that can be associated with familial relationships. With such a strong sense of familiarity, the agency tends to run on

> the basis of relationships and personalities rather than on the basis of the organizational structure. ...
>
> In brief, the organization has disenfranchised its supervisory staff and is characterized by too much division and animosity both among the units and among levels of staff.

(Id. at ¶ 43 (emphasis as in the Complaint).) This report authored by Hornby Zeller was hidden by OCY and its supervisors from the public and from County Council. (Id. at ¶ 44.)

Pursuant to 42 Pa. C.S.A. § 6377, the Pennsylvania Child Protective Services Act, the Pennsylvania Department of Public Welfare ("DPW") is required to establish staff-to-family ratios for OCY. (Complaint at ¶ 32.) At all times material to this case, OCY was not in compliance with the staff-to-family ratio regulations established by DPW. (Id. at ¶ 33.)

In 2005, DPW completed a review of OCY's handling of the multiple reports of abuse involved in Brittany's case. The Department found that OCY had violated the law with respect to at least four specific DPW regulations. (Complaint at ¶ 34 and Ex. A.) Among other things, OCY had failed to complete a risk-assessment report of suspected abuse within sixty days, failed to make direct contact with school district workers and other individuals who had direct knowledge concerning Brittany, and failed to include a safety plan detailing those issues that OCY was reviewing in determining Brittany's safety within her home. (Id. at ¶¶ 35-37 and Exhibit A.)

In January 2006, the Child Welfare League of America issued a report at the request of the County of Erie, which had hired the League to study OCY, perform a review, and make recommendations. (Complaint ¶ 45.) That report contained the following findings:

> For a number of years there have been role conflicts and a culture of disrespect at OCPS [Office of Child Protective Services, formerly known as OCY] that detracts from the ability of the agency to carry out its mission.
>
> A respectful working environment is key to a healthy organization. OCPS should implement a zero tolerance policy for disrespectful behavior at any level of the organization. Zero tolerance for disrespect does not mean there are no differences of opinion, or that sometimes management makes decisions that staff must abide by. It does mean staff at all levels of the organization should have the opportunity to be heard and understood, regarding issues related to them, and staff are actively engaged in developing solutions to promote an effective organization.
>
> We believe that OCPS is at a critical juncture. Factors related to workload increases, staff turnover and organizational culture have coalesced to a point of

4

> crisis. ...
>
> In summary, lack of strong and clear management structure, lack of integrity in role functions and staff perceptions or inequity and injustice in workload distribution and job requirements contribute to a **toxic work environment and interfere with OCPS's ability to carry out its mandate**.

(Complaint ¶ 46 (emphasis as in complaint).)

During the period relevant to this lawsuit, Defendant Debra Liebel was the Executive Director of OCY. (Complaint ¶ 9.) Defendant Edith Joseph was the intake supervisor assigned to Brittany's case and was directly responsible for handling the multiple complaints of suspected abuse of Brittany prior to her death. (Id. at ¶¶ 10, 39.) Defendants Robin Adams and Debbie Leasure were employed as supervisors at OCY. (Complaint ¶¶ 11, 16.) Defendant Cyndi Valimont, was employed as a caseworker at OCY. (Id. at ¶ 12.) Defendants Carroll Gallagher, Cindra Vallone, and Michael Hughes were employees at OCY during the time in question. (Id. at ¶¶ 13-15.)

Plaintiffs have sued OCY as well as each of the foregoing individuals whom, it is alleged, were involved in one way or another with the handling of Brittany Legler's case. (Complaint ¶¶ 17, 62.) The individual Defendants are sued in both their official and individual capacities. (Id. at ¶¶ 9-17.) Plaintiffs allege that these Defendants were engaged in a joint venture and conspiracy in that they agreed with and assisted each other in performing the various actions and inactions which led to Brittany's death and lent their support and the authority of their office to each other during these events. (Id. at ¶ 61.) It is further alleged that each of the Defendants "advised, assisted, ratified and/or directed the actions and inactions taken with respect to Brittany Legler." (Id. at ¶ 62.)

Based on these averments, Plaintiffs have asserted a claim under § 1983 against all Defendants for the alleged violation of Brittany's Fourteenth Amendment substantive due process rights. Plaintiffs assert a separate § 1983 claim against Defendants OCY, Liebel, Adams, Leasure, and the "other individual Defendant supervisors premised on their alleged failure to properly train and supervise the remaining individual Defendants" in their handling of Brittany's case. (Complaint ¶¶ 70-71.) As against Defendants OCY and Debra Liebel, Plaintiffs assert a claim of municipal liability under § 1983. With respect to the individual Defendants, Plaintiffs assert claims under Pennsylvania law for negligence *per se*

and gross negligence.  Finally, Plaintiffs assert a survival action on behalf of Brittany's estate pursuant to the Pennsylvania Survival Act, 42 Pa. C.S.A. § 8302.

Defendants have filed a motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all of these claims. The issues have been briefed and argued and the matter is ripe for consideration.

### III.  DISCUSSION

A.      Plaintiffs' § 1983 Claim for Violation of Substantive Due Process Rights

To prevail under 42 U.S.C. § 1983, a plaintiff must prove that he suffered the deprivation of his constitutional or federal rights by a person acting under color of state law.  Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995).  Here, Plaintiffs allege that the named Defendants, all of whom are indisputably state actors for purposes of § 1983, deprived Brittany of her Fourteenth Amendment right to substantive due process.

Defendants seek to dismiss the Plaintiffs' § 1983 claim on the grounds that Plaintiffs have failed to adequately allege a constitutional violation.  In addition, they argue that the supervisor Defendants cannot be held liable for the harm caused to Brittany Legler because no personal involvement on their part has been alleged.  Assuming that a constitutional violation on the part of the individual Defendants has been adequately pled, Defendants nevertheless maintain that they should be dismissed from this suit under the doctrine of qualified immunity.  Finally, Defendants argue that OCY cannot be held liable under § 1983 because Plaintiffs have failed to allege that the tragedy which befell Brittany Legler was anything other than a single occurrence.   We will address each of these arguments in turn.

(i)

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV.  In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), a case in which a young child sustained permanent brain damage as a result of being brutally beaten at the hands of his natural father, the United States Supreme Court held that the Fourteenth Amendment provides no affirmative right to governmental aid or protection against violence occurring at the hands of private individuals.  Id. at 195-96, 202.  The Court therefore upheld an award of summary judgment in favor of county welfare workers

6

and local officials who had been sued under § 1983 by the child's mother for failing to protect the child. There are, however, two recognized exceptions to DeShaney's basic premise: the "special relationship" rule and the "state-created danger" rule.

Under the first exception, the State's affirmative duty of care and protection arises "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. DeShaney, 489 U.S. at 200. Courts have thus recognized the State's obligation, e.g., to provide adequate medical care for prisoners in accordance with the Eighth Amendment's prohibition against cruel and unusual punishment, Estelle v. Gamble, 429 U.S. 97 (1976), and to provide the basic services necessary for the reasonable safety of involuntarily committed mental patients, pursuant to the Fourteenth Amendment's due process requirements. Youngberg v. Romeo, 457 U.S. 307 (1982).

The Third Circuit "'has read DeShaney as primarily setting out a test of physical custody' for purposes of determining whether there is a 'special relationship' between the state and the plaintiff." Ye v. United States, 484 F.3d 634, 637 n.1 (3d Cir. 2007) (quoting D.R . v. Middlebucks Area Vocational Tech. Sch., 972 F.2d 1364, 1370 (3d Cir. 1992) (en banc)). For example, the court has recognized a "special relationship" between the State and children who are placed in state-regulated foster care such that "certain affirmative duties" can be imposed upon the State. Nicini v. Morra, 212 F.3d 798, 808 (3d Cir. 2000) (en banc). Under "sufficiently culpable circumstances," the failure to perform these duties can give rise to liability under § 1983. Id. C.f. D.R . v. Middlebucks Area Vocational Tech. Sch., supra (public high school student who was allegedly sexually molested by other students during school hours could not maintain § 1983 claim against school officials because, despite compulsory attendance laws, no special relationship exists between state and school children).

The second exception – the "state-created" danger theory – originates from DeShaney's pronouncement that "while the State may have been aware of the dangers that [the young abuse victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201. The theory holds that the State can be liable under § 1983 for constitutional torts where "state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the

7

absence of state intervention.'" Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (quoting

Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003)), cert. denied, — U.S. — , 127 S. Ct.

1483 (2007). As the Seventh Circuit recognized in a pre-DeShaney case, "If the state puts a man in a

position of danger from private persons and then fails to protect him, it will not be heard to say that its role

was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v.

DeVito, 686 F.2d 616, 618 (7th Cir. 1982).

      The Third Circuit first adopted the "state-created danger" theory of liability in Kneipp v. Tedder, 95

F.3d 1199 (3d Cir. 1996). In that case, a married couple were stopped by police for causing a disturbance

on a public highway in the middle of a cold night. The wife was visibly intoxicated to the point that she

smelled of urine and was staggering. The husband obtained permission to return home, a short distance

away, to relieve the babysitter. He departed the scene under the false assumption that the police were

going to take his wife either to the hospital or to the police station. Instead, the police subsequently sent

the wife on her way home alone, which resulted in her falling to the bottom of an embankment where she

sustained severe brain damage due to her exposure to the cold. The Third Circuit found there was

sufficient evidence from which a jury could find that, "[a]s a result of the affirmative acts of the police

officers, the danger or risk of injury to [the wife] was greatly increased." 95 F.3d at 1209.

      To establish a claim under the "state-created danger" theory, as it has evolved in this circuit, the

following elements must be established:

> (1)     the harm ultimately caused was foreseeable and fairly direct;
>
> (2)     a state actor acted with a degree of culpability that shocks the conscience;
>
> (3)     a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4)     a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright, 443 F.3d at 281. The fourth element can be broken down into three necessary conditions, to wit:

(i) a state actor exercised his or her authority; (ii) the state actor took an affirmative action; and (iii) this

affirmative act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the

state had not acted at all. <u>Ye</u>, 484 F.3d at 639; <u>Bright</u>, *supra*, at 281-82.

As for the second element – *to wit*, that the state actor act with a degree of culpability that "shocks the conscience"[2] – the "exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'" <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 375 (3d Cir. 1999). Where a state actor has the time to deliberate about his actions and is not under pressure to make hurried judgments, the state actor's conduct will be sufficiently "conscience shocking" if it displays a deliberate indifference toward a substantial risk of serious harm to the plaintiff. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 851 (1998) ("As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practicable."). This includes situations involving decisions akin to the placement of a child into foster care. <u>See</u> <u>Nicini</u>, 212 F.3d at 811. In fact, "in the foster care context, most of the courts of appeals have applied the deliberate indifference standard, although they have defined that standard in slightly different ways." <u>Id</u>. at 810 (citing cases).

In this case, Plaintiffs premise their § 1983 claim on both exceptions to the <u>DeShaney</u> rule. That is, Plaintiffs allege the Defendants, having arranged Brittany's adoption by Iarussi, were in a "special relationship" with her and thereby had an affirmative duty to protect her from physical abuse. (Complaint ¶ 55.) Alternatively, Plaintiffs allege that OCY had a duty to protect Brittany because the agency's action in removing her from her home and placing her with Iarussi constituted a "state-created danger." (Complaint ¶ 20.) Plaintiffs allege that the harm to Brittany was foreseeable and that Defendants acted with deliberate indifference to that harm. (<u>Id</u>.)

Defendants challenge the adequacy of both these legal theories. As to the "special relationship" theory, they argue that no special relationship existed between OCY and Brittany because OCY did not

---

[2] The second element of the "state-created danger" theory – that the state actor's conduct "shock the conscience," is also required in order to establish liability under the "special relationship" theory. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998) (touchstone of due process is protection of the individual against arbitrary action of government; where the challenge involves executive rather than legislative action, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" and thus, substantive due process liability attaches only if the action is "so ill-conceived or malicious that it 'shocks the conscience.'"); <u>Johnson</u> *ex rel.* <u>Estate of Cano v. Holmes</u>, 455 F.3d 1133, 1141-42 (10th Cir. 2006) ("shocks the conscience" standard applies to both "special relationship" cases and "state created danger cases") (citation omitted); <u>Nicini</u>, 212 F.3d at 810 ("<u>Lewis</u> ... makes clear that a plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct 'shocks the conscience' in the particular setting in which the conduct occurred.").

take custody of her and hold her against her will.  Thus, we must initially decide whether Plaintiffs have adequately alleged a "special relationship" between Brittany and OCY by virtue of OCY's alleged involvement in removing Brittany from her natural parents' home and later placing her with Iarussi.

In support of their "special relationship" theory, Plaintiffs rely on Nicini, *supra.*  In Nicini, as we have noted, the Third Circuit Court of Appeals held that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties," the failure to perform which "can give rise, under sufficiently culpable circumstances, to liability under § 1983."  212 F.3d at 808.  The Court went on to explain:

> We recognize that the analogy between foster children on the one hand and prisoners and institutionalized persons on the other is incomplete.  For example, foster children, especially older ones, enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety.  Nonetheless, any distinctions between children placed in foster care and the prisoners at issue in *Estelle* or the institutionalized mentally retarded persons at issue in *Youngberg* are matters of degree rather than of kind.  See Norfleet [By and Through Norfleet v. Arkansas Dept. of Human Services], 989 F.2d [289, 292 (8th Cir. 1993)] (although there is a closer relationship between the state and prisoners than between the state and foster children, "the situations are sufficiently analogous").  In each of these cases the state, by affirmative act, renders the individual substantially "dependent upon the state ... to meet [his or her] basic needs."  D.R., 972 F.2d at 1372.

Id.

We are not persuaded that the holding in Nicini supports the conclusion that Plaintiffs have pleaded the basis of a "special relationship" between Brittany and OCY in this case.  In Nicini, the plaintiff was a boy who had been placed with a family through the New Jersey Division of Youth and Family Services and later suffered sexual abuse at the hands of one of the family members.  The case did not involve foster-care placement in the strict sense because the boy had come to stay with the family on his own initiative and the family had not been officially approved as either a foster or para-foster family. Importantly, however,

> Nicini was in DYFS custody throughout the relevant period.  Furthermore, the record is replete with evidence that Nicini was substantially dependent upon DYFS and that DYFS acquiesced in Nicini's stay at the Morra home.  At least by October 10, 1990, when Nicini's father signed a foster care placement agreement, DYFS was able to arrange for his foster placement.  At some point, the Superior Court of New Jersey awarded custody of Nicini to DYFS and DHS.  App. at 136.  Nicini was thereafter placed on several occasions with DYFS-approved foster parents and with relatives.  It also appears that after the police located Nicini at the Morra home and took him to JFK, DYFS returned him to their home over the objections of his aunt and his father.

Id. at 809.  Under these circumstances, the Court of Appeals found Nicini's situation "sufficiently

analogous" to that of a foster care placement such that it fell within the "special relationship" exception to

DeShaney.  Id.

In the case at bar, however, Plaintiffs do not allege that Brittany was abused while in a foster care

setting or while she was otherwise in the custody or under the tutelage of OCY.  Rather, Plaintiffs allege

that, at the time of the abuse, Brittany was living in Iarussi's home pursuant to an adoption that had been

finalized some 2 or 3 years earlier.  This is the critical factor that materially distinguishes this case from

Nicini, where the minor was unquestionably "in DYFS custody throughout the relevant period."  212 F.3d at

809.

We readily agree with Plaintiffs' contention that, tragically, Britany, being a mentally disabled child,

was certainly limited in her ability to take steps to ensure her own safety.  But absent a custodial or

"sufficiently analogous" relationship between Brittany and OCY, that factor is not sufficient, in and of itself,

to make out a "special relationship" claim.  If the Plaintiffs' argument is taken to its logical conclusion, then

child welfare agencies, having once played a role in the placement of a child into an adoptive home, will

thereby always assume a "special relationship" with the child – and, as well, an affirmative constitutional

duty to protect that child – for an indefinite period of time (or at least, presumably, until the child reaches

the age of majority), notwithstanding the termination of the agency's custodial relationship with the child.

For present purposes, we need not and do not opine as to whether a child welfare agency can

ever have a "special relationship" with an adopted child such that it acquires a duty to protect the child

from post-adoption abuse.  There may be cases where a child welfare agency has on-going involvement

with a child in an adoption setting such that it acquires a constitutional duty to protect the child from harm

occurring during the pendency of, or soon after, adoption proceedings.  See, e.g., Johnson ex rel. Estate

of Cano v. Holmes, 455 F.3d 1133, 1143 (10th Cir. 2006) (where child was killed at the hands of her

adoptive mother four weeks following adoption, social workers sued under § 1983 conceded that the state

had a "special relationship" with the child, and the only remaining question was whether the evidence

could support a finding that the two social workers violated the child's substantive due process rights).  But

see Lewis v. Anderson, 308 F.3d 768, 773-74 (7th Cir. 2002) (in a § 1983 suit brought by abused children

alleging that officials of state Department of Health and Social Services violated their due process rights

by placing them with abusive foster parents who later adopted them, the relevant period of inquiry was limited to the time during which the state had legal guardianship over the children; state's duty continued only through the period of foster care and terminated when the State relinquished guardianship to the adopting family); Griffith v. Johnston, 899 F.2d 1427, 1439-40 (5th Cir. 1990) (although Texas Department of Human Services created a "special relationship" with children removed from their natural homes and placed under state supervision, that "special relationship" lapsed when children were officially adopted since, under Texas law, adoptive parents assumed the same rights and duties toward the children as natural parents; thus, State was under no obligation to continue supplying special services to children once they were adopted).  We conclude only that, for present purposes, the Plaintiffs have failed to allege facts that would support the finding of a "special relationship" between Brittany and OCY at the time of the reported instances of abuse in this case.

Defendants also challenge the legal sufficiency of Plaintiffs' "state-created-danger" theory. Specifically, Defendants insist that Plaintiffs have failed to allege facts sufficient to satisfy the fourth prong of that test:  *to wit*, that the OCY Defendants took any *affirmative* action that had a *direct, causal relationship* to the harm inflicted upon Brittany.  Defendants rely on several cases in which our circuit court of appeals has found that the allegations in the complaint failed to adequately allege a state-created danger claim.  See Sanford v. Stiles, 456 F.3d 298 (3d Cir. 2006) (parent of highschool student who committed suicide sued school and its guidance counselor for counselor's conduct in dealing with the student prior to his death); Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006) (corrections officer and his wife alleged that they contracted a disease as a result of prison creating dangerous condition and misrepresenting the danger); Bright v. Westmoreland County, *supra* (parents of 8-year old girl who was murdered by an individual who had previously pled guilty to corrupting the morals of the girl's older sister sued probation and police officers for their conduct in failing to arrest the individual and/or enforce the conditions of his probation, which conduct allegedly created the danger to the 8-year old); Bryan v. Erie County Office of Children & Youth, No. Civ. A. 03-259 Erie, 2006 WL 2850446 (Sept. 29, 2006) (parents whose natural son was sexually abused by foster child placed in their home sued social services agencies and their employees for their alleged failures to investigate and/or disclose their actual knowledge of the foster child's sexually aggressive propensities); Bennett *ex rel.* Irvine v. City of Philadelphia, Civil Action

Nos. 03-5685, 05-0833, 2006 WL 1371189 (E.D. Pa. May 17, 2006) (children who were left in the care of

their unfit natural mother and abused by unsuitable care-givers, culminating in the death of one child, sued

city, alleging that city and its Department of Human Services violated their constitutional rights by obtaining

a discharge of their case through misrepresentation and by failing to properly respond to a hotline report of

the children's abuse).

Defendants argue that, like the above cases, this complaint does not present allegations rising to

the level of a constitutional violation under the state-created danger theory because the "mere failure to

protect an individual ... does not violate the Due Process Clause." Sanford, 456 F.3d at 312 (ellipsis in the

original) (quoted in Def.'s Br. in Supp. of Mot. to Dismiss [4].) Though the quoted legal principle is an

accurate statement of the law, we read Plaintiffs' state-created danger claim as being premised on more

than Defendants' mere failure to act on reported incidents of privately inflicted abuse. Significantly,

Plaintiffs alleged that OCY played an *affirmative* role in removing Brittany from her natural home and

placing her with Iarussi, thus rendering Brittany vulnerable to the abuse she later suffered at Iarussi's

hands. See Complaint ¶ 50 ("OCY favored the placement of Brittany Legler with Lisa Iarussi, who was

also mentally disabled, despite objections of other individuals who were critical of Iarussi's fitness to

parent."). This allegation, coupled with the averment that the agency and its employees effectively ignored

repeated reports of suspected abuse within the home is sufficient to establish a Fourteenth Amendment

claim under the state-created danger theory.

Defendants object that the allegations fail to establish the necessary causal connection between

OCY's actions and the harm inflicted upon Brittany. Defendants note that, according to the complaint,

approximately three years lapsed between the placement of Brittany in Iarussi's home and the first reports

of suspected abuse. To the extent Defendants are challenging the required causal connection, the legal

sufficiency of Plaintiffs' claim may ultimately depend, at least in part, on the quality of notice that OCY had

concerning Iarussi's unfitness to parent. However, this question is better addressed on a more fully

developed record. For present purposes, we conclude that Plaintiffs have successfully alleged a

constitutional violation under the state-created danger theory. Accord Currier v. Doran, 242 F.3d 905 (10th

Cir. 2001) (plaintiffs successfully stated a "state-created danger" claim against social workers for their

involvement in removing child from mother's custody and allowing father to gain custody where state

played affirmative role in placing child with father, who later killed the child); K.J. *ex rel.* Lowry v. Division of Youth and Family Serv., 363 F. Supp. 2d 728 (D.N.J. 2005) (children's § 1983 claim against child welfare agents for alleged due process violation survived motion to dismiss where defendants were allegedly involved in placing children with family and later approving their adoption by the same family, at whose hands the children were malnourished); Tazioly v. City of Philadelphia, No. Civ. A. 9-CV-1219, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998) (recognizing applicability of state-created danger theory in a case where city social workers terminated child's satisfactory foster care and played affirmative role in placing child with his biological mother who had drug problems and known propensities for violent and bizarre behavior); Ford v. Johnson, 899 F. Supp. 227 (W.D. Pa. 1995) (where Children and Youth Services had custody of a child and then affirmatively recommended court placement of the child with her father, who later beat the child to death, natural mother stated viable due process claim against agency under state-created danger theory).

(ii)

Plaintiffs have sued Defendant Debra Liebel under § 1983 both individually and in her official capacity as Executive Director of OCY. Defendants Joseph, Adams, and Leasure are being sued both individually and in their official capacities as supervisors at OCY. (Complaint ¶¶ 9-11, 16.) Defendants contend that there can be no liability as to these individuals because the complaint fails to allege any personal involvement on their part in the matters alleged.

Defendants correctly observe that, in order for an individual to be liable under § 1983 in his or her capacity as a supervisor, the individual must have "personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)). Typically, the plaintiff must show, for example, that the supervisor directed the wrongdoing or actually knew of the wrongdoing and acquiesced in it. See Rode, 845 F.2d at 1207. Where the plaintiff's claim is specifically premised on the defendant's failure to exercise supervisory authority, liability can attach "only if that official 'has exhibited deliberate indifference to the plight of the person deprived.'" C.H. *ex rel.* Z.H. v. Oliva, 226 F.3d 198, 202 (3d Cir. 2000) (*en banc*) (quoting Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)). "Accordingly, a plaintiff asserting a failure to supervise claim must not only identify a specific supervisory

practice that the defendant failed to employ, he or she must also allege 'both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.'" Id. (quoting Bonenberger v. Plymouth Tp., 132 F.3d 20, 25 (3d Cir. 1997)). Where the § 1983 claim is premised upon the defendant's alleged failure to properly train his or her subordinates, the plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir.1997) (citing Colburn v. Upper Darby Tp., 946 F.2d 1017, 1030 (3d Cir.1991)).

Defendants insist there are no facts pled in the complaint that would indicate Liebel, Adams, Leasure or Joseph had personal involvement in the matters alleged or that they directed, or actually knew of and acquiesced in, the alleged violations of Brittany's constitutional rights. We disagree.

As to Defendant Joseph, Plaintiffs have alleged that "Defendant Edith Joseph was the intake supervisor at OCY assigned to Brittany Legler's case and was directly responsible for handling the multiple complaints of suspected abuse of Brittany which were received before her death." (Complaint ¶ 39.) Thus, Plaintiffs have alleged direct, personal knowledge and involvement on her part relative to Brittany's plight.

With regard to Defendant Liebel, Plaintiffs have alleged that, as of 2000, OCY (presumably through, Liebel, its principal and Executive Director) was in possession of a report which expressed a concern among staff members that the agency was in crisis, that caseloads were insupportably high, and that there was an inadequate level of support from superiors. (Complaint ¶¶ 43-44.) It is further alleged that, at all times relevant to this lawsuit, Liebel failed to properly staff, train and supervise caseworkers with regard to the processing and assessment of reported child abuse and failed to implement written standards both for situations involving multiple referrals of a particular child victim and for cases involving suspected abuse against mentally retarded children. (Id. at ¶¶ 85-87.) Plaintiffs further aver that OCY (presumably through its chief policy maker, Liebel) had a policy or custom of tolerating the incompetent handling of reported child abuse cases, of disregarding the staff-to-family ratios required by law, and of tolerating employees' non-compliance with mandatory standards and deadlines for the processing and

15

assessing of reported incidents of child abuse.  (Id. at ¶¶ 89-90.)  It is alleged that Liebel's tolerance and refusal to correct this non-compliance on the part of OCY's caseworker and supervisors emboldened the individual Defendants by leading them to believe that their misconduct would go unchallenged.  (Id. at ¶¶ 90-91.)  Finally, it is alleged that Liebel's actions "were the moving force behind the acts of the individual Defendants" and proximately caused Brittany Legler's injuries and damages.  (Id. at ¶ 92.)  Collectively, these allegations are sufficient to establish Liebel's personal involvement in the violation of Brittany Legler's substantive due process rights.

As to Defendants Adams and Leasure, Plaintiffs' allegations are less specific but nevertheless sufficient to survive Rule 12(b)(6) scrutiny.  The complaint asserts that these Defendants, along with Liebel and the other named supervisors, failed to properly train and supervise the OCY Defendants under them by, inter alia, "fail[ing] to adopt and implement reasonable procedures to prevent harm from occurring to children who were the subject of reports to OCY of suspected abuse, especially those who were mentally retarded and had been placed in a suspected abusive home through OCY's arrangement." (Complaint at ¶ 71.)  Plaintiffs further aver that these supervisors failed to properly train and supervise the Defendant caseworkers with regard to "investigat[ing], track[ing] and correct[ing]" reports of child abuse. (Id. at ¶ 72.)  Additionally, it is alleged that, at all relevant times, all the named Defendants "were engaged in a joint venture and conspiracy" whereby they each "agreed with and assisted each other in performing" the alleged tortious conduct (id. at ¶ 61), "lent their support and the authority of their office to each other," (id.), and, "advised, assisted, ratified and/or directed the actions and inactions taken with regard to Brittany Legler." (Complaint at ¶ 62.)  Although these allegations are somewhat generalized, they are sufficient at this juncture to state a claim against Defendants Adams and Leasure in their supervisory capacities.[3]

_____

[3] While Defendants acknowledge that the allegations of conspiratory conduct in Paragraphs 61and 62 of the Complaint are not presented as a separate cause of action, they nevertheless argue that "Plaintiffs' Section 1983 conspiracy claim fails as a matter of law." (Def.s' Br. in Supp. of Mot. to Dismiss [4] at p. 22.)  Defendants quote Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000) for the proposition that a plaintiff seeking to assert a conspiracy claim under § 1983 must establish:  "(1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Id.  In essence, Defendants contend that Plaintiffs' "conspiracy claim" is legally deficient because Plaintiffs have not pled the second requirement – to wit, the deprivation of a constitutional right.  Defendants' argument in this regard is unavailing inasmuch as we have concluded that the Complaint adequately alleges a deprivation of Brittany Legler's Fourteenth Amendment substantive due process rights under the "state-created danger" theory.

(iii)

Defendants contend that, even if Brittany had a constitutional right to be protected from the abuse perpetrated by her adoptive mother, that right was not firmly established in law and, therefore, the individual Defendants should be protected from civil liability under the doctrine of qualified immunity. We do not agree that a grant of qualified immunity is appropriate at this stage of the litigation.

Qualified immunity shields state officials from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When the defense of qualified immunity is raised, courts must engaged in a two-step inquiry to determine whether a state official can be liable under § 1983. First, the court must determine whether the facts alleged would establish that the defendant's conduct violated a constitutional or statutory right. Yarris v. County of Delaware, 465 F.3d 129, 140-41 (3d Cir. 2006) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If the alleged conduct would establish the violation of such a right, then the court must next determine whether the right allegedly violated by the defendant was "clearly established" at the time the violation occurred. Id. at 141. If the court concludes that the defendant's conduct violated a clearly established constitutional or statutory right, it must deny the defendant the protection afforded by qualified immunity. Id. See also Williams v. Bitner, 455 F.3d 186, 190-91 (3d Cir. 2006). If the right was not clearly established, however, then the official is entitled to qualified immunity, and the plaintiff's claim must be dismissed.

Our court of appeals has "adopted a broad view of what constitutes an established right of which a reasonable person would have known." Burns v. County of Cambria, Pa., 971 F.2d 1015, 1024 (3d Cir.1992) (citations and quotation marks omitted). Accordingly, the Third Circuit has held that "there does not have to be 'precise factual correspondence' between the case at issue and a previous case in order for a right to be 'clearly established,' and we would not be 'faithful to the purposes of immunity by permitting ... officials one liability-free violation of a constitutional or statutory requirement.'" Kopec v. Tate, 361 F.3d 772, 778 (3d Cir. 2004) (police officers could be liable for Fourth Amendment violation after employing excessive force in the course of handcuffing an arrestee, despite the fact that there had been

17

no prior Supreme Court or Third Circuit ruling to that precise effect) (quoting People of Three Mile Island

Through Three Mile Island Alert, Inc.  v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144-45 (3d

Cir.1984)).

     In this case, we have determined that the Plaintiffs' complaint states a cognizable claim that

Brittany Legler's Fourteenth Amendment substantive due process rights were violated under a "state-

created danger" theory.  We conclude that reasonable officials in the position of the individual Defendants

would have known that the type of conduct attributed to them violates substantive due process principles.

     We begin by observing that the Third Circuit first recognized a viable state-created danger claim in

1996, when it decided Kneipp v. Tedder, discussed *supra.*  By that date, as the court noted, several courts

of appeals had already recognized the theory as a basis for establishing liability under § 1983 and prior

Third Circuit cases had considered the possible viability of the theory as a means of establishing a

constitutional claim under appropriate facts.  See Kneipp, 95 F.3d at 1205 (discussing cases).  Moreover,

in the years prior to Brittany's adoption, at least two district courts in this circuit had applied the "state-

created danger" theory in cases where child welfare workers had played an affirmative role in placing a

child with an unfit parent.

     In Ford v. Johnson, 899 F. Supp. 227 (W.D. Pa. 1995), the court held that the plaintiff – the

mother of a child who had been beaten to death by the child's natural father – stated a viable § 1983 claim

against county welfare workers who had played an affirmative role in placing the child with her father.  The

court noted that "the state-created danger theory has been clearly recognized when the State fails to

protect children in foster homes from mistreatment at the hands of their foster parents."  899 F. Supp. at

233 (citing K.H. *ex. rel.* Murphy v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990) and DeShaney, 489 U.S. at

201 n. 9).  Although the Ford court had not found prior cases applying the theory when the mistreatment

comes at the hands of a natural parent, the court concluded that "[t]he fact that the child is placed with a

parent as opposed to a foster parent should not change the standards by which social agencies and their

employees conduct their investigations."  Id.  The court found it significant that the child had not previously

been in the custody of the abusive father but, rather, had been in the custody of the child welfare agency

and was placed with the father only after the agency had investigated the matter and made an affirmative

recommendation in favor of the placement to the state court.  Id.

18

In Tazioly v. City of Philadelphia, No. Civ. A. 97-CV-1219, 1998 WL 633747 (E.D. Pa. Sept. 10, 1998), the court recognized the applicability of the state-created danger theory in a case where child welfare workers participated in terminating a child's satisfactory foster care and placing the child with his biological mother, who was known to have a drug dependency and to exhibit violent and bizarre behavior. The child was subsequently brutally abused by his mother, and the court found that the child and his caregivers could sustain a § 1983 claim against the responsible public agents. Citing Ford, *supra*, the Tazioly court concluded that "the state-created danger may apply in cases where a state actor has rendered a minor more vulnerable to injury at the hands of the minor's biological parent." Id. at *11.

Like the foregoing cases, the case at bar involves allegations that child welfare workers, after removing a dependent child from her natural home and placing her in foster care that was apparently satisfactory, subsequently terminated her foster care and then played an affirmative role in placing the child in an adoptive home, despite their awareness of concerns about the adoptive mother's fitness to parent. Plaintiffs allege that Brittany Legler was subsequently abused and ultimately killed at the hands of her adoptive mother, despite repeated reports of suspected abuse over a thirteen-month period which apparently were ignored by the Defendants. While the instant case involves placement of a child with an adoptive mother, rather than with a foster parent or a natural parent, we think the facts are sufficiently analogous to the aforementioned authority such that the Defendants were on notice that the type of conduct attributed to them would violate Brittany's Fourteenth Amendment rights. See Rivas v. City of Passaic, 365 F.3d 181, 200-01 (3d Cir. 2004) ("As the Supreme Court explained in Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), in some cases 'a generalized constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'") (alteration in the original)).[4]

_____

[4] While we presently decline to dismiss Counts 1 and 2 on qualified immunity grounds, we note that it may become appropriate to revisit the issue following discovery. At this point in the litigation, Plaintiffs having been unsuccessful in obtaining pre-litigation discovery, their information as to each Defendant's specific actions or inactions is incomplete and their allegations are therefore necessarily generalized. As this litigation proceeds, discovery will likely shed light on each Defendant's precise conduct relative to his or her involvement in Brittany Legler's case. Thus, it may be necessary for us to revisit the question of qualified immunity at a later time in light of a more complete record. While we are

(iv)

Plaintiffs' § 1983 municipal liability claim against OCY is premised on the theory that, through its chief policy maker Liebel, the agency failed to properly staff, train and supervise its caseworkers in various respects.  A municipality's failure to train employees can serve as the basis for § 1983 liability where the failure to train is the "moving force" behind the constitutional violation.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89 (1989).  The Third Circuit Court of Appeals recently summarized the principles of municipal liability as follows:

> In Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipal liability under 42 U.S.C. § 1983 cannot be based on the *respondeat superior* doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights. Id. at 691-95, 98 S.Ct. 2018; see also Bielevicz v. Dubinon, 915 F.2d 845, 849-50 (3d Cir.1990).  Municipal liability only attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694, 98 S.Ct. 2018; Bielevicz, 915 F.2d at 850.
>
> Thus, there are two ways that a plaintiff can establish municipal liability under § 1983:  policy or custom.  Under Monell, a plaintiff shows that a policy existed "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Bielevicz, 915 F.2d at 850 (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986))).  A plaintiff may establish a custom, on the other hand," by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480).  In other words, custom may be established by proving knowledge of, and acquiescence to, a practice.  Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.1989).
>
> It is clear under either route that "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz, 915 F.2d at 850 (citing Andrews, 895 F.2d at 1480).
>
> ***
>
> In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered.  Bielevicz, 915 F.2d at 850 (citing Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir.1984)).  As we have explained, "[a] sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is

---

mindful of the Supreme Court's admonition to "resolve immunity questions at the earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 227 (1991), we conclude that a grant of qualified immunity at the present time would be inappropriate.  See Thomas v. Independence Tp., 463 F.3d 285, 291-94 (3d Cir. 2006) (notwithstanding Supreme Court's directive to decide qualified immunity issues as early as possible, and despite the individual defendants' contention that the complaint lacked factual detail as to their alleged conduct, court would not apply the doctrine on a Rule 12(b)(6) motion to dismiss; plaintiff's allegations were required only to satisfy the notice pleading standard and plaintiff had no burden to allege facts that would negate the affirmative defense of qualified immunity).

established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Bielevicz, 915 F.2d at 851 (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir.1987)).

Watson v. Abington Tp., 478 F.3d 144, 155-56 (3d Cir. 2007).

Here, Plaintiffs have alleged that OCY and Debra Liebel:

* failed to properly staff, train and supervise caseworkers with regard to processing and assessing reports of suspected child abuse (Complaint ¶ 85);

* failed to adopt written standards for the agency's operations with regard to processing and assessing multiple referrals of suspected child abuse for a particular child and/or reports of suspected abuse against mentally disabled children (Complaint ¶¶ 86-87);

* maintained a custom or policy of tolerating incompetence, dysfunction and gross negligence in the handling of reported child abuse (Complaint ¶ 88);

* tolerated a pattern of noncompliance with legally mandated staff-to-family ratios (Complaint ¶ 89); and

* tolerated staff members' noncompliance with legally mandated standards and deadlines for the processing and assessment of reports of suspected child abuse (Complaint ¶ 90).

Plaintiffs aver that the foregoing policies and customs were the "moving force" behind Brittany Legler's injuries in that they foreseeably encouraged the individual Defendants in this case to believe that their misconduct in handling child abuse cases would continue unchallenged. (Complaint ¶¶ 91-92.) It is this very misconduct which Plaintiffs claim was the source of Brittany's injuries and damages. (Id. at ¶ 92.) Finally, Plaintiffs have alleged that these policies and customs demonstrated a deliberate indifference on the part of OCY and Liebel to the constitutional rights of children of Erie County with whom OCY's employees were likely to come into contact. (Id. at ¶ 84.) We find these allegations sufficient to state a claim against OCY under § 1983.

Defendants protest that the Complaint fails to comply with the requirements of Monell, *supra*, *et al.*, inasmuch as "[t]here is no allegation that this type of incident was widespread" and "Plaintiffs have set

forth no facts to show that what happened in the Legler tragedy was more than a single occurrence."
(Def. Br. in Supp. of Mot. to Dismiss [4] at p. 21.)  We disagree.  The very essence of Plaintiffs' theory, as
set forth in the complaint, is that there was such a degree of sanctioned under-staffing, lack of training and
incompetence in the handling of suspected child abuse cases at OCY – including cases involving mentally
impaired victims and/or multiple reports of suspected abuse against a particular child – that the tragedy
which befell Brittany Legler was entirely foreseeable and, indeed, proximately caused by the agency's
policies.  Moreover, Plaintiffs have alleged that this policy or custom evidenced a deliberate indifference
on the part of OCY and Liebel, its chief policy maker, toward children, like Brittany, with whom OCY's
agents were likely to have contact.  Plaintiffs are not required at this juncture to demonstrate that other
children actually died at the hands of abusive parents in order to state a successful § 1983 claim against
OCY.  See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163
(1993) (holding that there is no heightened pleading standard in § 1983 claims against municipalities; Rule
8 of the Federal Rules of Civil Procedure requires only that the complaint include "'a short and plain
statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the
grounds upon which it rests.") (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).


B.      Plaintiff's Claim for Punitive Damages

        Defendants contend that, to the extent Plaintiffs seek an award of punitive damages relative to
their § 1983 claims, such damages are not recoverable as against OCY or any individual Defendants in
their official capacities.  Punitive damages are not recoverable against municipalities under § 1983, City of
Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), and this limitation has been extended as well to
counties.  See Doe v. County of Centre, PA, 242 F.3d 437, 455 (3d Cir. 2001) (recognizing that City of
Newport "stands for the proposition that municipalities, and more broadly, state and local government
entities, are immune from punitive damages" under § 1983).  Since a claim against a county employee in
his or her official capacity is the functional equivalent of a claim against the county itself, see, e.g., Duffy v.
County of Bucks, 7 F. Supp. 2d 569, 581 (E.D. Pa. 1998) (official capacity suits against county correctional
officers must be analyzed as suits against the County itself), Defendants maintain that the Plaintiffs' prayer
for punitive damages against OCY and the individual Defendants in their official capacities should be

dismissed.

Plaintiffs do not appear to be contesting this issue.  Accordingly, we will strike the Plaintiffs'

demand for punitive damages insofar as it relates to Plaintiffs' § 1983 claim against OCY and the

individual Defendants in their official capacities.

C.      Plaintiffs' State Law Claims

Counts 3 and 4 of the Complaint assert claims under Pennsylvania law for negligence *per se* and

gross negligence, respectively.  Specifically, Count 3 alleges that Defendants Joseph, Valimont and the

other individually named OCY caseworkers and supervisors had a duty pursuant to 55 Pa. Code

§ 3490.232(d)(1)-(3),[5] § 3490.232(e),[6] § 3490.232(g)[7]; and § 3490.321(h)[8] to make an initial determination

of the risk to Brittany upon receiving reports of suspected abuse and to make a risk assessment at the

conclusion of the intake investigation within 60 calendar days.  (Complaint ¶ 75.)  Plaintiffs aver that, in

Brittany's case, a Risk Assessment was not completed until May 13, 2004, which was four days after her

death and sixteen days after the individual Defendants had made the decision to close Brittany's case for

---

[5] Section 3490.232(d) provides that:

> The county agency shall use a State-approved risk assessment process for general protective services as required by § 3490.321 (relating to standards for risk assessment) to:
>
>   (1)  Aid in its assessment of whether to accept the family for services.
>
>   (2)  Insure that its assessment is comprehensive.
>
>   (3)  Help determine the need for general protective services.

55 Pa. Code § 3490.232(d)(1)-(3).

[6] Plaintiffs cite to § 3490.232(3) in the complaint.  This appears to be a typographical error, the relevant provision being § 3490.232(e), which states:

> The county agency shall complete an assessment within 60-calendar days to determine whether or not the child and family should be accepted for general protective services, be referred to another agency for services or close the case.

55 Pa. Code § 3490.232(e).

[7] Section 3490.232(g) provides:

> The county agency shall interview the child, if age appropriate, and the parents or the primary person who is responsible for the care of the child.  The county agency shall also conduct interviews with those persons who are known to have or may reasonably be expected to have information that would be helpful to the county agency in determining whether or not the child is in need of general protective services.

55 Pa. Code § 3490.232(g).

[8] Section 3490.321(h) states, in relevant part:

> Periodic assessments of risk shall be completed by the county agency as follows:
>
> (1)  At the conclusion of the intake investigation which may not exceed 60-calendar days.

55 Pa. Code § 3490.321(h)(1).

the second time.  (Id. at ¶ 76.)  Plaintiffs allege that the Defendants' failure to conduct a proper and adequate investigation and to complete a timely risk assessment proximately resulted in her physical damages, emotional distress and loss of life.  (Id. at ¶ 77.)

Count 4 of the Complaint asserts a cause of action for gross negligence.  Specifically, Plaintiffs allege that the Defendants were grossly negligent in failing to properly investigate the various reports of abuse, in failing to interview individuals with apparent knowledge of the abuse, and in failing to perform a mandated risk assessment for Brittany within the required 60-day period.  (Complaint at ¶¶ 79-80.)  It is further alleged that Defendants' actions constituted reckless, wanton, and willful misconduct which proximately caused the injuries suffered by Brittany.  (Id. at ¶¶ 81-82.)

The individual Defendants contend that they are immune from these claims under Pennsylvania's Political Subdivisions Tort Claims Act ("PSTCA"), 42 Pa. C.S.A. §§ 8541-8542.  Sections 8541 and 8545 of the PSTCA provide a general grant of immunity from tort liability as to local agencies and their employees and agents acting within the scope of their duties, subject only to certain enumerated exceptions.  See 42 Pa.C.S.A. § 8541(a) ("Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."); id. at § 8545 (an agency employee acting within the scope of his duties is liable for civil damages only to the same extent as his employing agency).  Plaintiffs do not appear to allege that any of the exceptions applicable to local agency immunity are present here.  See 42 Pa.C.S.A. § 8542(b)(1)-(8).

On the other hand, Plaintiffs do assert an exception to immunity insofar as it relates to the individual Defendants.  In particular, 42 Pa.C.S.A. § 8550 provides an exception to the general rule of immunity afforded to local officials in cases where the injury caused by the official constitutes "a crime, actual fraud, actual malice or willful misconduct."  Plaintiffs have alleged in ¶ 81 of the complaint that the "Defendants' actions and inactions amounted to reckless, wanton and willful misconduct."  (Complaint ¶ 81.)  See also Complaint ¶ 59 ("Defendants acted with gross negligence, with reckless, wanton and willful misconduct, and/or with deliberate indifference toward Brittany Legler and her federal constitutional rights.").

Defendants contend that this exception has no applicability here.  They refer us to Robbins v.

Cumberland County Children and Youth Services, 802 A.2d 1239 (Pa. Commw. 2002), wherein the

Pennsylvania Commonwealth Court observed that:

> "[w]illful misconduct, for the purposes of tort law, has been defined by our
> Supreme Court to mean conduct whereby the actor desired to bring about the
> result that followed or at least was aware that it was substantially certain to follow,
> so that such desire can be implied." Evans v. Philadelphia Transportation
> Company, 418 Pa. 567, 212 A.2d 440 (1965).  In other words, the term "willful
> misconduct" is synonymous with the term "intentional tort."  See W. Prosser,
> *Handbook of The Law of Torts*, 31 (4th ed. 1971).

802 A.2d at 1252-53 (quoting King v. Breach, 540 A.2d 976, 981 (Pa. Commw. 1988)).  The Robbins

Court further advised that, "[t]o prove willful misconduct, a plaintiff must establish that the actor desired to

bring about the result that followed, or at least it was substantially certain to follow, *i.e.*, specific intent." Id.

at 1253 (citing Diaz v. Houck, 632 A.2d 1081, 1085 (Pa. Commw. 1993)).  Robbins was a case in which

the adoptive parents of an abused child brought state and federal claims against the Cumberland County

Office of Children and Youth Services and certain of its employees stemming from injuries which the

abused child had suffered at the hands of his natural mother.  In concluding that the agency's employees

were entitled to immunity under the PSTCA, the Commonwealth Court agreed with the trial court's

assessment that:

> [A] fair reading of the factual allegations regarding the Defendants' conduct, and
> the reasonable inferences to be drawn therefrom, if believed, do not support a
> conclusion that any of the individual defendants acted with malignant feelings or a
> wicked disregard of the interests of the minor plaintiff.  Nor do they support a
> conclusion that any such defendant acted with an intent that the minor plaintiff be
> injured, or with an awareness that his injuries were substantially certain to occur.
> At most, the complaint presents a series of events in which an error of judgment
> by a defendant in failing to recognize an unusual personality disorder in the minor
> plaintiff's mother resulting in the most tragic of consequences.

802 A.2d at 1253.

    Defendants also refer this Court to Bryan v. Erie County Office of Children & Youth, No. Civ. A.

03-259 Erie, 2006 WL 2850446 (W.D. Pa. Sept. 29, 2006).  In Bryan, foster parents sued the Erie County

Office of Children & Youth Services ("ECOCY") and various of its employees as the result of a sexual

assault which their natural son suffered at the hands of a foster child placed within their home.  Among

other things, the plaintiffs in Bryan alleged that ECOCY and certain of its employees knew or should have

known of the foster child's sexually abusive and violent behavior toward others and failed to apprise

plaintiffs of the serious risk he posed to the minor children in the plaintiffs' home.  The plaintiffs claimed that the agency's employees had failed to perform a mandated risk assessment relative to the foster child's placement; alternatively, they claimed that the defendants had deliberately or recklessly disregarded or failed to disclose the information obtained pursuant to the assessment.  With respect to the plaintiffs' state law claims, which included allegations of intentional infliction of emotional distress, negligence *per se*, and assault and battery, the district court ruled that the ECOCY defendants were entitled to immunity under the PSTCA.  The court specifically found that the plaintiffs had failed to adequately allege "willful misconduct" on the part of the individual defendants for purposes of asserting § 8550's statutory exception to immunity, notwithstanding the fact that the plaintiffs had asserted, *inter alia*, that the individual defendants had acted "recklessly and with deliberate indifference in failing to perform their duties" and that the defendants' "acts/omissions were 'outrageous, intentional, reckless and negligent.'"  Id. at *24.  Citing Robbins' discussion on the type of behavior which constitutes "willful misconduct," the Bryan court noted that the concept of "willful misconduct" under Pennsylvania law is synonymous with "intentional tort," id. at * 23 (citation omitted), and incorporates a requirement that the individual employees "acted with the *specific intent to injure plaintiffs*."  Id. at *24 (citation omitted) (emphasis in the original).  The Bryan court found that the plaintiffs had alleged "a serious error in judgment and negligence, rather than a specific intent to harm."  Id. at *24.

In the case at bar, the individual Defendants claim that the allegations against them, like those in Bryan and Robbins, do not meet the standard for abrogating official immunity.  They claim the alleged misdeeds constitute serious errors of misjudgment and perhaps negligence, but not a specific intent to harm Brittany Legler.

Plaintiffs, on the other hand, maintain that they should be permitted to pursue their negligence *per se* claim based upon the holding of U.S. ex rel. Fear v. Rundle, 506 F.2d 331 (3d Cir. 1974).  In that case, the Third Circuit Court of Appeals entertained an appeal of a jury award in favor of a Pennsylvania state prisoner who had received negligent medical care from two prison physicians relative to a wrist injury the plaintiff had sustained while incarcerated.  On appeal, the principal inquiry was whether the physicians were immune from liability as officers of the Commonwealth.  In upholding the verdict against the physicians, the Court of Appeals held that the prison physicians were not entitled to qualified immunity:

> As low officials, the defendants' liability to plaintiff for their tortious action or failure to act is dependent, under Montgomery [v. Philadelphia, 140 A.2d 100 (Pa. 1958)] and Ammlung [v. City of Chester, 302 A.2d 491 (Pa. Super. 1973)], upon whether their decision to act or to refrain from acting was left to their discretion by state law. Were defendants performing a discretionary function when they caused plaintiff's injury, they would only be liable to plaintiff, under Pennsylvania law, if their action or failure to act was reckless, malicious or wanton. Were the defendants performing a non-discretionary function, we believe they could be held liable to plaintiff, under Pennsylvania law, if their action or omission was merely negligent.

506 F.2d at 335.  Noting that the defendant physicians were required under 61 P.S. § 372 to make inquiries concerning the health of each prisoner and to inform the warden of any physical infirmity affected by prison treatment, the court of appeals determined that the defendants had a non-discretionary duty to comply with the statute.  The court further concluded that the defendants were therefore "low officials" who failed to perform a non-discretionary act and, as such, their conduct was subject to liability under the negligence standard generally applied in common law malpractice actions, rather than by the "reckless, wanton or malicious" standard.  Id. at 335-36.

To the extent Plaintiffs here are arguing that the individual Defendants should be held to a standard of ordinary negligence pursuant to Rundle, we are not persuaded.  That case did not involve any application or interpretation § 8550 of the PSTCA, as the defendants in that case were state employees rather than local officials; in fact Rundle appears to predate the enactment of § 8550.  Accordingly, Rundle provides no guidance with respect to our application of § 8550 to the allegations in this case.

Plaintiffs also rely on the decision of Ford v. Johnson, 899 F. Supp. 227 (W.D. Pa. 1995), in defense of their state law claims.  In Ford, as we have previously discussed, the mother of a child who was beaten to death by the child's father sued individual members of the Allegheny County Children and Youth Services ("CYS") based upon their role in helping to place the child with the father.  With respect to her pendent state law claim, the plaintiff argued that the claim should be permitted to survive under 42 Pa.C.S.A. § 8550 because she had alleged "gross negligence" – a term which has been statutorily defined as "reckless, willful or wanton misconduct."  See 899 F. Supp. at 234 (citing 42 Pa.C.S.A. § 8336(d).)  The district court ruled that, to the extent the plaintiff was alleging acts of willful misconduct on the part of the individual CYS defendants, such claim could be maintained pursuant to 42 Pa.C.S.A. § 8550.  Plaintiffs

28

here claim that, because of their allegations of gross negligence, their state law claim should similarly survive.

This Court is not persuaded that Plaintiffs have adequately alleged willful misconduct within the meaning of 42 Pa.C.S.A. § 8550. Having reviewed all of the aforecited cases, the Court finds that the holdings of <u>Robbins</u> and <u>Bryan</u> are the more persuasive authority relative to this particular legal issue. Not only are those decisions more recent than <u>Ford</u>, but they also involve more detailed analyses of § 8550's meaning and application. Like the courts in <u>Robbins</u> and <u>Bryan</u>, we conclude that the misconduct alleged in this case certainly bespeaks a deliberate disregard for the rights and welfare of Brittany Legler, but not the kind of intentional wrongdoing and specific intent to harm as is required by § 8550.

Plaintiffs seek to distinguish <u>Robbins</u> and <u>Bryan</u> by suggesting that those cases – unlike the present case – did not involve specific allegations of willful misconduct. However, the <u>Robbins</u> plaintiffs had asserted claims against the individual CYS defendants for, among other things, intentional infliction of emotional distress (an intentional tort), had sought punitive damages, and had raised allegations of "gross negligence," "willful disregard" and "deliberate indifference" to the child-victim's safety. <u>See</u> <u>Robbins</u>, 802 A.2d at 1252. In <u>Bryan</u>, the plaintiffs had asserted that the individual defendants acted with "deliberate[] or reckless[] disregard[]" for their statutory duties, <u>see</u> <u>Bryan</u>, *supra*, at *1 and *24, and that the defendants' acts/omissions were "outrageous, intentional, reckless, and negligent." <u>Id.</u> at *24. Such allegations are not materially distinguishable from the type of allegations being raised here. Moreover, Plaintiffs' mere incantation of the term "willful misconduct" does not by itself entitle them to defeat the PSTCA's general grant of immunity. Instead, we will consider the substance of Plaintiffs' allegation as it bears on the Defendants' alleged misconduct. <u>See</u> 2 James Wm. Moore, *Moore's Federal Practice* § 12.34[1][b], at 12-61 to 12-63 (3d ed. 2001) ("Liberal construction has its limits ... conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.") (cited in <u>General Motors Corp. v. New A.C. Chevrolet, Inc.</u>, 263 F.3d 296, 333 (3d Cir. 2001)). Because Plaintiffs have failed to allege "willful misconduct" on the part of the individual Defendants, the state law claims against the individual Defendants will be dismissed.

29

**IV. CONCLUSION**

Based upon the foregoing discussion, the Defendants' motion to dismiss will be granted with respect to Plaintiffs' claim under 42 U.S.C. § 1983 for the alleged violation of Brittany Legler's Fourteenth Amendment substantive due process rights insofar as said claim is premised upon a "special relationship" theory.  In addition, Defendants' motion is granted as to Plaintiffs' prayer for punitive damages insofar as it relates to Plaintiffs' § 1983 claims against the individual Defendants in their official capacities.  Finally, Defendants' motion is granted with respect to Counts 3 and 4 of the Complaint, which are founded on state law claims of negligence *per se* and gross negligence, respectively.  In all other respects, Defendants' motion to dismiss will be denied.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES HAYES, et al.,                    )
                                          )
                    Plaintiffs,           )
                                          )        Civil Action No. 06-234 Erie
        v.                                )
                                          )
ERIE COUNTY OFFICE OF CHILDREN            )
AND YOUTH, et al.,                        )
                                          )
                    Defendants.           )

**O R D E R**

AND NOW, *to wit*, this 29th day of June, 2007, for the reasons stated in the accompanying

Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Complaint [3] is GRANTED in part

and DENIED in part as follows:

1.    Defendants' motion to dismiss is GRANTED with respect to Plaintiffs' claim under
      42 U.S.C. § 1983 for the alleged violation of Brittany Legler's Fourteenth
      Amendment substantive due process rights insofar as said claim is premised
      upon a "special relationship" theory;

2.    Defendants' motion is GRANTED as to Plaintiffs' prayer for punitive
      damages insofar as it relates to Plaintiffs' § 1983 claims against OCY and
      the individual Defendants in their official capacities;

3.    Defendants' motion is GRANTED with respect to Counts 3 and 4 of the
      Complaint, which are founded on state law claims of negligence *per se*
      and gross negligence, respectively; and

4.    In all other respects, Defendants' motion to dismiss is DENIED.


                                          s/     Sean J. McLaughlin
                                          _____

                                          SEAN J. McLAUGHLIN
                                          United States District Judge

cm:    All counsel of record.

31