**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHARLES HAYES and ) | |
| VICTORIA L. HAYES, ) | |
| Administrators of the Estate of ) | |
| BRITTANY LEGLER, Deceased, ) | |
| ) | Case No. 1:06-cv-234-SJM |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ERIE COUNTY OFFICE OF ) | |
| CHILDREN AND YOUTH, *et al.,* ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District J.,

This civil action arises out of a tragic case in which Brittany Legler, a mentally handicapped teenager, was killed at the hands of her adoptive mother, Lisa Iarussi. Plaintiffs Charles Hayes and Victoria L. Hayes, the Administrators of Brittany's estate, have brought this lawsuit against the Erie County Office of Children and Youth ("OCY") and several of its present or former employees,[1] claiming, among other things, that the Defendants violated Brittany's federal civil rights by virtue of their involvement in first placing Brittany with Iarussi and later failing to adequately investigate or address numerous reports of suspected abuse perpetrated upon Brittany by Iarussi.

Presently pending before the Court is a motion by the Defendants for summary

---

[1] The individuals named as Defendants in this case are Debra Liebel, Edith Joseph, Robin Adams, Cyndi Valimont, Carroll Gallagher, Cindra Vallone, Michael Hughes and Debbie Leasure.

judgment.  This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331, 1343(a) and 1367(a).  For the reasons set forth below, the motion will be granted.

## I.  STANDARD OF REVIEW

In adjudicating a motion for summary judgment, we apply the well-established legal standard presently set forth in Fed. R. Civ. P. 56(a), pursuant to which summary judgment shall be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ*., 585 F.3d 765, 771 (3d Cir.2009) (citation omitted), and a factual dispute is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49, 252 (1986).  Accordingly, in order for a claim to survive summary judgment, "there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff."  *Id.*  For purposes of Rule 56, we assume that the non-moving party's allegations are true and give the non-moving party the benefit of the doubt when those allegations conflict with the moving party's claims*.  Valhal Corp. v. Sullivan Assocs*., 44 F.3d 195, 200 (3d Cir.1995).  However, summary judgment must be entered against any party unable to present sufficient evidence in support of an essential element of a claim because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

With this standard in mind, we review the evidence of record.  Except as otherwise indicated, the following facts are undisputed.

## II.  BACKGROUND FACTS

A.    Events Leading to Brittany's Adoption

Brittany Legler first came into contact with OCY in 1998 when her biological family was referred to the agency for general neglect.  (Defs.' Ex. 24 [126][2] at ¶¶ 4-5.) In December of 1998, the case was assigned to Defendant Carol Gallagher, an ongoing services case worker for OCY.  (Id. at ¶ 6; Defs.' Ex. 9 [81] at pp. 2, 10.)[3]  Gallagher was supervised at the time by Defendant Cindra Vallone.  (Defs.' 9 [81] at pp. 2, 10; Ex. 24 [126] at ¶ 2.)

Initially, Brittany and her siblings were placed in the care of their biological father due to the fact that their mother had allowed a known perpetrator of sexual abuse to have access to the children.  (Defs.' Ex. 9 [81] at p. 30.)  However, the children were later removed from their father's care when concerns surfaced that the father himself might be committing sexual abuse.  (Defs.' Ex. 24 [126] at ¶¶ 7-14.)

Brittany was found to be a dependent child by the Erie County Court of Common

---

[2] Defendants' Exhibit # 24, the affidavit of Cindra Vallone, was originally submitted into the record as document # 96; however, the affidavit as originally submitted was not sworn, signed, and dated.  Defendants have since resubmitted Ms. Vallone's affidavit, in a format that conforms to the requirements of Fed. R. Civ. P. 56, as document # 126.

[3] All page citations supplied herein refer to the official court pagination located in the header of the designated document rather than the pagination used internally within the cited documents.

Pleas and detained at a foster home placement because of a finding of neglect, excessive truancy, and lack of supervision, exposure to known sexual perpetrators, and possible sexual abuse.  Her placement into foster care occurred on April 12, 1999. (Defs.' Ex. 24 [126] at ¶ 7; Defs.' Ex. 9 [81] at p. 6.)

In July of 1999, Brittany began receiving counseling services through the Sexual Abuse Initiative Program run by Family Services of Northwest Pennsylvania.  At that time, it was reported that Brittany was developmentally delayed, had a history of sexual abuse, and had been in the presence of a known perpetrator when in her mother's care.  In her foster care placement she was displaying aggressive and manipulative behavior and was having difficulty understanding personal safety issues.  (Defs.' Ex. 19 [91] at p. 1.)

Over the course of the ensuing months, Brittany disclosed to Gallagher that she didn't want to live with her father and his girlfriend, stating that the girlfriend was "mean" and "locks them out of the house" (Defs.' Ex. 24 [126] at ¶ 8.)  Eventually, Brittany further disclosed that she had suffered sexual abuse at the hands of her father and his girlfriend, which resulted in the matter being taken up by law enforcement authorities. (*Id*. at ¶¶ 9-14.)

Brittany continued to reside in foster care from April 1999 to May 2000.  Although she suffered no major problems in that setting, a decision was made to find a permanent placement for Brittany, as her foster family was not interested or able to make a commitment to adopt.  (Defs.' Ex. 9 [81] at pp. 6-8.)

Meanwhile, Brittany's biological mother had been residing with several of Brittany's younger siblings at the Mercy Center for Women, where she received

counseling and other services designed to prepare her for a return to independent living.  As the end of the 1999-2000 school year approached, it remained OCY's goal to eventually reunify Brittany with her biological mother.  (Defs.' Ex. 9 [81] at p. 8; Ex. 4 [76] at p. 2.)  During a May 2, 2000 court hearing, OCY requested another six-month period for purposes of maintaining the goal of reunifying Brittany with her mother.  In response, the juvenile court issued an order allowing OCY to proceed with a concurrent plan of attempting to find an alternative placement for Brittany while simultaneously pursuing the goal of reunification.  (Defs.' Ex. 9 [81] at pp. 8-9.)

At some point while Brittany was still in foster care, Lisa Iarussi was identified as a possible permanent placement source for Brittany.  Iarussi was a former classmate and friend of Brittany's mother, who had known Brittany since her infancy and had frequently cared for her.  (Defs.' Ex. 4 [76] at p. 2.)

In April of 2000, OCY contracted with Family Services of Northwestern Pennsylvania to perform a kinship family profile of Iarussi.  The profile was performed by Ann Badach, an adoption caseworker, and summarized in a report dated July 27, 2000.  (Defs.' Ex. 24 [126] at ¶ 15; Defs.' Ex. 4 [76].)

In the course of conducting her study, Badach had several contacts with Iarussi, including three interviews of Iarussi at her mobile home in Millcreek Township.  Badach reported that Iarussi was motivated to provide kinship care for Brittany partly because of the "close bond she has developed with Brittany over the years since her birth."  (Defs.' Ex. 4 [76] at p. 2.)

Badach's study involved obtaining Iarussi's biographical information, from which she learned that Iarussi had been diagnosed as a child with Attention Deficit Disorder

("ADD") and "'some type' of developmental delay" which had resulted in her receiving special education instruction during her grade school years.  (Defs.' Ex. 4 [76] at p. 4.) After dropping out of highschool and attending cosmetology school, Iarussi had become involved with a man whom she subsequently married at age 17.  This marriage, which Iarussi described as "very immature," lasted only a few months.  (*Id*. at p. 5.)  Following this break-up, Iarussi suffered a period of depression, which resolved successfully following a two-year period of treatment with Zoloft.  (*Id.* at p. 6.)

Iarussi subsequently became involved in a 12-year relationship with an individual who suffered from alcohol addiction and who subjected Iarussi to emotional and physical abuse, including one incident which had resulted in the individual being arrested and jailed overnight for physically beating her.  After quitting this relationship, Iarussi subsequently became involved with another man by whom she became pregnant.  This individual became addicted to crack cocaine and left Iarussi shortly after the birth of their daughter, Abigail (hereinafter, "Abby").  (Defs.' Ex. 4 [76] at p. 6.)

At the time of her study, Badach found that Iarussi was living alone in a 14 x 80 mobile home with Abby, who was then four-years old.  Iarussi was reportedly unable to hold steady employment due to her ADD but was receiving assistance in the form of food stamps, a monthly SSI check, and disability benefits for "ADD/Depression and a (untitled) Learning Disability."  (Defs.' Ex. 4 [76] at pp. 5, 7.)  Iarussi was also seeing a counselor at St. Vincent Behavioral Health in order to, as Badach described it, "assist her in steadying her sense of self-esteem and self-image due to years of suffering abuse in relationships."  (*Id*. at p. 5.)  According to the report, Iarussi had a supportive family and several close friends and felt her life was on a "solid footing."  (*Id*.)  She felt

6

proud of her accomplishments as a single parent and had set a personal goal of becoming self-sufficient, employed, and a homeowner within five years. (*Id*.)

As a parent, Iarussi was felt to display a responsible attitude. Badach described her parenting style as "fairly calm and stable" and reported that Iarussi enjoyed being a parent and had a close bond with her daughter Abby, whom she loved very much. (Defs.' Ex. 4 [76] at p. 6.) Badach found Abby to be a bright, cheerful, and inquisitive child who was fond of Brittany and enjoyed Brittany's company. (*Id*.) Iarussi advised Badach that her plan for caring for Brittany was to parent Brittany in the same way that she had parented Abby. (*Id*.)

As part of her study, Badach conducted clearance checks with the City of Erie Police Department, the Pennsylvania State Police, OCY, and the Pennsylvania Department of Public Welfare's ChildLine. None of these sources reported any negative information concerning Iarussi. In addition, Badach requested access to Iarussi's records from St. Vincent Behavioral Health. After initially agreeing to this request, Iarussi revoked her consent, citing the fact that she preferred to not allow disclosure of her patient records until she established a stronger, long-term bond with her counselor. (Defs.' Ex. 4 [76] at pp. 6-7.)

Badach's study also involved feedback from four references, all of whom expressed support for Iarussi's interest in providing kinship care for Brittany. (Defs.' Ex. 4 [76] at pp. 7-9.) One of the four references was Plaintiff Victoria L. Hayes, Iarussi's biological sister. In a written reference dated May 19, 2000, Hayes described Iarussi as "a lot of fun" and someone whose strengths included the fact that she "loves being around children[,] reading to them, caring for them[.] [A]ny child would benefit from her

7

care." (Defs.' Ex. 3 [75] at p. 1.)  As to Iarussi's weaknesses, Hayes wrote that, "Lisa

worries a lot [sic] which in this day & age you almost have no choice.  It's better to be a

worrier than not..." (*Id*.)  She described Iarussi's personality as "a very sweet girl.  She

would give you the world on a silver platter if she could.  She loves people & has many

friends." (*Id*.)  Hayes responded positively when asked whether she felt Iarussi would

be able to provide a good home for Brittany:  "[Lisa] is wonderful with children.  I have

six children of my own & everyone of them adore her.  She would take good care of any

child.  It's just her nature." (*Id*.)  Asked whether she had observed Iarussi with children,

Hayes wrote, "She is really good with children.  She listens alot [sic].  She can come

down to their level so that the child knows that she understands & cares." (*Id*. at p. 2.)

In commenting on Iarussi's experience or training, Hayes wrote, "I wouldn't say she has

alot [sic] of experience but her caring ways about her mean she'll do a great job &

children just attract to her..." (*Id*.)  She further commented:  "Lisa will make a wonderful

foster mother to Brittany.  They've always had a great relationship & I think Brittany

feels safe with Lisa.  Lisa will show her the best ways to get through life & keep out of

trouble." (*Id*.)  Asked whether she had any reservations about recommending her sister

as a care-giver, Hayes wrote, "I have no doubt in my mind that Lisa will be a terrific care

giver to any child.  Especially to Brittany[.]  [T]hey have already formed a close bond to

each other." (*Id*.)

A second individual who had been a neighbor and friend of Iarussi's for

approximately five years indicated that she felt "honored" to provide a reference for

Iarussi.  According to Badach, this source "described [Iarussi] as a person who displays

mature judgement [sic], initiative, and devotion to children" and reportedly knew Iarussi to be "a calm and effective planner who is considerate and understanding of others." (Defs.' Ex. 4 [76] at p. 8.)  This individual claimed to have no reservations about recommending Iarussi as a kinship caregiver; she "believe[d] that Lisa would be able to provide a good home for any child, as she has had Lisa care for her own seven-year-old on occasion."  (*Id*.)  In fact, this individual went to far as to say that she would recommend Iarussi over her own family members as a child care provider.  (*Id*.)

A third source who had known Iarussi for over ten years as a neighbor and a friend described her (in Badach's words) as "a very giving and caring person who is outgoing and mixes very well with all kinds of people."  (Defs.' Ex. 4 [76] at p. 8.)  This woman reported having no reservations about recommending Iarussi as a kinship care provider and believed that Iarussi would be able to provide a good home.  In addition, this individual claimed to have had occasion to observe Iarussi interacting with Brittany and reportedly "indicated that Lisa treats Brittany with the same kindness and respect that she does to her own daughter, Abby."  (*Id*.)

A fourth reference, who had been friends with Iarussi for three years, described her as a caring, loving, and sentimental person whose strengths were being able to relate well to children.  This source believed that Iarussi would be a very good kinship parent for Brittany and indicated that she would not hesitate to entrust her own children to Iarussi's care.  (Defs.' Ex. 4 [76] at pp. 8-9.)

Badach's report, dated July 27, 2000, reflects her own impression that Iarussi was a "committed caregiver of children" and someone who could provide the "stability and continuity" that Brittany would need.  (Defs.' Ex. 4 [76] at p.10.)  It was noted that

Iarussi had set a "lofty goal" in planning to be a self-sufficient homeowner within five

years, and Badach expressed concern that this goal might be too difficult for Iarussi to

meet, given her limited financial means.  "In addition," Badach noted,

> Lisa is very guarded about her personal life.  Initially, she was very
> agreeable to allow this worker access to her historical files with St. Vincent
> Behavioral Health, and, subsequently, her current counselor.  However,
> the day after signing consents, Ms. Iarussi phoned this agency and spoke
> to a colleague in an anxious tone, requesting she receive the signed
> consents to destroy – thereby denying access to any of her counseling
> records or therapists.  At her request, this worker did return the signed
> consent for Ms. Iarussi to destroy.  She indicated that she felt
> uncomfortable allowing access to information from "long ago" and also,
> most recent information from a (counseling) relationship that had barely
> begun to develop.  (She had, at the time of consent, only met with her
> counselor twice.)  Her cooperation was often shadowed by some sense of
> anxiety or distrust, which made some contents of her interviews rather
> difficult to attain.  The type and scope of her "learning disability" and
> subsequent ADD diagnosis, resulting in SSI and Social Security Disability,
> are still not totally clarified nor understood by this worker.

(*Id.*)  Nonetheless, Badach felt Iarussi's desire to care for Brittany was "certainly

authentic."  (*Id.*)  She also felt that Iarussi had managed very well as a single parent to

Abby, who was well-behaved, listened well, and showed her mother love and respect.

(*Id.*)

Badach summed up her evaluation and recommendation by noting that

Iarussi had "numerous strengths and abilities," *to wit*:

> She is caring, compassionate, and devoted to her own child and to the
> desire to care for Brittany full-time.  She is organized and structured in her
> environment and has a keen sense of responsibility as a homemaker and
> parent.  In addition, Lisa has a strong support network of family and
> friends who have offered to help her in a variety of ways, if necessary.
>
> Lisa and Brittany have known each other since Brittany was very young.
> Lisa has been her primary caregiver many times, for many days at a time.
> ...

(Defs.' Ex. 4 [76] at p. 11.)  Badach thought it would be beneficial for the family to have

continuous support services in place while Iarussi transitioned from a part-time to a full-time caregiver and parent. (*Id.*) "In addition," Badach noted, "as Lisa continues to explore her own personal issues with a therapist, it would be helpful to allow her an opportunity to work collectively with a professional in parenting a child with a known history of being a victim of abuse herself. It is hoped that Ms. Iarussi will not 'take on' the issues of Brittany upon herself as she works through her own history of abuse, as well." (*Id.*)

While Badach's study was in progress, OCY took steps to facilitate Brittany's placement with Iarussi on an interim basis. On June 9, 2000, Gallagher and Vallone filed a request with the juvenile court for permission to transfer Brittany into Iarussi's home pending the next permanency hearing, which was scheduled for the following November. In support of this request, Gallagher and Vallone stated that:

> Brittany ... has had several weekend visits at the home of her prospective caretaker, Lisa Iarussi, and the visits have been uneventful and positive for Brittany. The homestudy process has been completed and this placement is recommended. The homestudy report is not yet prepared in written form, but according to Ann Badach of Family Services, the Iarussi home will be approved. Brittany completes the school year on June 9, 2000, and the child and prospective caretaker desire immediate placement.

(Pls.' Appendix 1 [116-1] at p. 16 (emphasis added).) Copies of OCY's request were sent to the attorney representing Brittany's parents, as well as to Christine Jewell, Esq., Brittany's appointed guardian ad litem, and Sheila Baldwin, her Court Appointed Special Advocate (CASA). (*Id.*)

On June 13, 2000, Baldwin sent a letter to the juvenile court concurring with the request to place Brittany with Iarussi. Baldwin's only stated concern at that point was

that Brittany continue her counseling through the Sexual Abuse Initiative and that

Iarussi be included in the counseling so as to address safety concerns for Brittany.

Baldwin noted in her letter that, "[a]lthough there had been some concern about Ms.

Iarussi complying with this order, at this point in time she has agreed to do so."  (Defs.'

Ex. 6 [78] at p. 1.)

The juvenile court approved the placement request on June 15, 2000.  (Pls.' Ex.

Vol. 1 [116-1] at p. 15.)  At this point, Brittany left her foster care home and began living

with Iarussi on a full-time basis.

Following her placement with Iarussi, Brittany continued to receive various

"Wraparound" services coordinated through the Sexual Abuse Initiative ("SAI") of

Family Services of Northwestern Pennsylvania.  This Behavioral Health Rehabilitative

Services Team – informally referred to as the "Wraparound Team" – included Danielle

Szklenski, Supervisor of the SAI, who also served as the team facilitator.  Additional

members of Brittany's team included, among others, Defendant Gallagher, Ann

Badach, Sheila Baldwin, representatives from the Mental Retardation Base Services

Unit, a child specialist from the Mercy Center, Therapeutic Staff Support (TSS) workers

providing behavioral support services to Brittany and, generally, any other case worker,

therapist, psychologist, or other service provider working with Brittany and/or her

biological family.  (See Defs.' Ex. 17 [89] at pp. 2-8; Defs.' Ex. 18 [90] at pp. 1-5.)  The

purpose of the team was to provide a multi-disciplinary, collaborative approach to the

various coordinated interventions that Brittany and her family were receiving.  (Defs.'

Ex. 17 [89] at pp. 6-8.)

During the time period June 2000 through May of 2001, while Brittany was living

12

with Iarussi but prior to her adoption, there were various discussions among the Wraparound Team members regarding Brittany's progress.  (Defs.' Ex. 17 [89] at p. 12.)  On some occasions, Brittany's biological mother, her maternal grandmother, and Iarussi were present, along with the team members.  (*Id*. at pp. 12-14;  Defs.' Ex. 18 [90] at pp. 1-5.)  Reports from the team meetings suggest that a degree of conflict developed between Iarussi and Brittany's mother over matters of visitation and perceived criticisms by Iarussi concerning the choices and actions of Brittany's mother.

One such incident was noted at an August 30, 2000 meeting of the Wraparound Team.  (*See* Defs.' Ex. 18 [90].)  As of that date, Brittany was seeing her mother and siblings twice a month through prearranged visits.  (*Id*. at p. 1.)  She had just started the school year and was reportedly doing well.  (*Id*. at p. 2.)  However, some two weeks earlier a disagreement had arisen when, at the start of a prescheduled visit between Brittany and her mother, Iarussi had requested that Brittany return early in order to attend a family picnic.  That day happened to be the mother's birthday and, wanting Brittany to stay for her entire allotted visitation time, Brittany's mother refused the request.  (*Id*. at pp. 1-2.)  Gallagher and Szklenski agreed that the visits should occur on the pre-scheduled dates and times unless an agreement to do otherwise were reached in advance.  There was also a request by Brittany's mother to have more regular phone contact with Brittany, which she claimed was not occurring.  (*Id*. at p. 2.)  Other discussions centered around Brittany's mother's finances, her improved interaction with her children, and her goal of obtaining independent, safe housing.  (*Id.* at p. 4.)

On September 20, 2000, the Wraparound Team met again, this time with both Iarussi and Brittany's mother present.  It was noted that Brittany was enrolled in the sixth grade life skills classes at her new school and she had not engaged in any sexualized behaviors over the past several weeks.  The team identified numerous "strengths" in Brittany -- namely, that she was cute and friendly, she liked spending time with her mother and siblings, she interacted well with other children, she was loving and caring and enjoyed school, she loved Iarussi's daughter Abby, she had participated in various summer outings and activities, and she enjoyed math and gym and riding her bike.  The team also noted that "[c]urrently, a great deal of tension ha[d] been mounting" between Brittany's mother and Iarussi, and it centered around Iarussi limiting contact between Brittany and her mother.  (Defs.' Ex. 20 [92] at p. 1.)

One week later, the Team reassembled and generated a progress update. Brittany's mother and Iarussi were both present, once again, for the team meeting.  At this September 27, 2000 meeting, Iarussi apologized for being critical of Brittany's mother and indicated a willingness to allow Brittany contact with her mother outside of her own home.  Brittany's mother was slow to accept the apology and expressed a distrust of Iarussi and a continued interest in being reunited with Brittany.  Defendant Gallagher cautioned, however, based on discussions with Defendant Vallone, that if reunification were to occur and then subsequently fail, Brittany's mother could end up losing all four children.  Both Iarussi and Brittany's mother agreed to the team's recommendation to resolve their conflict by attending counseling with an independent psychologist.  (Defs.' Ex. 21 [93].)

On October 16, 2000, Danielle Szklenski submitted a summary of Brittany's

14

status to the juvenile court.  (*See* Defs.' Ex. 19 [91].)  Szklenski noted that Brittany was residing in a well-kept mobile home with Iarussi and her daughter Abby and that Brittany was succeeding socially and academically at school.  Brittany's diagnosis, reviewed as of September 20, 2000 by Martha Eichenlaub, a licensed psychologist, was ADHD, Sexual Abuse of a Child, and Mental Retardation.  She had completed counseling at Rape Crisis of Erie County and was seeing her mother and four siblings twice monthly at the Mercy Center for Women.

In her summary report, Szklenski noted the "strengths" that the team had identified for Brittany at its September 20, 2000 meeting, adding also that Brittany "has two women ([her mother and Iarussi]) who both love her very much."  (*See* Defs.' Ex. 19 [91] at p. 2.)  Szklenski also discussed Brittany's various needs, including the need to define and make permanent a long-range plan regarding residency, the need for Iarussi to formalize a safety plan to prevent sexual touching of Abby by Brittany, and the need for Iarussi and Brittany's mother to resolve their conflicts and minimize hostility so as to ease the tension this was creating for Brittany.  Szklenski noted that she had not yet explored Brittany's prior trauma, as Brittany seemed anxious about the uncertainty of her future and the focus thus far had been on stabilization.  (*Id.*)

With regard to her current living situation, Szklenski reported,

It seems that Brittany feels very connected to the Iarussi family.  In fact, when asked to draw a picture of her family, she first drew Lisa and Abby, whom she has recently begun to refer to as "mom" and "sister," respectively.  Brittany later added her biological siblings and grandparents to the picture and, finally, added her mother after I encouraged her to add anyone who was missing.  It should be noted that Lisa [Iarussi] was present during this activity.

(*See* Defs.' Ex. 19 [91] at p. 3.)

15

Szklenski also reported on the tension that had built between Brittany's mother

and Iarussi relative to Brittany's custodial arrangement:

It seems that Brittany is experiencing loyalty conflicts related to the hostility and conflict that has existed between Lisa Iarussi and [her biological mother].  On two occasions reported to this worker, Brittany looked to Lisa for "permission" to greet her mother and has been reluctant to interact with her mother in Lisa's presence.  However, when this worker has observed Brittany during her family visits at the Mercy Center, Brittany has shown no hesitation in interacting with [her mother] or [her siblings] and, in fact, expresses disappointment when the visits come to an end and she has to return to Ms. Iarussi's.

The hostility between [Brittany's mother] and Lisa seems to have historical roots.  [Mother's] friend from high school, Lisa reports anger with [Brittany's mother] over the bad parenting choices she's made and their impact on her children.  Lisa reports attempting to influence [Brittany's mother] to make better choices.  Further, Lisa reports feeling used by [Brittany's mother] to care for Brittany off and on since she was an infant, with no monetary support.  Initially, Lisa reported to this worker that she wanted to adopt Brittany and, after it was final, she would not permit Brittany to have contact with [her mother].

[Brittany's mother] reported feeling betrayed by her friend, Lisa, as Lisa continued to loudly criticize [her] and her past mistakes to workers involved.  She felt that Lisa was not recognizing the positive changes she has made in her life.  [Brittany's mother] reported that Lisa offered to care for Brittany many times in the past and that Brittany was not constantly forced on her.  [Brittany's mother] feared that Lisa was taking her daughter from her as Lisa attempted to shorten Brittany's visits with [her biological family].  [Brittany's mother] began to worry that if adopted by Lisa, Brittany would be out of her life forever.  This fear has prompted [Brittany's mother] to be even more determined to have Brittany returned to her care.

The Child & Family Team arranged for private counseling for Lisa and [Brittany's mother], by [a] licensed psychologist, to address their conflict and to help them create a plan for Brittany's care to be presented to the team and to the court.  Through these sessions and through their efforts to mend the relationship, the two women are now interacting with each other more positively.  Lisa reports agreeing to continue Brittany's visits with her biological family even if she adopts her.  [Brittany's mother] seems pleased with this but is reluctant to trust in this completely.  She continues to want Brittany returned to her care, despite the promise of continued contact.  [Brittany's mother] reports it has always been her goal

to have all of her children returned to her. ...

(Defs.' Ex. 19 [91] at pp. 3-4.)  Brittany's mother appeared to be more comfortable with the custodial arrangement of one of her other children, who had been placed with a family member.  Because that placement involved a family relation, Brittany's mother felt she had greater access to her child and trusted that she would be portrayed more favorably to her children.  (*Id*. at p. 4.)

Although Szklenski did not feel it was her role to make a placement recommendation, she enumerated several reasons for the court to consider reunifying Brittany with her mother, as well as several reasons for it to consider involuntary termination of parental rights and adoption by Iarussi.  With respect to reunification, Szklenski noted:

1.      [Brittany's mother] has complied with her service plan, and attended all scheduled sessions.

2.      While continued work is needed and is occurring, [Mother] has made tremendous gains in parenting three children, with TSS support, while living at the Mercy Center for Women.

3.      [Mother] has saved over $1,000, at this writing, to be used toward establishing independent living.

4.      [Mother] is moving toward securing an independent residence with a target date of January 2001.

5.      [Mother] is open to continued involvement with case management, Wraparound services and TSS support to assist, as needed, outside of the Mercy Center.

6.      [Mother] has paid down a significant portion of her previous debt and if she continues as scheduled, will have no debt at the time she leaves the Mercy Center in January 2001.

7.      [Mother] has not been afforded the opportunity to attempt to parent four

children at her present skill level.

8.      [Mother] wants Brittany returned to her care.

9.      The Mercy Center is willing to have Brittany move in, if the court approves.

10.     [Mother] has improved her assertiveness skills, which was a risk factor contributing to her children's previous abuse.

11.     Brittany will have the opportunity to be raised by her mother and to strengthen her relationship with her mother.

12.     Brittany will have the opportunity to grow up with three of her biological siblings.

13.     Brittany is a cooperative child who is not difficult to manage.

14.     [Mother] has agreed to allow Brittany to continue contact with Ms[.] Iarussi, at Ms. Iarussi's request.  It should be noted that Ms. Iarussi has stated that she wants no contact with Brittany if she cannot adopt her, as it would be difficult for her (Ms. Iarussi) emotionally.

(*See* Defs.' Ex. 19 [91] at p. 4.)

Szklenski offered the following reasons for the court to consider the involuntary

termination of parental rights and adoption by Iarussi:

1.      [Brittany's mother] may not be able to care for four children safely and successfully, once outside of the supportive structure of the Mercy Center.

2.      Due to Brittany's easy and compliant nature, her needs may be overlooked by [Mother] due to the challenge and demand of caring for three other children[,] two of whom ... have behavior problems.

3.      Brittany... is safe and secure in the home of Ms. Iarussi and her daughter, Abby.

4.      Ms. Iarussi and Brittany appear to share a strong emotional connection that originated when Brittany was an infant.

5.      Brittany has reported a desire to continue to live with Ms. Iarussi and her daughter.

18

6.     Ms. Iarussi has expressed a willingness to continue counseling services for Brittany, if she adopts her.

7.     Ms. Iarussi has agreed to allow Brittany to visit with her biological family, if she adopts her.

(*See* Defs.' Ex. 19 [91] at p. 5.)

On November 3, 2000, Brittany was referred to Donna Ziegler, Ph.D., for a psychological consultation due to questions concerning what disposition and/or placement options would best meet her emotional needs – specifically, whether Brittany should remain in her placement with Lisa Iarussi or be returned to the care of her mother.  (Def.'s Ex. 25 [97] at pp. 2-3; Ex. 26 [98] at p. 1.)  When questioned as to why she preferred to remain with Iarussi, Brittany replied that "she takes care of me" and that "she loves me."  (Defs.' Ex. 25 [97] at pp. 10-12; Ex. 26 [98] at p. 2.)  When asked why she would not prefer to return to her mother, Brittany responded that "she got to take care of those two" and "she needs to get out of the Mercy.  She's trying as hard as she can to get on her feet."  (Defs.' Ex. 26 [98] at p. 2.)  During the interview Brittany spontaneously mentioned that "she [Iarussi] keep us safe.  She take care of us and feed us.  She make me take a shower every night and Abby, 'cause Lisa keep us safe to not touch anybody.  Keep our hands to our self."  (Ex. 26 [98] at p. 3.)  When queried about what she meant by "safe," Brittany responded with "no bad stuff."  (*Id*.)  When asked whether any "bad stuff" had ever happened at her mother's house, Brittany nodded affirmatively but then quickly changed the subject.  (*Id*.)  Dr. Ziegler considered it significant that Brittany had been taught to keep her hands to herself and that Brittany viewed this as part of Iarussi "taking care of" her; to Dr. Ziegler, these comments were

19

reflective of Brittany's treatment for past victimization "and Lisa keeping some tabs on that." (Ex. 25 [97] at pp. 15-16.) Brittany demonstrated feelings of closeness to Abby by drawing a picture of Abby alongside herself when asked to create a self-portrait. (*Id.* at p. 18.)

In eliciting responses from Brittany, Dr. Ziegler felt that Brittany's comments were authentic and not the result of coaching. (Defs.' Ex. 25 [97] at p. 12.) She noted that Brittany seemed to be experiencing anxiety about at a court hearing that was scheduled for later that day, especially the possibility of seeing her father there. (Defs.' Ex. 25 [97] at p. 14; Ex. 26 [98] at p. 3.) When asked about what the judge might say at the hearing, Brittany responded, "[I]f my mom get me back or if Lisa get me. I don't want to go back to my mom. I'll probably watch [my younger siblings]. I'm only eleven." (Ex. 26 [98] at p. 3.) Dr. Ziegler interpreted this as "an apparent reference to the expectation that she would be responsible in some ways for younger siblings, and her awareness that this expectation was excessive for her at her age." (*Id.*) Although Brittany expressed sadness at the idea of losing contact with her biological siblings in the event she were adopted by Iarussi, she never expressed a desire to live with her mother and, in fact, Dr. Ziegler concluded that the opposite was true. (Pls.' Ex. Vol. 1 [116-1] at p. 26.)

Psychological testing revealed that Brittany demonstrated clinically significant levels of depression, negative mood, interpersonal problems, feelings of ineffectiveness and anhedonia. (Defs.' Ex. 26 [98] at pp. 3-4.) In Dr. Ziegler's view, the depression was likely a result of Brittany's psychosocial stressors, including apprehension about the potential outcome of the pending court hearing, the fact that she might encounter

her father there, the fact that she might be returned to her mother, and concern that she might be separated from Abby and Iarussi.  (*Id.* at p. 4; Ex. 25 [97] at p. 27.)

In spite of this, however, Dr. Ziegler felt that Brittany was well adjusted considering her significant history of sexual abuse and chronic neglect.  (Defs.' Ex. 26 [98] at p. 4.)  On the whole, she presented a solid, positive self-esteem and no greater preoccupation with sexual issues than would be expected in light of her history.  She was able to verbalize her preferences and support them with very relevant needs and perceptions based upon her own security and safety issues.  It was felt that Brittany "clearly associate[d] a return to her mother's care with high expectations that are not appropriate for her, i.e., for care and supervision of her younger siblings."  (Defs.' Ex. 26 [98] at p. 4; see also Ex. 25 [97] at pp. 21-24.)

Dr. Ziegler concluded by making the following recommendations:

1.      Continued placement in the current foster care/ adoptive kinship home is highly recommended.  I believe that Brittany has adequate insight into her own needs and motives at this point in time and that she also recognizes her safety and security needs are currently being met in this placement.  Additionally, she clearly stated that she does not want to return to the care of her mother.

I believe Brittany's level of adjustment in this home and in school are further indicators of the appropriateness of this placement.

2.      A psychiatric evaluation is recommended to consider anti-depressant medication.

3.      It is recommended that Brittany participate in a regimen of art therapy to assist in working through the psychological issues surrounding the history of abuse, the reason for her out-of-home placement, and the likely termination of material rights.

4.      It is highly recommended that dispositional decision include the possibility of continuing supervised visits with the biological siblings.

(Defs.' Ex. 26 [98] at pp. 4-5.)  In making these recommendations, Dr. Ziegler was never asked to interview Iarussi or review any her personal records.  Dr. Ziegler viewed her role not as one where she was making an assessment of Iarussi's fitness to parent; rather she viewed her role as being an independent evaluator and advocate for Brittany. (Pls.' Ex. Vol. 1 [116-1] at pp. 34-35.)

On November 3, 2000, the same day that Brittany was evaluated by Dr. Ziegler, the juvenile court held a hearing to consider whether the parental rights of Brittany's biological parents should be involuntarily terminated and/or whether Brittany should continue permanently in the care of Iarussi.  At the hearing, OCY took the position that it was in Brittany's best interest to terminate parent rights and to proceed toward adoption by Iarussi.  However, in a report submitted by OCY at the November 3 hearing, the Agency candidly advised the court that members of the Wraparound Team disagreed with this plan.  In relevant part, this report, as read into the present record, stated as follows:

> Although the Agency believes that it is in the best interest of Brittany to file a petition to terminate parental rights and to proceed with the adoption of Brittany by Ms. Iarussi, pending administrative and legal review and approval, the Agency is also obligated to inform the court of Ms. Kris Petulla and the members of the wrap team's disagreement with this permanency plan.
>
> Members of the wrap team believe mother should be given the opportunity to parent Brittany based on her progress at the Mercy Center. The progress is well documented in the reports submitted by Danielle Szklenski, supervisor of the Sexual Abuse Initiative.  The Agency acknowledges the current level of progress made by mother and the fact that she cares deeply for Brittany.  The Agency is deeply concerned with mother's success.

(Defs.' Ex. 9 [81] at p. 31-32.)  OCY's concerns about reunifying Brittany with her

22

mother appear to have stemmed from the fact that Brittany's mother was mentally challenged and had a history of making bad decisions.  (*Id.* at 42.)

Those present at hearing and, thus, privy to the Wraparound Team's objections, included not only the juvenile court judge but also Brittany's CASA (Baldwin), her guardian ad litem, her natural parents, and their attorney. (Defs.' Ex. 9 [81] at pp. 30-34.)  In fact, an objection was raised at the hearing by counsel for Brittany's mother concerning Brittany's continued placement with Iarussi, as Brittany's mother still wanted to be reunified with her daughter.  There was also talk during the November 3, 2000 hearing concerning whether another family that had already adopted one or two of Brittany's siblings might want to take Brittany in.  (Defs.' Ex. 9 [81] at p. 38.)  Although the details of that discussion are not part of this record, it appears that neither OCY nor Baldwin considered this to be in Brittany's best interest.  (*Id.* at pp. 38-39; Defs.' Ex. 6 [78] at p. 6.)  Ultimately, the court deferred making a ruling at the November 3 hearing pending the receipt of Dr. Ziegler's written report.  (Defs.' Ex. 9 [81] at pp. 34-35.)

Following the completion of Dr. Ziegler's report on November 16, the juvenile court entered an order, dated November 21, 2000, in which it found the following with respect to Brittany:

> A.   Placement continues to be necessary and appropriate
>
> ***
>
> D.   Living in the home of a parent or another root relative is contrary to the welfare of the child, removal from the home of a parent or another relative is in the child's best interests, and reasonable efforts have been made, as fully set forth on the record.
>
> E.   The appropriate and feasible placement goal for the child is adoption.

F.      The child is safe.

(Defs.' Ex. 24 [126] at ¶ 29.)

The following day, Baldwin issued a letter to the court in which she expressed

support for OCY's permanency plan.  In her letter, Baldwin represented that "Brittany is

thriving in the home of Lisa Iarussi and she clearly states that this is where she wishes

to remain."  (Defs.' 6 [78] at p. 5.)  Baldwin further remarked that the permanency plan

was not "haphazard"; rather, "a lot of thought and preparation ha[d] gone into making it

a successful placement for Brittany," and, moreover, "[t]he professional service

providers who [were] working with [Brittany's] family [were] also in support of it."  (*Id.*)

Copies of the letter were ostensibly sent to Gallagher and Brittany's guardian ad litem,

as well as the attorney representing Brittany's mother.

Baldwin corresponded with the court again on December 12, 2000 to reiterate

her support for OCY's permanency plan.  Elaborating, Baldwin wrote:

> The plan for Brittany to eventually be adopted by Lisa Iarussi was carefully made
> with Brittany's best interests foremost in mind.  Ms. Iarussi has been a constant,
> safe, stable source in Brittany's life.  Ms. Iarussi and her daughter have been a
> family to Brittany.  [Brittany's mother] recommended Ms. Iarussi as a possibility
> for permanent placement a year and a half ago.

(Defs. Ex. 6 [78] at p. 6.)

The letter went on to address the suggestion, apparently raised by counsel for

Brittany's mother at the November 3, 2000 hearing, that an alternative placement

resource might exist for Brittany.  Although Baldwin considered this alternative resource

to be "a very generous person who sincerely wants to help in any way that she can,"

Baldwin noted that a Family Preservation Specialist had worked with that family for six

months and did not recommend that Brittany be placed with them, as the family had

24

already taken in two of Brittany's siblings as well as their own adult daughter and her son.  (Defs. Ex. 6 [78] at p. 6.)  Although she felt "sure they would all be loving to Brittany," Baldwin recommended against placing Brittany with this family because they lacked the space for another child and the arrangement, Baldwin felt, would not be in Brittany's bests interests.  (*Id*.)  Baldwin concluded:

> Brittany is emotionally bonded to the Iarussis.  She is being lovingly cared for.  I am sure Brittany could adjust to another situation, but I think a move would be emotionally harmful to her.  Brittany's interests are best served in the Iarussi home.

(*Id*.)  Both Gallagher and Brittany's guardian ad litem were copied on this letter.  (*Id*.)

During the latter part of 2000, when, as Szklenski put it, "things were coming to a head in terms of whether or not the recommendation was going to be for Brittany to return to her mother or for rights to be terminated," (Pls.' Ex. Vol. 1 [116-1] at p. 38), Szklenski observed that Iarussi was becoming increasingly "agitated ... [a]bout the possibility of losing Brittany."  (*Id.*)  Specifically, Szklenski and Iarussi had some conversations around this time during which Iarussi yelled and expressed anger over what she perceived to be a lack of support for her efforts to become Brittany's caregiver.  (*Id*.)  According to Szklenski, Iarussi also expressed her feeling that "perhaps she should just give Brittany back, because it would be so damaging to her emotionally if she lost Brittany, if Brittany didn't live with her."  (*Id*.)  This agitation, which was continuing to be expressed in an ongoing basis, led to some concerns on Szklenski's part about Iarussi's emotional stability.  (*Id*. at 37-39.)  Szklenski was also aware that Iarussi, in connection with Badach's kinship care study, had revoked her consent relative to the release of her records from St. Vincent Behavioral Health.  (Pls.'

Ex. Vol. 1 [116-1] at p. 47.)

Accordingly, at some point in January or February of 2001, Szklenski contacted Gallagher to "suggest that perhaps they should consider a psychological or a psychiatric eval[uation] for Lisa, because of her instability."  (Pls.' Ex. Vol. 1 [116-1] at p. 41; *see id.* at 37, 39.)  In light of Iarussi's revocation of consent relative to her mental health records, it was Szklenski's belief that "perhaps an evaluation would clarify some things."  (*Id*. at p. 47.)  Gallagher informed Szklenski that she would discuss the matter with her supervisor, Defendant Vallone.  (Pls.' Ex. Vol. 1 [116-1] at pp. 40, 43.)

Several weeks later, Szklenski contacted Gallagher again to inquire whether OCY had considered her suggestion about a psychological or psychiatric evaluation. (Pls.' Ex. Vol. 1 [116-1] at pp. 41.)  According to Szklenski, Gallagher inquired, either directly or indirectly, whether Szklenski felt that Brittany was at risk of physical abuse or in danger in Iarussi's home, and Szklenski indicated that she did not believe so.  (Defs.' Ex. 17 [89] at pp. 49-50; *see also id.* at pp. 52-53; 64.)  Gallagher also communicated to Szklenski that, "if [she] felt, or anyone felt, that Brittany were in physical danger, that [OCY] would certainly act on that."  (*Id*. at 50-51; *see also id.* at p. 54.)  Accordingly, the issue of a psychological evaluation was not pursued further because "it was felt that [an evaluation] was not warranted."  (*Id*.; Defs.' Ex. 17 [89] at p. 48.)

On March 6, 2001, Brittany's parents voluntarily relinquished their parental rights with respect to her, thus clearing the way for her adoption by Iarussi.  (Pls.' Ex. Vol. 2 [116-2] at p. 16.)  After this development, according to Szklenski, things seemed to settle down and her concerns over Iarussi's emotional stability began to diminish. (Defs.' Ex. 17 [89] at pp. 58, 61-62.)

26

In April of 2001 Brittany's case was transferred from Gallagher to Defendant Michael Hughes.  (Defs.' Ex. 9 [81] at p. 4.)  At this point in time, according to Hughes, the decision had already been made by OCY to pursue permanent adoption by Iarussi and Hughes' responsibilities included monitoring her case for the few months preceding the adoption and getting all the final paperwork in order.  (Defs.' Ex. 13 [85] at p. 2.)  During this time Hughes met with Brittany and Iarussi on a monthly basis at Iarussi's home to discuss adoption issues.  (*Id*. at pp. 7-8.)  Hughes also supervised a final visit between Brittany and her biological family approximately one month before the adoption.  (*Id*. at p. 7.)

The following month, the juvenile court held another permanency hearing.  On May 7, 2001, the court entered an order finding, among other things, that:

> A.    Placement continues to be necessary and appropriate
>
> ***
>
> D.    Living in the home of a parent or another root relative is contrary to the welfare of the child, removal from the home of a parent or another relative is in the child's best interests, and reasonable efforts have been made, as fully set forth on the record.
>
> E.    The appropriate and feasible placement goal for the child is adoption.
>
> F.    The child is safe.

(Defs.' Ex. 24 [126] at ¶ 30.)

On July 31, 2001, the orphan's court issued an order setting the adoption hearing for August 22, 2001.  (Pls.' Ex. Vol. 2 [116-2] at p. 32.)  The order directed that "[a] home study shall be performed and submitted to verify the statements of the [adoption] Petition and to provide such other facts as will give the Court full knowledge

of the desirability of the proposed adoption."  (*Id.*)  In addition, the order directed that

"[a] Child Line Clearance and Pennsylvania State Police Criminal Record Check shall

be submitted to the Court no later than the time of the scheduled hearing..."  (*Id.*)

There is no documentation in the present record to confirm whether these measures

were undertaken.  According to Hughes, home studies generally have to be updated

every year, at least for Child Line and criminal history clearances, or if there are

changes with respect to medical or financial concerns.  (Defs.' Ex. 13 [85] at p. 4.)

In any event, the orphan's court approved Iarussi's adoption of Brittany on

August 22, 2001.  (Pls.' Ex. Vol. 2 [116-2].)  At the hearing, Hughes appeared on behalf

of OCY in his capacity as Brittany's caseworker and recommended that the court

approve the adoption.  (*Id.* at p. 14.)  He certified to the court that OCY Iarussi had

been provided OCY's full file concerning Brittany's medical history and social history.

(*Id.* at p. 17.)  Hughes further testified that Brittany had no particular physical,

emotional, or social difficulties and that she was "basically a normal, healthy child,"

although he also acknowledged that she had been diagnosed as mentally retarded and

was receiving social security disability benefits.  (*Id.* at p. 18.)

Iarussi also testified at the hearing.  She represented to the court that she was a

homemaker with no employment but that she had the financial means to support

Brittany.  (Pls.' Ex. Vol. 2 [116-2] at pp. 21-22.)   She acknowledged that Brittany was

receiving social security benefits and that the adoption was a permanent arrangement.

(*Id.* at p. 22.)  She agreed that she had received all of OCY's medical and social history

records and that it was her desire to adopt Brittany.  (*Id.* at 22, 25.)  She denied being

induced, forced or pressured by anyone to enter into the adoption and agreed that it was a knowing and voluntary decision on her part.  (*Id*. at pp. 25-26.)

As the foregoing events demonstrate, there were many individuals who had contact with Brittany, her biological family, and/or her prospective adoptive family between April 22, 1999, when she was declared a dependent, to August 22, 2001, when she was finally adopted by Iarussi.  The record includes deposition testimony from many of these individuals.

*Sheila Baldwin*

One such person was Baldwin, who served as a CASA for Brittany and her biological siblings.  (Defs.' Ex. 5 [77] at 10.)  She was specifically assigned to Brittany's case from April 22, 1999 to May 7, 2001.  (*Id*. at pp. 2-3, 10-12.)  As the CASA, Baldwin had access to all of Brittany's court, medical, and school records.  (*Id*. at pp. 4, 20.)  In the course of her duties, Baldwin sometimes spent 20 to 25 hours per week working on Brittany's case.  (*Id*. at pp. 6, 20.)  She reviewed all of the records on file at OCY concerning Brittany's family, attended doctors' appointments with Brittany and her siblings, and also visited the psychologist's office.  (*Id*.)  At times she spoke with health care providers; sometimes she simply reviewed their charts.  (*Id*. at p. 6.)  Because Baldwin was part of the Wraparound Team, she also had access to all of the team's records.  (*Id*. at pp. 8-9; Defs.' Ex. 17 [89] at pp. 14-16.)   After Iarussi was identified as a possible placement source for Brittany, Baldwin became acquainted with her through

various meetings, such as family visits and Wraparound Team meetings. (Defs.' Ex. 5 [77] at p.8.) During the course of her appointment as CASA, Baldwin had numerous occasions to observe Brittany and to discuss with her how she felt and how she was doing, both in school and in Iarussi's home. (*Id*. at pp. 9-10.)

As CASA, it was Baldwin's duty to act as the child's voice in court and report to the court concerning what she believed to be in Brittany's best interests. (Defs.' Ex. 5 [77] at p. 4.) At no point during her service as CASA did Baldwin believe that Brittany was at risk for physical harm within Iarussi's home. (*Id*. at pp. 21-22.) Quite to the contrary, Baldwin consistently supported Brittany's placement there, as is evident from the letters she wrote to the juvenile court. Moreover, Baldwin could not recall anyone on the Wraparound Team ever raising concerns for Brittany's safety in the Iarussi home, nor did she recall Brittany's biological mother raising such concerns. (*Id*. at p. 22.)

Baldwin stated at her deposition that she could not recall being informed about Iarussi's refusal to allow the release of her mental health treatment records and she denied having seen Badach's kinship care profile on Iarussi. (Pls.' Ex. Vol. 1 [116-1] at pp. 30, 32.) Although she could understand why some people are reluctant to sign consents concerning their mental health treatment, due to the stigma surrounding mental illness, Baldwin felt that a person seeking to adopt a child should sign those consents. (*Id*. at 31.) While she felt that Badach's study contained important information, she was not sure that she would have included any of that information in her own report to the juvenile court. (*Id*. at 32.)

30

*Danielle Szklenski*

Another individual who had substantial contact with Brittany during this time was Szklenski.  Szklenski provided ongoing services to Brittany from 1999 until May of 2001 through the Sexual Abuse Initiative.  In addition, Szklenski was the facilitator of the Wraparound Team that was providing coordinated intervention for Brittany and her biological family.  In these capacities, Szklenski had frequent contact with Brittany, sometimes on a weekly basis.  (Defs.' Ex. 17 [89] at pp. 2-12.)  Between June of 2000, when Brittany began living with Iarussi on a full-time basis, and May 2001, when Szklenski's involvement ended, there were several team meetings which included discussions about Brittany's placement in the Iarussi home.  (*Id.* at pp. 10, 12.)

Szklenski noted that, during this period, Brittany was progressing well academically and socially at her middle school.  (Ex. 17 [89] at p. 24.)  No concerns were raised by Brittany's counselors at Rape Crisis about her physical or emotional safety while living with Iarussi.  (*Id*. at pp. 26-27.)  In fact, no issues were identified by anyone at the team meetings concerning the placement with Iarussi itself.  (*Id.* at pp. 28-29.)  Nor were any concerns about Brittany's safety in the Iarussi home raised by the court, Brittany's CASA, Brittany's guardian ad litem, or the lawyer representing Brittany's parents.  (*Id*. at pp. 36-37.)  Notably, Szklenski herself did not believe Brittany to be physically at risk in Iarussi's home.  (*Id*. at p. 30.)  In fact, in her October 2000 court summary, Szklenski opined that Brittany was "safe and secure" with Iarussi.  This opinion was based on Szklenski's own experience in providing safety services to Brittany; it was also partly informed by a psychological evaluation performed by Martha

31

Eichenlaub as well as by Brittany's interactions with other professionals on the team. (*Id*. at 38-40.)

Though Szklenski did feel that the developing conflict between Brittany's mother and Iarussi might be emotionally detrimental to Brittany, Szklenski did not necessarily consider this situation to be unsafe or abusive, and she noted in her court summary that the two women had undertaken counseling to improve their relationship. (Ex. 17 [89] at 30-32.) In addition, Szklenski's concerns about Iarussi's emotional stability (which had led Szklenski to inquire in early 2001 about whether Iarussi should undergo a psychological evaluation) began to diminish, particularly after the issue of parental rights was resolved and the case moved toward adoption. (*Id*. at 58, 60-62.) At no point following her October 2000 court summary did Szklenski feel the need to contact the court, or any of the lawyers, in order to express concerns about Brittany's placement with Iarussi. (*Id*. at p. 42; Pls.' Ex. Vol. 1 [116-1] at p. 39.) At no point during her involvement with Brittany, even when Iarussi appeared angry and agitated, did Szklenski feel that Brittany was at risk of physical harm in Iarussi's home. (Defs.' Ex. 17 [89] at pp. 50, 54.)

*Sherry Lacey*

Sherry Lacey was another individual who had contact with Brittany through the Wraparound Team. As a Supports Coordinator for the Mental Retardation Base Service Unit, it was Lacey's job to ensure that Brittany and her family were introduced to the appropriate mental retardation and mental health services available in the community. (Defs.' Ex. 14 [86] at p. 4.) Although Lacey recalled some team meetings

where members discussed the possibility of Brittany being placed permanently with Iarussi, Lacey did not recall any discussions where concerns were raised regarding Brittany's safety in that environment.  (*Id*. at p. 6.)  In fact, Lacey's own personal impression based on her interactions with Brittany and Iarussi was that "Brittany seemed happy to be there.  Lisa appeared to genuinely care about her."  (*Id*. at p. 12.)  Lacey never had any concerns for Brittany's welfare while in Iarussi's home.  (*Id.*)


*Donna Ziegler*

Donna Ziegler conducted a psychological evaluation of Brittany in November of 2000 for the purpose of making a recommendation to the court about Brittany's "dispositional" options.  (Defs.' Ex. 25 [97] at pp. 2-3.)  At that point in time, Brittany had been living with Iarussi for nearly five months.  Dr. Ziegler found no indications that Brittany was suffering any type of abuse at the hands of Iarussi and, quite to the contrary, Dr. Ziegler formed the impression that Brittany was making a very good adjustment.  (*Id*. at pp. 8, 10.)  There was no evidence, in Dr. Ziegler's opinion, that Brittany was being victimized in any way at the time that she was evaluated.  (*Id.* at pp. 16-17, 24-26.)  Based on her evaluation of Brittany, Dr. Ziegler recommended that Brittany remain in Iarussi's home rather than return to her mother's care.  (*Id.* at p. 28.)  Dr. Ziegler believed that Brittany recognized her own safety and security needs and, moreover, Brittany had communicated to Dr. Ziegler that these needs were being met and that she did not desire to return to the care and custody of her mother.  (*Id.* at pp. 28-30.)

Brittany had also undergone two psychological evaluations conducted by Martha Eichenlaub, a certified school psychologist, for the benefit of Family Services, in February and September of 2000.  The latter evaluation was conducted after Brittany had begun living full-time with Iarussi.  In rendering her own professional opinions about which placement arrangement would best suit Brittany's emotional and psychological needs, Dr. Ziegler considered and relied upon the Eichenlaub's reports, neither of which had expressed any concern about physical abuse or bad parenting on the part of Iarussi.  (Ex. 25 [97] at pp. 10, 24-26, 34-36.)

*Ann Badach*

Ann Badach was retained by OCY in April of 2000 to perform a study of the Iarussi home as a possible placement resource.  Based on her assessment, which included detailed interviews with Iarussi in her home, criminal background and ChildLine checks, and references obtained from family and friends, Badach had no personal fears about this placement option for Brittany, nor any concerns that Iarussi would be a source of danger to Brittany.  (Defs.' Ex. 2 [74] at pp. 18-20.)  At the time that her report was completed, no concerns had been expressed by anyone about Iarussi being abusive.  (*Id*. at pp. 24-26.)  Badach did have some concerns about certain "unknowns" relative to Iarussi's personal issues, and she therefore recommended that Iarussi continue with the therapy she had recently undertaken relative to issues of self-esteem and goal setting.  (*Id*. at p. 28.)  Moreover, in light of Brittany's past history of sexual victimization, Badach further recommended that Brittany and Abby have certain boundaries such as separate rooms.  (*Id*.)  However,

these concerns were not enough to give Badach any reservations about Brittany's placement in Iarussi's home.  (*Id.* at pp. 28.)

### *Carol Gallagher*

Defendant Gallagher was Brittany's OCY caseworker from December 1998 until April of 2001 when the case was transferred to Hughes.  (Defs.' Ex. 9 [81] at pp. 2-4; Defs.' Ex. 29 [101] at p. 7.)  During this time Gallagher met with Brittany at least on a monthly basis.  (Defs.' Ex. 29 [101] at p. 7.)  These meetings occurred at various locations –  initially in the home of Brittany's father when she was still living there, later in Brittany's foster home and then in Iarussi's home, and also at various other places such as the Mercy Center for Women, Wraparound Team meetings, parent/child visitation sites, and school.  (*Id.*)  During these meetings, various other people were commonly present, including Brittany's foster parents, Wraparound Team members, Mercy Center staff, and Brittany's CASA.  (*Id.*)

Gallagher also had contact with Iarussi beginning in early 2000 both in Iarussi's home and at the Mercy Center for Wraparound Team meetings.  (Defs.' Ex. 29 [101] at p. 8.)  Following Brittany's placement with Iarussi in June of 2000, Gallagher made monthly in-home visits there.  (*Id.*)

As part of her duties, Gallagher was involved in investigating the allegations of sexual abuse which Brittany disclosed relative to her father.  (Defs.' Ex. 29 [101] at p. 9.)  These reports led to involvement on the part of law enforcement agencies.  (Defs.' Ex. 24 [126] at ¶¶ 9, 13-14.)  Gallagher was also responsible for commissioning from Family Services the kinship care study of Iarussi which was performed by Badach.

(*See* Ex. 4 [76] at p. 2; Ex. 24 [96] at ¶¶ 15-16.)

Gallagher did not view Badach's report as revealing anything that suggested Iarussi was unfit to be a kinship care provider or potential adoptive parent to Brittany. (Defs.' Ex. 9 [81] at p. 28.)  Moreover, no comments were ever made during Gallagher's conversations with Badach and her supervisor that indicated concerns on the part of Family Services about Brittany's placement with Iarussi.  (*Id*. at pp. 28-29.)  In fact, Gallagher has testified that, from the time that Brittany was first placed with Iarussi in June of 2000 until Brittany's case was transferred to Hughes in April of 2001, there were never any reports, to her knowledge, from Childline, other OCY workers, members of the Wraparound Team, the court, Brittany's school, or any other source indicating that Brittany was being abused in Iarussi's home.  (*Id*. at pp. 39-40.)

Gallagher does acknowledge that, during the latter part of 2000, there was some disagreement among the Wraparound Team members as to whether or not reunification efforts should continue to be pursued or whether, instead, there should be a move toward an involuntary termination of rights from Brittany's parents.  However, this dispute was aired before the juvenile court, which held its decision in abeyance pending the results of Dr. Ziegler's psychological evaluation.  (Defs.' Ex. 9 [81] at pp. 30-35.)

*Victoria Hayes*

Plaintiff Victoria Hayes is the sister of Lisa Iarussi and one of the individuals who provided a reference to Badach strongly supportive of Iarussi's efforts to become Brittany's caregiver.  She contends that she provided the reference as a result of having

been pressured by Iarussi and because she believed Iarussi was honestly trying to provide a better home for Brittany and was only seeking fair compensation and financial support for care-giving duties which she had been regularly providing anyway. (Pls.' Ex. Vol. 2 [116-2] at pp. 7-8, 11; Defs.' Ex. 12 [84] at pp. 3-4.) In filling out the questionnaire form entitled "Kinship/Foster-Adoption Reference," Hayes insists that she believed her sister's goal was merely to provide foster care for Brittany, not undertake an adoption. (Pls.' Ex. Vol. 2 [116-2] at 9-11.)

Hayes claims that she did not lie about anything in providing a favorable recommendation for her sister, but she may have "exaggerated a little bit with the pressure from my sister on me constantly." (*Id*. at p. 8.) Hayes states she did not really get along with Iarussi, whom she did not see often and whom she described as "an off the wall person," but "not with a child." (Pls.' Ex. Vol. 2 [116] at p. 7, 9.) Although Hayes believed her sister was "good with children," she did not take her own children over to Iarussi's home because she felt Iarussi had weird friends and was loud and would swear. (Defs.' Ex. 12 [84] at 2, 4.) When questioned how anyone would have known that Brittany's arrangement with Iarussi would have ended so tragically, Hayes replied, "Probably all her friends would know. The people that she had were terrified of her." (*Id*. at p. 6.) Yet, Hayes denies having personally had any concerns about physical violence in Iarussi's home at the time she provided her favorable reference, or even when Brittany was adopted in 2001, because Hayes "never knew anything that was going on over there." (*Id*. at p. 4; *id*. at p. 8.) She further admits that she never raised any concerns in May of 2000 when she wrote her evaluation, or in 2001 when she was called upon to support the adoption, about the possibility of Iarussi

37

perpetrating physical violence on Brittany.  (*Id*. at 10.)  According to Hayes, "If OCY would have done their job, they would have seen that ... there's no way anybody's going to let Lisa adopt a child."  (Pls.' Ex. Vol. 2 [116-2] at p. 9.)

*Rosemary Burroughs*

Rosemary Burroughs is the biological maternal grandmother of Brittany and was sometimes present at meetings of the Wraparound Team.  She has provided an affidavit in support of the Plaintiffs' brief opposing summary judgment.

Burroughs maintains in her affidavit that OCY "pressured Brittany's mother ... to give up her parental rights to Brittany" and "pushed for Iarussi o become Brittany's mother by adoption."  (Pls.' Ex. Vol. 3 [116-3] at p. 36, ¶¶ 3-4.)  Burroughs claims that "[she] was against the adoption" and that she "knew Lisa Iarussi had a violent temper and a bad reputation for violence, including she beat up the sister of a news woman who was on WSEE TV - Channel 35."  (*Id*. at p. 36-37, ¶¶ 5-6.)  Moreover, Burroughs claims that she was ignored by the Agency after "[telling] workers on Brittany's case that I was against Iarussi adopting Brittany, that I was afraid for Brittany's safety and I told them I wanted to be involved so I could be a watchdog for Brittany's safety."  (*Id*. at p. 37, ¶¶ 7-8.)[4]

---

[4]  Burroughs also claims in her affidavit that Brittany's foster mother expressed concern about Brittany's safety based on the foster mother's belief that Iarussi was not a fit parent.  (Pls.' Ex. Vol. 3 [1161-3] at p. 37, ¶ 8.)  According to Burroughs, these concerns were also ignored by the Agency.  (*Id*.)  There is nothing presently of record from Brittany's former foster mother, either by way of affidavit or deposition testimony and, thus, this last statement constitutes hearsay information. This circuit generally permits consideration of hearsay statements in connection with a motion for summary judgment, provided that the evidence is reducible to admissible evidence at time of trial.

*Lisa Iarussi*

Despite the notation in Badach's study that Iarussi had revoked her consent to release records from St. Vincent Behavioral Health, no efforts were made by Badach, OCY personnel, or anyone else to further investigate this aspect of Iarussi's profile. Had the records been uncovered, they would have revealed that, beginning in March of 2000, just months before Brittany was placed full-time in her care, Iarussi began receiving counseling for an explosive anger problem which involved both verbal outbursts and, at times, physical violence. (*See generally* Pls.' Ex. Vol. 4 [116-4] at pp. 3-22.) The records further reflect that Iarussi demonstrated poor stability and an unwillingness to take responsibility for her actions. (*Id*. at pp. 18-21.)

Iarussi claims that she told Gallagher that she did not believe herself capable of parenting a special needs child because of her own special needs. (Pls.' Ex. Vol. 3 [116-3] at p. 45.) According to Iarussi, "I was on disability and I had issues of my own," yet "[Gallagher] never questioned. ... Nobody in Children Services ever asked me why I was on disability." (*Id*.) As Iarussi sees it, the "bottom line" is that

> Children Services did not do their job and check me out thoroughly. They just knew that I took care of this child since she was six months old and, oh, Brittany[ ] loves you and she wants to stay with you. They just wanted to get rid of this child because of her age and she had issues and no one else would take her. ..."

---

*See Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 222-23 n.2 (3d Cir. 2000); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989). Because the foster mother's alleged out-of-court statements do not appear to be reducible to an admissible form (*see* N.T. Oral Argument held 11/23/09 [125] at p. 52), they will not be considered for purposes of this record. *C.f. J.S. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (court would consider affidavit containing hearsay statements of out-of-court sales personnel where there was no indication that these individuals would be unavailable to testify at trial).

(*Id*. at p. 46.)  Despite Iarussi's alleged reservations about adopting Brittany, however, she never expressed any concerns to the orphans' court judge; on the contrary, she affirmed to the court that her adoption of Brittany was a knowing and voluntary decision and that no one had forced her or pressured her into the decision in any way.

B.    Post-Adoption Reports of Abuse

On April 29, 2003, some twenty months after Brittany's adoption, a staff member from her middle school called the Pennsylvania Department of Public Welfare ChildLine to report concerns about bruising on Brittany's body.  The matter was classified as a General Protective Services ("GPS") referral and forwarded to OCY for follow-up.  (Pls.' Ex. Vol. 5 [116-5] at p. 20.)

OCY staff member Pam Bruno screened the referral, documenting the following allegations:

> Today when [Brittany] got on the bus the bus company staff noticed that the child had bruising on her neck.  After seeing this the school counselor and principal and the nurse all talked to her, and [s]he has old bruises on her left upper arm and on her right upper arm, and on the right shoulder blade, and a small bruise on the right side of her face.
>
> When they asked her how she got these bruises, the child reported that she didn't know ... and the child added that nobody hit her. This was [Brittany's] first day at school after being absent for the past 4 school days 4/22 thru [sic] 4/25.  [The referral source] says that mom had put some make up on the child's bruised face, and the child acknowledged this.  Brittany is somewhat MR. ...

(Pls.' Ex. Vol. 5 [116-5] at p. 13.)

The matter was assigned to OCY caseworker Jim Place for investigation.  On

40

April 30, 2003, Place spoke with the guidance counselor at Brittany's school and learned that Brittany had originally told the counselor that she had fallen off her bike. The counselor further reported that Brittany's mother was "irate" that the school had interviewed her about the bruises. (Pls.' Ex. Vol. 5 [116-5] at p. 14.) Place then examined Brittany while she was at school and documented faded bruises on her right cheek, back, shoulder blades, and left arm, which he photographed. At that time, Brittany denied knowing how she had gotten the bruises and specifically denied receiving any corporal punishment. She reported to Place that she felt safe at home and that, when she gets in trouble, she gets sent to her room. She further claimed that she had missed the prior four days of school due to the flu. (Pls.' Ex. Vol. 5 [116-5] at pp. 14,16.)

Place next interviewed Abby Iarussi while she was at school.[5] Abby likewise denied any corporal punishment being used at home and denied knowing how Brittany had gotten the bruises. She claimed that, when she gets in trouble at home, she has to go sit in her room. (Pls.' Ex. Vol. 5 [116-5] at pp. 14, 16.)

Later that day, Iarussi called Place to report that she did not want OCY to have any further contact with her children, as Abby had been upset by the visit to her school. Subsequent to this call, Place made an unannounced visit to Iarussi's home. At that time, Iarussi was very upset about the OCY referral and was threatening to sue the school district. Iarussi disputed that there were bruises on Brittany's body and claimed that she had examined Brittany the previous day after Brittany had gotten home from

---

[5] Although the identity of the interviewee is redacted on the records in question, it is clear from context that the subject of the interview was Abby Iarussi.

school and had found no bruises.  When Place confronted her with the fact that he had

personally seen the bruises and photographed them, Iarussi became very defensive

and stated that she had never hit either of the girls.  She maintained that Brittany had

missed the four days of school because of a virus which had caused Brittany to

experience vomiting and diarrhea.  After asking Place to leave the premises, Iarussi

contacted Defendant Edith Joseph, Intake Supervisor at OCY, and stated that the

Agency was to have no further contact with her family.  (Pls.' Ex. Vol. 5 [116-5] at pp.

14, 16.)

On June 11, 2003, Place completed a risk assessment of the referral and closed

the file.  Although he felt that Abby and Brittany were "moderately" vulnerable to abuse

or neglect, he assigned an overall risk analysis of "low," which he explained as follows:

> [Abby][6] and Brittney [sic] were assessed in the moderate range for
> vulnerability.  [Abby's] rating was based on her age.  Brittney [sic]
> was assessed in the moderate range because she is mildly
> mentally retarded.  Their vulnerability placed them at increased risk
> for abuse and neglect.
>
> Lisa was assessed in the moderate range for cooperation.  This
> assessment is based on her refusal to acknowledge that Brittney
> [sic] had bruises, and her unwillingness to explore the possible
> origin of these bruises.  She also denied any further access to her
> children to me to conduct follow up interviews.
>
> The overall risk for this case is in the low range.  The major
> concern is Lisa's refusal to acknowledge Brittney's [sic] injury and
> determine their cause.  Both [Abby] and Brittney [sic] denied any
> corporal punishment in the home however.  Lisa also professes
> that she has never hit the girls, and she adopted Britney [sic] to
> provide her with a safe stable environment that Brittney's [sic]
> biological mother was unable to provide.

---

[6] Although Abby's name is redacted from the Court's copy of this document, the
context of the document makes it clear that she is being referenced.

(Pls.' Ex. Vol. 5 [116-5] at pp. 16-17.)  Place's risk assessment was reviewed and approved by his supervisor, Defendant Edith Joseph.  (*Id.* at pp. 15, 17.)

The same day that Place closed OCY's file, he and Joseph co-signed a letter to Iarussi, stating that Place had completed his evaluation of the April 29 referral and had determined that it was not necessary for Iarussi's family to receive ongoing services from OCY at that time.  (Pls.' Ex. Vol. 5 [116-5] at p. 11.)  The letter indicated that, in the event new allegations were to be received by OCY, an intake specialist would be assigned to evaluate them, and it invited Iarussi to contact the agency if she felt that OCY could be of assistance in preventing the abuse or neglect of her children.  (*Id.*)

Approximately seven months later, on January 5, 2004, OCY caseworker Isabelle Wolf received an anonymous call from Cynthia Matecki, a teacher's aide at McDowell Intermediate High School, where Brittany was attending a life skills class.  According to Ms. Wolf's notes, this "referral source" stated that Brittany had a split lip, redness in her eyes, and cuts behind her ear and on her head.  (Pls.' Ex. Vol. 2 [116-2] at pp. 33-34)  It was reported that Brittany had denied knowing how she got the injuries, but that she had been seen by the school nurse.  It was also noted by Ms. Wolf that Brittany was in special classes, that she was adopted, and that there had been a prior intake in 2003.  (*Id.*; Defs.' Ex. 7 [79] at p. 2.)   Upon screening this call, Ms. Wolf assigned a low risk to the referral, noting that the referral source had limited information and the child had been seen by the nurse and had made no allegations of abuse.  (Id*.)*

The following day, another OCY employee, Pam Bruno, telephoned Nancy Carlson, the school nurse at McDowell Intermediate.  At that time, Carlson reported that Brittany had a problem biting her lips as well as an ongoing problem with bruises.  The

previous day (January 5), Brittany had been observed to have bruising on the bridge of her nose and red eyes.  When asked about her injuries, Brittany claimed that she had been playing football and had gotten hit in the face.  Carlson called Iarussi and was told the same story.  Later that same day, it was brought to Carlson's attention that Brittany also had a cut and bruising behind her ear.  After discovering this new injury, Carlson had called Iarussi again and told her that she would have to take Brittany for medical treatment.  (Pls.' Ex. Vol. 2 [116-2] at p. 34.)  Documentation in the record indicates that Iarussi took Brittany to the Hamot Hospital Emergency Room on January 5, where she was given a prescription for an antibiotic; the prescription was filled that same day.  (*Id*. at pp. 23-24.)  Bruno's notes from the January 6 telephone call reflect that Iarussi had informed Carlson that Brittany was anemic and was taking iron to address this problem. The notes further reflect that Carlson had informed Iarussi that she wanted documentation of the ER visit and Iarussi had agreed to provide it.  (Pls.' Ex. Vol. 2 [116-2] at p. 34.)

After discussing this incident with her supervisor, Bruno advised Carlson that the Agency also wanted a copy of the documentation; this was faxed to OCY within a day or so thereafter.  (Defs.' Ex. 7 [79] at pp. 2-4.)  Following this, the matter was "screened out" by the agency, meaning it was not accepted for further evaluation.  (*Id*.)  Although Wolf's notations on the screening form indicated that there had been a prior "intake" concerning Brittany in 2003, it does not appear that Bruno ever reviewed that referral prior to deciding to "screen out" the January 5, 2004 call.  Bruno could not remember personally pulling the 2003 file, and there is no notation by her to suggest that she ever did.  (*Id*. at 3.)

44

The following month, OCY received another referral concerning Brittany, this time from Karen Staab, the school district's psychologist.  Pam Bruno screened the call, which came in on February 26, 2004, and supplied the following narrative:

> In early 1/04 we had received a call regarding some possible physical abuse by mom.  In checking this out I spoke with Mrs. Carlson at school, and she indicated that she had been aware of the child's injuries, and had also talked with mom about this, and at that time the child was saying that the injuries that she did have were not inflicted.  I ended up talking to mom, and we didn't accept it for evaluation at that time.  Mom was not happy about the referral that was made to us.

> Several weeks later we recieved [sic] a call from this current [referral source] who I believe is a psychologist for the Millcreek school district.  I guess there is a pattern with Brittany frequently coming into school with various bruises, cuts, scrapes to various body parts, and it's a concern to the school, but the child has never come out and reported that mom did anything to her.

> I've talked with Brittany's teacher, Karen Halmi, and she indicated that she is suspicious of things at home.  The child has seemed depressed all year, and at times shes [sic] so almost lethargic that Ms. Halmi has had to help her get up from her seat and get a drink of water.  When the teachers or staff tell her shes [sic] a good kid, she starts to cry, and she always seems to want food.  Ms. Halmi also mentioned that Brittany [always] has some sort of bruising somewhere on her.

> What prompted [the referral source] to contact us again was that the school has scheduled something like 4 meetings for mom to come in and talk with them about problems that she is having with the child at home, but mom fails to show up for these meetings.  Mom will say she wants guidance, and then not bother following up.  The Achievement Center is involved maybe with TSS or mobile therapy, and Carrie Paternosh is the worker, and she has tried to reach mom, as mom said she wanted help, but mom hasn't returned any of Carrie's calls.  Mom went to the MH BSU for help and now isn't showing any interest.

> It looks like mom adopted Brittany thru [sic] our agency, and we've had 1 prior intake on this family for P/A.

(Defs.' Ex. 8 [80] at p. 8.)  Bruno classified the referral as being low risk, and the matter

was assigned to Advanced Intake Specialist Cynthia Valimont for further investigation. (*Id.* at p. 7.)

On March 4, 2004, Valimont telephoned McDowell Intermediate to confirm Brittany's attendance there. A school official confirmed that Brittany did attend a life skills class but indicated that she was absent that day. (Defs.' Ex. 23 [95] at ¶ 3, p. 3; Pls.' Ex. Vol. 3 [116-3] at p. 2.)

The following day, which was Friday, March 5, 2004, Valimont called the school a second time in an attempt to make arrangements to see Brittany there. Valimont was informed that Brittany was again absent. (Defs.' Ex. 23 [95] at ¶ 3, p. 3; Pls.' Ex. Vol. 3 [116-3] at p. 2.) Valimont then made an unannounced visit to Brittany's home and was greeted by an adult woman who identified herself as "Linda" and stated that she was house-sitting for Iarussi. Linda advised Valimont that the family had gone to Pittsburgh to visit a relative who was ill and they were expected to return on Monday, March 8. Valimont left her card with Linda to be forwarded to Iarussi upon her return. (Defs.' Ex. 23 [95] at ¶ 3, p. 3; Pls.' Ex. Vol. 3 [116-3] at p. 2.)

Later that day, Valimont's intake supervisor, Defendant Joseph, received a call from Iarussi, who reported that she had gotten a call from Linda about the home visit. Iarussi stated that she was calling from Pittsburgh where she and the children had gone to visit Abby's father, who was reportedly dying of a liver disorder. Iarussi expressed surprise at the referral and stated that she would meet with someone as soon as she returned. (Defs.' Ex. 23 [95] at ¶ 3, p. 3; Pls.' Ex. Vol. 3 [116-3] at p. 2.)

On either March 6 or March 8,[7] Iarussi telephoned Valimont, who briefly explained the allegations.  Iarussi denied hurting Brittany or Abby and stated that she loved her children and would never hurt them.  She expressed disbelief over the allegations and claimed that the report may have been made out of vengeance.  Iarussi advised Valimont that she had adopted Brittany at age eleven, that Brittany has some health problems, including acid reflux disorder, and that she was receiving case management services with Sherry Lacey.  Valimont and Iarussi scheduled a home visit for the following Tuesday.  (Defs.' Ex. 23 [95] at ¶ 3, p. 3; Pls.' Ex. Vol. 3 [116-3] at p. 3.)

On or about March 9, 2004, Valimont conducted a visit to Iarussi's home.[8]

---

[7] The record contains conflicting dates for this contact, but we deem the conflict immaterial for present purposes.

[8] The Court acknowledges that Plaintiffs have submitted an affidavit from Abby Iarussi in which Abby states, in relevant part, "I do not remember any caseworker coming to the trailer to question us about Brittany's injuries or bruises before Brittany's death."  (Affid. of Abby Iarussi, Pls.' Ex. Vol. 2 [116-2] at ¶ 23, p. 38.)  However, viewing the evidence of record in its totality, we find no genuine dispute as to whether this home visit actually occurred.  We note that the visit is documented both in Valimont's affidavit and in a detailed log entitled "Dates of Contact/Safety Assessment and Plans" (see Pls.' Ex. Vol. 3 [116-3] at pp. 2-13), the latter of which would likely be admissible at trial pursuant to either Fed. R. Evid. 803(6) or 803(8).  In addition, the fact that a home visit occurred on or about March 9, 2004 is independently corroborated by the testimony of a third party witness, who recalls being present on that occasion and questioned by the caseworker, although she does not have an independent recollection that the caseworker was Defendant Valimont.  (See Defs.' Ex. 37 [109] at p. 4; Defs.' Ex. 36 [108] at pp. 3-4, 7, 12-14, 16.)  We also note that the averment by Abby Iarussi, made some five and one-half (5 and ½) years after the incident in question, does not constitute a denial that this home visit took place; strictly speaking, it establishes only the child's lack of recollection that a home visit occurred prior to Brittany's death.  Finally we note that Plaintiffs have proffered evidence suggesting that Iarussi's children were not present during the home visit which, if believed, could account for Abby's lack of recollection of the event.  Under the totality of these circumstances, the Court finds that there is no genuine dispute as to the fact that Valimont conducted a home visit on

Certain aspects of this home visit are disputed by the parties.  Defendant Valimont has

submitted an affidavit which describes the details of this visit as follows:

> The home environment was noted to be clean and neat with no apparent safety
> hazards.  Brittany and Abby share a room with bunk beds and Ms. Iarussi has the
> other bedroom.  The home had water and all utilities.  There was plenty of food and
> the children ate Pop Tarts while I was there.  Brittany did have red, crusty areas
> around her mouth that Ms. Iarussi indicated were from constant biting of the lips.
> Brittany confirmed that she does bite her lips and the resulting scabs out of habit.
> She actually was biting her lips while I was present and Ms. Iarussi told her to stop
> before she made them bleed.  Brittany also reportedly has a problem with drooling.
> She does so excessively and needs to be reminded to swallow her saliva.  Brittany
> agreed with this also.  Ms. Iarussi stated that despite constant reminders, Brittany
> continues to drool and bite her lips.  Ms. Iarussi further reported that Brittany seems
> very susceptible to illness and often gets colds.  Brittany had a runny nose at the time
> of this home visit.  Brittany was rubbing her nose and had rubbed it raw.  Ms. Iarussi
> handed her a tissue, but she needed several reminders to use it.  I spoke to Brittany
> who indicated that she is happy in the home with her mom, Lisa and sister, Abby.
> She indicated that she has not been hit by Lisa or anyone else and that she is not
> hurt in any way.  When asked about punishment, she stated that she has to go to her
> room (time out).  According to Ms. Iarussi, there would never be a need to hit or
> physically punish Brittany as she is very well behaved.  Ms. Iarussi stated that
> Brittany rarely ever does anything wrong.  Brittany was somewhat lethargic, but Ms.
> Iarussi stated that she has always been like that.  She has known Brittany since she
> was an infant as she was an acquaintance of Brittany's biological mother.  Ms.
> Iarussi reported that Brittany often "stares off into space" and she did this several
> times while I was there.  When I inquired about Brittany being tired all the time, Ms.
> Iarussi stated that she too has noticed this.  Brittany goes to bed between 8:00 and
> 9:00 pm and wakes up at 5:30 am on weekdays to catch her school bus at 6:00 am.
> On weekends, she sleeps later.  She reportedly sleeps well and sometimes naps on
> the weekends.  Brittany agreed that she sleeps well.  Regarding the lethargy and the
> bruising that has been reported, Ms. Iarussi stated that Brittany is anemic and is
> prescribed Feonsa iron supplement for this.  She often bruises easily.  She gets
> bruised from bumping into things or being grabbed by the arm when playing, as in
> tag or football.  Brittany was also reported to be quite clumsy.  She often trips and
> bumps into things.  Brittany laughed about this and agreed.  I noticed that Brittany
> appeared to have "pigeon toes" and walked with an unsteady gait.  Brittany showed
> me her arms and back and had no current marks with the exception of a small scab
> on her elbow (pencil eraser size).  She was unable to recall where she got it, but it
> appeared to be a small brush burn or rug burn.  She stated that it did not even hurt.
> Ms. Iarussi and I had a lengthy discussion about allergies and the possibility that
> Brittany may have some.  She was exhibiting several symptoms such as dark circles
> under the eyes, lethargy, and runny nose.  Brittany was reportedly seen in the past by
> Dr. Fornelli, an Ear, Nose, and Throat specialist so Ms. Iarussi stated that she would
> contact him about allergy testing as well as about Brittany's lips.  Brittany and Abby
> do not have a current Primary Care Doctor.  They were going to Children's Health
> Care West until recently.  Ms. Iarussi stated that a receptionist treated her rudely the
> last time they were there and she would not go back.  The children have been seen
> in the Emergency room for any needed treatment since then.  Ms. Iarussi stated that
> she was currently reviewing the list[ ] to locate a new family doctor.  Ms. Iarussi also

---

or about March 9, 2004.

reported that Sherry Lacey, Brittany's case manager, was helping her arrange a psychiatric consultation for Brittany to rule out depression and to address some concerns about statements from Brittany.  Brittany had been saying that she wants to marry Ms. Iarussi and be intimate with her.  She also had asked to be bathed and cuddled.  It was unclear if Brittany understands what she is saying or if she simply enjoys the affection and attention that may have been lacking in her family of origin.  Brittany was very affectionate with Ms. Iarussi while I was there.  She patted her mother's leg, leaned her head on Ms. Iarussi's shoulder, and told her that she loves her.  Regarding the school meetings, Ms. Iarussi admitted that she had not been consistent in meeting with them as she felt that they were rude and accusatory whenever they called her.  She was reminded of the importance of working together with all Brittany's provider's [sic], as a team, to ensure that Brittany's needs were being met.  This includes educational, mental retardation, mental health, and medical providers.  Lisa Iarussi agreed.  Abby Iarussi, age 8, was also interviewed.  She was able to identify good and bad touches (including hitting, kicking, etc).  She denied ever getting any bad touches and denied being hit by anyone.  She stated that she is well taken care of and loves her family (mom, Brittany, and dad).  She stated that she has everything she needs (food, clothes, toys, a nice room).  Ms. Iarussi then told me that Abby's father is dying of a liver condition (Hepatitis) and is on a transplant list.  Ms. Iarussi stated that he is a drug addict and therefore has poor judgment which led to the illness.  She monitors Abby's visitation with him.  He lives in Pittsburgh.  Abby also was affectionate with her mother while I was there.  A neighbor, Sue Vanorsdale, stopped by while I was there.  She sometimes babysits Brittany and Abby.  She stated that she feels that Ms. Iarussi is a good parent and treats the girls well.  She stated that the girls have never disclosed any abuse to her and she has not observed any.  She was surprised that anyone would suspect that Ms. Iarussi was harming the children.  She stated that she sees Brittany and Abby at least two or three times per week.  Lisa Iarussi was very candid during the two hour home visit and she was distressed by the allegations.  She stated that she would never harm Brittany and that she has been trying to address her problems.  Both Brittany and Abby appeared happy and comfortable in the home with their mother.  Brittany smiled and laughed several times.  She did not appear to be in any distress physically or emotionally.  We developed a plan for Ms. Iarussi to follow up with the allergy testing and psychiatric evaluation and call me with the details.  She signed releases of information for Children's Health Care West, Dr. Fornelli, and Sherry Lacey.

(Defs.' Ex. 23 [95] at ¶ 3, pp. 3-6.)

Valimont's account is contradicted in certain respects by Sue Vanorsdale,[9] a

neighbor who resided immediately across the street from Iarussi in the trailer park

where they both lived.  At Iarussi's request, Vanorsdale stopped by Iarussi's mobile

---

[9] Ms. Vanorsdale presently goes by the last name "Lowe."  (See Defs.' Ex. 36 [108] at p. 1.)  However, for present purposes, we will refer to her by her prior surname.

home and was present for part of Valimont's visit.[10]   Vanorsdale does not dispute that

she was interviewed by Valimont and that she told Valimont (truthfully) that she had not

witnessed any abuse on the part of Iarussi toward the children. (Defs.' Ex. 36 [108] at p.

4.)  In addition, Vanorsdale agrees it is "absolutely" possible that she might have told

Valimont that Iarussi was a good parent who treated her children well, although she

could not specifically remember saying this.  (*Id*.)  On the other hand, however,

Vanorsdale does not recall that the children were present for this home visit, and her

testimony at deposition was that she thought they were at school.  (*Id*. at p. 8.)

Additionally, in a statement given to a police officer on May 24, 2004, Vanorsdale

described her encounter with the caseworker as follows:

> Someone had called the school and Lisa thought it was her friend Cindy who did it so the case workers [sic] was over, Lisa called me and said come on over, I went over and the caseworker again like you asked have you ever seen Lisa abuse the children, I said no I have not ... and Lisa acted as though they were friends, they were speaking about relatives, I said I got to go.  I don't know what happened there. ...
>
> ***
>
> ... when the caseworker was over there, she had said that if she knew it was going to be this much trouble she would have, she's going to give [Brittany] back ... and she said if you think it's so easy, you take her and I said okay.  And uh, oh she also said that when [Brittany] was eighteen, when she turned eighteen she was going to put her in one of those I don't know what they're called, half way house ...

(Defs.' Ex. 37 [109] at pp. 4-5.)  At her deposition, Vanorsdale was questioned

repeatedly as to whether Iarussi had made the foregoing remarks in the presence of

_____

[10] At her deposition, Vanorsdale did not recognize Valimont as the caseworker who visited the Iarussi home on or around March 9, 2004, but she indicated that this was due to lack of memory.  (Defs.' Ex. 36 [108] at p. 3.)  Accordingly, the Court does not perceive any genuine dispute concerning the fact that Valimont was the individual who conducted the March 9 home visit.

Valimont.  Ultimately, however, Vanorsdale was not sure whether Valimont had been present at the time these comments were made.  (Defs.' Ex. 36 [108] at pp. 9, 12, 15-16.)

On March 9, 2004, Valimont received a telephone message from Carlson that Brittany's teacher at McDowell Intermediate would be calling with concerns about Brittany – specifically, that Brittany had returned to school with some changes in her behavior and appearance after having been out the previous week.  (Pls.' Ex. Vol. 3 [116-3] at pp. 4-5).  Valimont subsequently received a message to contact Regina Kukolen, Brittany's speech therapist.  Ms. Kukolen saw Brittany every Monday and Tuesday for 30 minutes.  When Valimont contacted her, Ms. Kukolen reported that Brittany had been very lethargic the previous day and had slept through both of her speech therapy sessions.  She had dark circles under her eyes and her lips were split open.  Valimont did not consider these reports to be new concerns.  (*Id.* at p. 5; Defs.' Ex. 23 [95] at ¶ 3, p. 7.)

The following day, March 10, 2004, Valimont received a call from Brittany's teacher, Karen Halmi.  What happened during the course of this telephone call is somewhat disputed.  According to Valimont, Ms. Halmi reported that Brittany had had 30 absences from school, all of which had been excused, some of which were medical.  Valimont also recalls Halmi reporting that Brittany had had an enormous appetite that day and was refusing to participate in pool class.  According to Valimont, she and Halmi discussed the follow-up measures that were planned for Brittany regarding allergy testing and a psychiatric evaluation, and it was agreed that Halmi would report any further concerns.  (Pls.' Ex. Vol. 3 [116-3] at p. 6; Defs.' Ex. 23 [95] at ¶ 3, p. 7.)

51

According to Halmi, Valimont made comments in the course of this conversation to the effect of, "how would I feel if someone kept calling Child Services on me ... and did I know how hard it was to find placement for these kids," which left Halmi feeling "threatened."  (Pls.' Ex. Vol. 3 [116-3] at pp. 20-21.)

About one month later, on Monday, April 19, 2004, a member of Brittany's school bus staff called the ChildLine to report that, when Brittany had gotten on the bus that morning, she had swollen lips with dark scabs.  The caller noted that Brittany is frequently absent for a week and then when she gets back on the bus she has marks. Upon speaking with Brittany's teacher and the school nurse, he had been told to call the ChildLine.  The source was unsure if the school nurse had examined Brittany.  The call was categorized as a General Protective Services call and referred to OCY.  (Pls.' Ex. Vol. 3 [116-3] at pp. 33-34.) Pam Bruno screened the referral, which was acknowledged by Defendant Joseph, and it was forwarded to Defendant Valimont.  (*Id*. at p. 35.)

That same day, Valimont left a message for Iarussi inquiring about follow through on the planned allergy testing and psychiatric evaluation for Brittany.  Valimont also requested a second home visit to discuss the reported concerns about new scabs around Brittany's mouth.  (Pls.' Ex. Vol. 3 [116-3] at p. 6; Defs.' Ex. 23 [95] at ¶ 3, p. 7.)

Valimont contacted Iarussi later that same day and was informed that Dr. Fornelli had seen Brittany in late March and had ordered an upper and lower GI series to take place in May.  According to Iarussi, Dr. Fornelli felt that Brittany's acid reflux disorder may be contributing to her lip and mouth sores.  He had reportedly examined the sores and instructed Iarussi to put neosporin on them until testing is done.  Dr. Fornelli had

52

also reportedly wanted the GI series performed before proceeding with the allergy testing. Iarussi stated to Valimont that Brittany had had problems with her mouth since her toddler years, and that she seemed to suffer periodic "outbreaks" which sometimes lasted for months at a time. Iarussi further stated that Brittany had been out of school for four days that week as a result of throwing up from acid reflux. Valimont inquired about the psychiatric evaluation for Brittany and was informed that it had not yet been scheduled by Sherry Lacey. Valimont then suggested that she and Iarussi meet with McDowell Intermediate personnel to discuss their concerns about Brittany as well as Iarussi's concerns. Iarussi agreed to this and Valimont advised Iarussi that she would contact the school and get back to her with a date and time. (Pls.' Ex. Vol. 3 [116-3] at p. 6; Defs.' Ex 23 [95] at ¶ 3, pp. 7-8.)

Although the parties disagree somewhat as to the details of what occurred over the course of the ensuing week, it is undisputed that Valimont initially undertook steps to arrange a meeting between school officials and Iarussi regarding concerns about Brittany. OCY's contact log suggests that Valimont initially spoke with a person named "Meagan" in student services on Thursday, April 22, 2004 requesting, on behalf of herself and Iarussi, a meeting with Brittany's teacher and guidance counselor for the purpose of discussing Brittany. (Pls.' Ex. Vol. 3 [116-3] at p. 6; Defs.' Ex. 23 [95] at ¶ 3, p. 8.) It appears Valimont received a message the following day from Brittany's teacher, Karen Halmi, indicating that the school personnel could meet on April 28 at 8:00 a.m. and requesting that Valimont call back to confirm the tentative date and time. (Pls.' Ex. Vol. 3 [116-3] at p. 7; Defs.' Ex. 23 [95] at ¶ 3, p. 8.) Halmi contends that she indicated in a message to Valimont that she wanted "the people on [her] team" there as

well.  (Pls.' Ex. Vol. 3 [116-3] at p. 25, 27.)

Valimont then contacted Iarussi on Sunday, April 25, 2004 to advise her about the meeting planned for that Wednesday, April 28, at which time Valimont was informed by Iarussi that Iarussi had already met with school personnel, on her own, the previous Wednesday, April 21.[11]  (Pls.' Ex. Vol. 3 [116-3] at p. 8; Defs.' Ex. 23 [95] at ¶ 3, p. 8.) OCY's contact log reflects that Valimont had received a message on April 20, 2004 to contact Iarussi, but there was no indication in the message that Iarussi was planning to meet with school officials on her own.  (Pls.' Ex. Vol. 3 [116-3] at p. 6; Defs.' Ex. 23 [95] at ¶ 3, p. 8.)   According to Valimont, Iarussi indicated during this April 25 telephone call that she had met with the school's principal (Tom McKalevich), Brittany's teacher (Karen Halmi), the school nurse (Nancy Carlson), a school psychologist, and an educational services representative, and that they were planning to reevaluate Brittany's educational needs and IQ, which was last thought to be in the 50's or 60's. Iarussi further advised Valimont that she (Iarussi) had explained all of Brittany's current conditions and problems to the school personnel, and it was agreed that the principal would contact Iarussi with any further concerns.  (Pls.' Ex. Vol. 3 [116-3] at p. 8; Defs.' Ex. 23 [95] at ¶ 3, p. 8.)

---

[11] There is a slight discrepancy in the record concerning the date on which this meeting between Iarussi and school personnel occurred, but it appears that the meeting took place on April 21, 2004.  Valimont's affidavit indicates that Iarussi had placed the date of the meeting at April 21, 2004 and Karen Halmi's deposition testimony likewise suggests that date.  (Defs.' Ex. 23 [95] at ¶ 3, p.8; Pls.' Ex. Vol. 3 [116-3] at p. 18.)  On the other hand, OCY's phone log suggests that Iarussi placed the date less precisely, at either the previous Tuesday or Wednesday (i.e., April 20 or 21). For present purposes, this discrepancy is not material and we assume the meeting occurred on Wednesday, April 21, 2004.

During the course of this April 25 conversation, Iarussi further informed Valimont that Brittany had fallen over the handlebars of her bike the previous evening (April 24) and had required stitches to her lip.  According to Valimont, Iarussi claimed that she and her friend, Linda Fisher, had tried to treat the bleeding at home with ice and compresses but had eventually taken Brittany to St. Vincent Emergency Room when they could not stop the bleeding.  Iarussi identified Dr. Anderson as the treating physician.  In discussing this incident, Valimont inquired about "Linda," whom Iarussi had sometimes referred to as a "roommate" and sometimes as a "friend."  Iarussi stated that Linda was a close friend who often stayed at the home but maintained her own residence across the street and that she was very involved with the children, as she had none of her own.  Valimont claims that, during this conversation, she suggested that Iarussi call Brittany's school to apprise them of the bike accident so they would be aware of this injury, and Iarussi agreed.  (Pls.' Ex. Vol. 3 [116-3] at p. 8; Defs.' Ex. 23 [95] at ¶ 3, p. 8.)

On the following day, Monday, April 26, Valimont received a message from McDowell Intermediate indicating that the meeting for Brittany was scheduled for Wednesday, April 28 at 8:00 am in the guidance office.  Valimont's log indicates she attempted to return the call and got no answer.  (Pls.' Ex. Vol. 3 [116-3] at p. 8; Defs.' Ex. 23 [95] at ¶ 3, p. 8.)

Valimont telephoned Halmi the next day, April 27, 2004, concerning the meeting which had originally been set for April 28.  The timing and specifics of this conversation are somewhat disputed.  According to Valimont, Halmi indicated during this contact that school officials had already met with Iarussi, they were satisfied with the results of the

meeting, they had developed a plan for the principal to contact Iarussi with further concerns, and another meeting with Valimont present was therefore unnecessary. Valimont claims she concurred with Halmi's analysis that no additional meeting was necessary, and that no objection was ever raised by school personnel regarding the cancellation of the April 28 meeting.  (Defs.' Ex. 23 [95] at ¶ 3, p. 9.)  According to Halmi, Valimont contacted her at some point between April 22 and April 28 and unilaterally decided to cancel the April 28 meeting, to which Halmi replied "okay" merely as a way of "acknowledging th[e] fact that she was canceling."  (Pls.' Ex. Vol. 3 [116-3] at pp. 25-26.)

In addition to the reports and referrals outlined above, numerous calls were allegedly made to OCY by Cynthia Matecki, a special education assistant at McDowell Intermediate High School.  In her capacity as a teacher's aide, Matecki worked with Brittany about four hours each day.  (Pls.' Ex. Vol. 4 [116-4] at p. 24 ¶¶ 2-3.)

Matecki witnessed a pattern of Brittany being bruised often, having make-up applied over the bruising, making excuses about the bruising, and missing school often. Matecki observed that this bruising got worse, and Brittany became more withdrawn, toward the end of her life.  (Pls.' Ex. Vol. 4 [116-4] at pp. 24-25, ¶¶ 7, 9, 14,16-17; *id.* at p. 26, ¶ 29.)  In addition, she was always hungry at school and, toward the end, she only wanted to sleep; Matecki felt that Brittany was "giving up" due to the severity of the beatings."  (*Id.* at p. 26, ¶¶ 24, 28.)

Matecki felt that there were "many red flags" indicating that Brittany was being abused.  (Pls.' Ex. Vol. 4 [116-4] at p. 26, ¶ 32.)  According to Matecki, there were so many incidents with Brittany during April-May of 2004 that Matecki wound up making

repeated calls to OCY to report that "the beatings were getting worse and that [Brittany] had a cauliflower ear all year." (*Id*. at p. 25, ¶ 19.)  In fact, Matecki contends that she called OCY on five separate occasions between January of 2004 and late April/early May of 2004.  (*Id*. at p. 25, ¶ 18.)  During these calls, Matecki "directly stated' her opinion "that Lisa Iarussi was abusing Brittany Legler."  (*Id*. at p. 26, ¶ 23.)  She was told by OCY personnel that "it was an ongoing investigation" and that they could not give her any information.  (*Id*. at p. 26, ¶ 21.)  By the third or fourth time she called OCY, Matecki became irritated that the agency, in her opinion, was "apparently doing nothing."  (*Id*. at p. 26, ¶ 25.)  By the fifth call, she claims, "OCY personnel sounded as if they were agitated at me."  (*Id*. at ¶ 26.)  Matecki avers that she "said to Erie County OCY when are you going to take her out of the house which irritated the Erie County OCY person to whom I was reporting my concerns about Brittany's physical welfare." (*Id*. at ¶ 27.)  Despite her many calls to OCY expressing her concerns about Brittany's well-being and her suspicion that Brittany was being abused, noone from OCY ever called her, interviewed her, or came to the school to meet with her.  (*Id*. at p. 26-27, ¶ 33.)

Instead, on April 27, 2004, Valimont met with her intake supervisor, Defendant Joseph, for about ten minutes to review the case.  (Defs.' Ex. 22 [94] at p. 2.)  Despite the fact that state regulations required a written risk assessment to be completed, this was not done.  Instead, Valimont claims, she and Joseph verbally discussed the risk assessment factors and decided to close the case.  (*Id*.)  According to Valimont, she recommended closure of the case because physical abuse had been denied by Brittany

and Iarussi, Brittany' health problems were being addressed, Iarussi had met with school personnel to address their concerns and Brittany's educational needs, Brittany's basic needs were being met, and there were no current, apparent child welfare issues outstanding.  (Defs.' Ex. 23 [95] at ¶ 3, p. 9.)  Plaintiffs maintain that school personnel were never informed that OCY's file was being closed.

Twelve days later, on May 9, 2004, Brittany died after an abusive episode in which Iarussi and her partner Linda Fisher forced Brittany lie between two bed mattresses and then proceeded to jump on Brittany while taunting her.  (Pls.' Ex. Vol. 3 [116-3] at ¶¶ 20-21, pp. 37-38.)  According to the affidavit submitted by Abby Iarussi,[12] this final tragedy was merely the culmination of a litany of abuse perpetrated by Lisa Iarussi upon Brittany.  In the home of her adoptive mother, Brittany was humiliated, forced to do most of the household chores, denied food, denied companionship, beaten, and, at times, physically tied to the bed while the rest of the family went out to eat.  (*Id.* at pp. 36-37, ¶¶ 7-8, 11-19.)

The formal cause of Brittany's death was found to be "Cardiac Arrhythmia due to Myocardial Ischemia due to Hypoplasia of [the] Right Coronary Artery with stress from physical assault and involuntary physical exertion."  (Pls.' Ex. Vol. 5 [116-5] at p. 2.)  Incredibly, an autopsy subsequently revealed some 212 blunt-force trauma injuries to Brittany's head, face, neck, trunk, and extremities in the form of abrasions, contusions or lacerations, as well as a cauliflower ear, a healed rib fracture, and a soft tissue

---

[12]  The Court notes that Abby signed her affidavit using the name "Abby Hayes." It is not clear from the record whether she formally changed her name but, in any event, we refer to Abby for present purposes as "Abby Iarussi."

hemorrhage to the back.  (*Id*. at p. 3.)  Iarussi eventually pleaded no contest to criminal

charges stemming from Brittany's death and is now serving a state sentence of 7 to 14

years of imprisonment.

Despite having received releases on or around March 9, 2004 to obtain Brittany's

medical records from Dr. Fornelli and Children's Healthcare West, Valimont did not

send out the authorizations to these providers until May 13, 2004.  (Pls.' Ex. Vol. 4 [116-

4] at pp. 33, 41-42.)  That same day, which was four days after Brittany's death and

sixteen days after OCY had closed its file, Valimont completed a written "Interim Risk

Assessment" at the direction of Robin Adams, then OCY's Director of Policy and

Evaluation.  (Pls.' Ex. Vol. 4 [116-4] at p. 43; Defs.' Ex. 1 [73] at pp. 2-3.)  Valimont's

Risk Assessment, which was approved by Defendant Joseph, rated Brittany's overall

risk as "low."  (Pls.' Ex. Vol. 4 [116-4] at pp. 43-44.)  According to Valimont, the low risk

assignment was based on preliminary reports from law enforcement indicating that

Iarussi, Linda Fisher, and Abby had all claimed that Brittany had died as the result of an

accidental fall in which Brittany had hit her head;[13] the report from the Coroner's office,

which suggested physical abuse as a contributing cause of death, had not yet been

received by OCY.  (*Id*. at p. 43.)

In 2005, the Pennsylvania Department of Public Welfare conducted an

investigation into OCY's handling of Brittany's case.  The Department found that OCY

had violated at least four different provisions of the Pennsylvania Administrative Code,

---

[13] Abby maintains that she initially lied to the police about the manner of
Brittany's death at the direction of her mother because of her fear as to what Iarussi
might do to her.  (Pls.' Ex. Vol. 2 [116-2] at pp. 37-38, ¶ 21.)

as follows:

* 3490.232(d) (1) (2) (3)

In the case under review a Risk Assessment was not completed, according to the agency record, until May 13, 2004.  This was 16 days after the worker and supervisor had made a decision to close the case at intake on April 27, 2004.  These regulations require that the county agency shall use a State-approved risk assessment process to:

1.   Aid in its assessment of whether to accept the family for services.

2.   Insure that its assessment is comprehensive.

3.   Help determine the need for general protective services.

* 3490.232(e)

In the case under review the agency failed to complete its assessment to determine whether or not the child and family should be accepted for GPS within the required sixty day time framework required by this section of the regulations.

* 3490.232(g)

In the case under review the assigned worker did not confirm observations/assumptions made during the course of the agencies [sic] evaluation of the case by making the appropriate collateral contacts.  This section of the regulations specifies that ... "the agency shall also conduct interviews with those persons who are known to have or may be reasonably be [sic] expected to have information that would be helpful to the county agency in determining whether or not the child is [in] need of general protective services."  In this case, the assigned worker had no direct contact with several medical providers, the MR BSU, the MH BSU, as well as school staff who had direct knowledge of the child referred for services.

* Chapter 3130.21(b)

The case under review did not contain a safety plan for the child referred for service from the point of referral to case closure.  The record does not specify what factors or issues were assessed in determining that the children remained safe while residing in their home.  The case file contents were not reflective of the mandates of OCYF Bulletin #3490-00-02 Safety Assessment and Safety Planning.

(Pls.' Ex. Vol. 3 [116-3] at pp. 30-32.)

C.      Procedural History

In 2006, Iarussi's sister, Victoria Hayes, and her husband Charles, acting as the

administrators of Brittany's estate, commenced this lawsuit, naming as Defendants

OCY, Gallagher, Vallone, Hughes, Valimont, Joseph, Debbie Leasure (an intake

screening supervisor for OCY), Robin Adams (OCY's Director of Policy and Evaluation)

and Debra Liebel (Director of OCY).   The complaint originally asserted federal claims

under 42 U.S.C. §1983 and state law claims under common law theories of negligence

*per se* and gross negligence as well as the Pennsylvania Survival Act, 42 Pa. C.S.A. §

8302.   In a memorandum opinion and order dated June 29, 2007, this Court dismissed

the state law negligence claims and, in addition, dismissed the § 1983 claims in part.[14]

*See Hayes v. Erie County Office of Children and Youth*, 497 F. Supp. 2d 684 (W.D. Pa.

2007).

Following extensive discovery, Defendants filed the instant motion for summary

judgment.   The issues have been briefed and argued and the Court has reviewed the

rather extensive record in this case in its entirety.   Accordingly, Defendants' motion is

ripe for disposition.

---

[14] This Court dismissed Plaintiffs' § 1983 claims to the extent they were premised on the theory that the Defendants were in a "special relationship" with Brittany by virtue of having assisted in arranging her adoption by Iarussi such that they acquired an affirmative duty to protect her from physical abuse.  *See Hayes v. Erie County Office of Children and Youth*, 497 F. Supp. 2d 684, 693-95 (W.D. Pa. 2007).  The Court permitted the § 1983 claims to proceed under a "state-created danger" theory, however, as we discuss, *infra*.  *See id.* at 695-703.

## III.  DISCUSSION

A.  <u>Federal Claims</u>

Plaintiffs' federal claims in this case are brought under 42 U.S.C. § 1983, which provides a cause of action to:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ...

42 U.S.C. § 1983.  To prevail under 42 U.S.C. § 1983, a plaintiff must prove that s/he suffered the deprivation of a constitutional or federal rights by a person acting under color of state law.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995).

As it is undisputed that all the named Defendants are state actors for purposes of § 1983, the focus here is on whether the evidence supports the existence of a constitutional tort.  In Count I of the Complaint, Plaintiffs allege that all the named Defendants violated Brittany's right to substantive due process under the Fourteenth Amendment to the U.S. Constitution.  Count II of the Complaint asserts a § 1983 claim against Defendants OCY, Liebel, Adams, Leasure, and the "other individual Defendant supervisors" premised on their alleged failure to properly train and supervise the other individual Defendants in their handling of Brittany's case.  Count V of the Complaint asserts a § 1983 claim against OCY and Defendant Liebel based on a theory of municipal liability.  We will address each claim in turn.

62

1. Count I: Substantive Due Process Violation

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Thus, individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment. *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

Under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), however, the Due Process Clause does not generally impose upon the state an affirmative obligation to protect its citizens from harm inflicted by private individuals. An exception to this general rule exists, nonetheless, under what is known as the "state-created danger" theory. *Phillips*, 515 F.3d at 235. This theory holds that government actors can be liable under § 1983 for private harm which befalls a citizen where "state authority is affirmatively employed in a manner that injures [the] citizen or renders him 'more vulnerable to injury from another source than he ... would have been in the absence of state intervention.'" *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir.2006) (*quoting Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir.2003)). In *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982), a case which predates *DeShaney*, the Seventh Circuit Court of Appeals famously summarized the theory behind state-created danger liability by noting that, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." 686 F.2d at 618.

63

To establish a claim under the "state-created danger" theory in this circuit, the following elements must be shown to exist:

    (1)    the harm ultimately caused to the victim was foreseeable and fairly direct;

    (2)    the state actor acted with a degree of culpability that shocks the conscience;

    (3)    a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

    (4)    a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright*, 443 F.3d at 281.

The first element – that the harm ultimately caused was foreseeable and fairly direct – necessarily entails allegations of "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips,* 515 F.3d at 238. *See also D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 625 (M.D. Pa. 2009). In addition to the foreseeability component of the analysis, we must assess whether the harm "is a 'fairly direct' result of the defendant's acts." *Phillips*, 515 F.3d at 239. "This inquiry essentially asks whether the alleged misconduct and the harm caused were "too attenuated" to justifiably hold the defendant liable." *D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d at 625 (citing *Phillips, supra*, at 238).

With respect to the second element of the "state-created danger analysis," *to wit*,

that the state actor act with a degree of culpability that "shocks the conscience," the "exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'" *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999). Where a state actor has the time to deliberate about his actions and is not under pressure to make hurried judgments, the state actor's conduct will be sufficiently "conscience shocking" if it displays a deliberate indifference toward a substantial risk of serious harm to the plaintiff. *See Navolio v. Lawrence County*, No. 10-1820, 2011 WL 162059 at * 5 (3d Cir. Jan. 19, 2011) ("In a case where state actors have the time to make unhurried judgments, the level of culpability required to shock the conscience is deliberate indifference.")(*quoting Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir.2006)).

The third element requires that the plaintiff show "a relationship between the state and the plaintiff" such that the plaintiff was "a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Smith,* supra, at *6 (*quoting Bright*, 443 F.3d at 281). This requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Id*. (*quoting Kneipp*, 95 F.3d at 1209 n. 22).

The fourth element of the state-created danger analysis can be broken down into three necessary conditions, *to wit*: (i) a state actor exercised his or her authority; (ii) the state actor took an affirmative action; and (iii) this affirmative act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not

acted at all.  *Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007); *Bright, supra*, 443 F.3d at 281-82.

The failure by a plaintiff to establish any of the foregoing elements will preclude a viable state-created danger claim.  *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir.1997) (for purposes of state-created danger claim, court did not need to decide whether the decedent and others who were present in school where decedent was fatally shot were a sufficiently discrete group of persons who could have been foreseeable victims of an armed and dangerous intruder, since plaintiff could not satisfy the remaining three elements of his claim); *Smith v. School Dist. of Philadelphia*, Civil Action No. 07-2080, 2009 WL 667455 at *3 (E.D. Pa. Mar. 10, 2009) ("A plaintiff's failure to satisfy any of the four elements defeats his state-created danger claim.") (citing *Morse, supra*).  To avoid entry of a summary judgment in this case, therefore, Plaintiffs must present evidence which shows there is a genuine issue of material fact as to each element of their state-created danger claim.  *See* Fed. R. Civ. P. 56(c); *Smith, supra*, at *3.

In addition, each Defendant's potential liability must be predicated on the basis of his or her own personal knowledge and actions relative to Brittany's case, because liability under § 1983 cannot be premised on theories of vicarious liability or *respondeat superior*.  *See Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1948 (2009) (noting that, because vicarious liability is inapplicable in a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution") (assessing a motion to dismiss under Fed. R. Civ. P. 12(b)).

Accordingly, this Court will consider the sufficiency (or insufficiency) of the Plaintiffs' evidence as it pertains to the respective conduct of each named Defendant. Broadly speaking, the relevant conduct can be broken down into two discreet time periods involving two discreet sets of actors – a distinction which I will refer to as "pre-adoption conduct" and "post-adoption conduct."

### a)    Pre-adoption Conduct

As the Court's discussion of background facts demonstrates, Defendants Gallagher, Vallone, and Hughes collectively played a significant role in the events that led to Brittany's placement with, and ultimate adoption by, Lisa Iarussi. Each of these Defendants was involved in advocating Brittany's transfer from a foster care setting to the permanent care of Iarussi. With respect to these Defendants, then, the fourth element of the state-created danger analysis is satisfied because a jury could reasonably conclude that these Defendants affirmatively used their authority in a manner that ultimately made Brittany more vulnerable to danger than she would have been if they had not acted at all. Moreover, the third element is likely satisfied as well, since Brittany –  a mentally challenged, sexually abused minor from a broken home – fell within a class of individuals uniquely vulnerable to harm at the hands of an abusive caregiver.

Nevertheless, having reviewed this record in its entirety, the Court is compelled to the conclusion that Plaintiffs' § 1983 claim against Defendants Gallagher, Vallone and Hughes cannot survive summary judgment inasmuch as Plaintiffs have failed to demonstrate the existence of a genuine issue of fact relative to the first two elements of

their state-created danger theory.  The lack of any genuine issue of fact as to elements (1) and (2) means that Plaintiffs' claims against these Defendants fails as a matter of law, and summary judgment in the Defendants' favor is therefore warranted.

### (i).    Foreseeability of Harm

The first element of the state-created danger theory requires a showing that the harm ultimately caused to the victim was foreseeable and fairly direct.[15]  *Bright*, 443 F.3d at 281.  It is Plaintiffs' theory that Defendants Gallagher, Vallone, and Hughes, in facilitating and/or advocating Brittany's placement with, and later adoption by, Iarussi, "disregarded red flag after red flag with regard to Brittany being placed in harm's way..." and, in so doing, displayed a willful disregard for Brittany's safety.  (Pls.' Mem. in Opp. to Mot. for Summ. Judg. [117] at p. 19.)  This theory rests chiefly on four sources of evidence:  Iarussi's statements concerning her alleged interactions with OCY

---

[15] In this segment of our discussion we address only "foreseeability," concluding that the abuse which Brittany suffered at the hands of Iarussi was not foreseeable to the actors in question.  We do not decide the issue of whether the harm was also a "fairly direct" result of their actions.  Nevertheless we do note that it is questionable whether "fairly direct" harm could be established on this record, given that the first reported referral for suspected abuse occurred some twenty (20) months after Brittany's adoption.  At least one federal court has ruled that the passage of such time precludes a finding of directness.  *See Fondrk v. Westmoreland County*,, Civil Action No. 04-0900, 2007 WL 4457141 at *6 (W.D. Pa. Dec. 16, 2007) (in a state-created danger case arising out of the death of a child who had been killed by her natural parents, no liability could exist with respect to defendants, Westmoreland County and its agents, where these defendants had not been involved with the child and her family for more than 14 months prior to the child's death; the court found that, "[d]ue to the sheer passage of time, the Westmoreland County defendants' failure to act could not have been a 'fairly direct' cause of Kristen's harm.").

personnel; the kinship care home study[16] prepared by Badach; Szklenski's suggestion

that Iarussi should undergo a psychological evaluation; and Rosemary Burroughs' claim

that she warned OCY workers about placing Brittany with Iarussi.  In order to fairly

assess the forseeability of harm, however, these supposed red flags must be viewed in

the context of the entire record of undisputed facts.  In doing so, we find that the

Plaintiffs' evidence, even when viewed collectively, fails to establish a reasonable

inference that the harm which Brittany suffered in her adoptive home was foreseeable

to the OCY workers involved in her placement there.

    We consider first Iarussi's testimony that she made multiple phone calls to OCY,

prior to January of 2004, indicating that she was in "over [her] head," that Brittany was

"getting to be too much," and that she wanted OCY to "take her back because [she

couldn't] do it."  (Pls.' Ex. Vol. 3 [116-3] at p. 40.)  According to Iarussi, "they kept telling

me, oh, I'm sorry, Ms. Iarussi, you know, *you adopted her now* and blah, blah, blah,

and they told me that all mothers have a bad day, that tomorrow will be better."  (*Id*. at

---

[16] Although Plaintiffs appear to dispute the characterization of Badach's report as
a "homestudy," we do not perceive any genuine dispute relative to this issue which
could affect the outcome of this case.  Gallagher apparently regarded it as such, as is
indicated by her June 9, 2000 report to the juvenile court, wherein she stated that "[t]he
homestudy report is not yet prepared in written form, but according to Ann Badach of
Family Services, the Iarussi home will be approved."  (Pls.' Ex. Vol. 1 [116-1] at p. 16.)
Badach similarly regarded her report as a homestudy; she testified that her
responsibility in this case was "to complete a kinship family profile on Lisa Iarussi," part
of which involved "completing a written family profile, *also known as a written home
study*."  (Defs.' Ex. 2 [74] at p. 2 (emphasis supplied).)  Moreover, the term "home
study" seems to be a statutory term of art, *see* 23 Pa. C.S.A. § 2530(b) (discussing
the requirements of the "preplacement report" which is "to be prepared by the agency or
person conducting the home study"), and Badach's written report seems to have
fulfilled the statutory requirements of a homestudy in all material respects.  *See id.*
Accordingly, we refer to her written report as a homestudy.

pp. 40-41 (emphasis added).)  According to Plaintiffs, this is one factor which should have put Gallagher, Vallone and/or Hughes on notice that Iarussi was an unsuitable placement alternative for Brittany.  However, Iarussi's own statements, as highlighted above, establish that these alleged phone calls were made *after* Brittany's adoption in August of 2001.  In fact, Iarussi attributes the foregoing responses specifically to Defendants Joseph and Valimont, who were principally involved in handling the reports of abuse that arose post-adoption (*id*. at p. 41, 44); none of these remarks are attributed by Iarussi to Gallagher, Vallone, or Hughes.  Accordingly, this aspect of Iarussi's testimony does not implicate any particular awareness or conduct on the part of Gallagher, Vallone or Hughes relative to the pre-adoption placement of Brittany in Iarussi's home.

More relevant for present purposes is Iarussi's testimony that "I told Carroll Gallagher many of [sic] times that I was on disability and I had issues of my own."  (Pls.' Ex. Vol. 3 [116-3] at p. 45.)  According to Iarussi, neither Gallagher nor anyone else at OCY ever questioned why she was on disability.  (*Id*.)  In addition, Plaintiffs claim that Badach's home study report was rife with "red flags," chief among them the fact that Iarussi was known to be receiving counseling at the time of the report but was very guarded about her personal life and had revoked her prior consents for the release of her mental health treatment records.  This information, Plaintiffs insist, should also have put the Defendants on notice that Iarussi was an unsuitable care-giver.

In order to establish the foreseeability element of a state-created danger claim, however, the Plaintiffs must demonstrate "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently

concrete to put the actors on notice of the harm." *Phillips,* 515 F.3d at 238.  *See also*

*D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 625 (M.D. Pa. 2009); *Gremo v.*

*Karlin*, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005) ("A harm is foreseeable when a state

actor has actual awareness, based on concrete information, of a risk of harm to an

individual .... such that the actor is on notice that his or her act or failure to act

significantly enhances that risk of harm.").  Nothing in this record suggests that

Gallagher, Vallone, or Hughes had actual knowledge of Iarussi's abusive nature during

the time period leading to Brittany's adoption.

    In addition, however, we find nothing in Badach's report or in Iarussi's alleged

remarks to Gallagher showing that these Defendants had reason to know of a "concrete

risk" that Iarussi would be physically abusive toward Brittany.  Although Iarussi was

known to be receiving benefits for an unspecified learning disability, and though she

now professes that she told Gallagher she had (unspecified) "issues of her own" which

she felt made her incapable of taking on a special needs child,[17] none of this

information – even if taken at face value – amounts to a concrete risk that Iarussi would

be violent or abusive toward Brittany.  Similarly, Badach's report that Iarussi was

guarded about her personal life and that she had revoked consents for her mental

health records does not necessarily suggest that Iarussi was an unfit parent or a violent

---

    [17] While we accept this testimony for purposes of summary judgment, we note
that Iarussi's supposed reluctance to take Brittany into her home is contradicted by
every other source of information in the record, including her own actions in revoking
the consent to release her mental health records and the testimony of her sister,
Plaintiff Victoria Hayes.  Notably, Hayes has testified that Iarussi was highly motivated
to care for Brittany to the point of pressuring her into writing a favorable
recommendation.

person.  As far as could be gleaned from Badach's report, the prior mental health

records in question involved counseling which Iarussi had undergone some ten years

prior in relation to a discreet depressive episode; her current mental health treatment

reportedly was related to "self-esteem issues" and "goal setting," which was ostensibly

consistent with Iarussi's self-reported status as a past abuse victim who was trying to

achieve a life of self-sufficiency.  Moreover, the fact that Iarussi was reportedly

"guarded" and reluctant to release her mental health records does not necessarily

indicate that she was an unfit care-giver or a dangerous person; such guardedness

could just as easily be construed as consistent with a fear of stigmatization, which often

is felt among those who require mental health treatment.  In fact, Iarussi gave an

ostensibly rational explanation for withholding her consents – namely, that "she felt

uncomfortable allowing access to information from "long ago" and also, most recent

information from a (counseling) relationship that had barely begun to develop.  (She

had, at the time of consent, only met with her counselor twice.)"  (Defs.' Ex. 4 [76] at p.

10.)

Significantly, this information was contained within a report that, on balance,

painted a very favorable impression of Iarussi as a care-giver.  Among other things,

Badach's report indicated that Iarussi was a responsible and compassionate caregiver

to her own four-year old daughter, she had a strong support network of family and

friends to help her out, and her desire to care for Brittany appeared to be sincere and

based on a long-term relationship with the child.  All of the references whom Badach

consulted were uniformly supportive of Iarussi's desire to provide kinship care for

Brittany, and there no reports from law enforcement or ChildLine implicating Iarussi in

any type of past criminal behavior or child abuse.  When viewed in the context of

Badach's entire report, the alleged "red flags" cited by Plaintiffs fail to establish any

concrete basis for believing that Brittany would be subject to harm in Iarussi's home.

Notably, Badach herself had no concerns about Brittany's safety in that environment.

Plaintiffs also rely on testimony from Szklenski to the effect that, in early 2001,

she questioned Gallagher about whether Iarussi should undergo a psychological

evaluation due to Iarussi's agitation and apparent instability.  Again, however, this

alleged "red flag" must be viewed in the context of other undisputed evidence.  The

record here reflects that Iarussi's agitation and instability were observed to occur in the

context of a developing conflict between Iarussi and Brittany's natural mother

concerning Brittany's placement.  That conflict did not involve concerns about Iarussi's

fitness to care for Brittany; rather, it concerned a rift that had begun to develop between

the two women due to the fact that Iarussi was perceived to be judgmental about

mistakes that Brittany's mother had made in the past and unsupportive of Brittany's

relationship with her mother.  According to Szklenski, this tension came to a head in the

latter part of 2000 and early 2001 pending the court's permanency determination, but

the two women agreed to undergo counseling to address their conflict, and the problem

seemed to diminish after the issue of parental rights was settled.  Thus, Szklenski came

to view Iarussi's agitation and instability as a temporary, short-lived occurrence.

Moreover, while Szklenski thought this tension might create stress for Brittany, she did

not develop concerns about Brittany's safety during her placement with Iarussi.  On the

contrary, Szklenski specifically recalled having been asked by Gallagher whether it was

her opinion that Brittany was in any kind of physical danger in Iarussi's home, and she

replied that she did not believe so.  According to Szklenski, Gallagher indicated that, if anyone on the Wraparound Team believed Brittany to be at risk of physical danger, then the concern should be expressed and OCY would act on it, but there is no indication in the record that such concerns were ever expressed by any of the team members.

Plaintiffs also rely on the affidavit of Rosemary Burroughs, Brittany's maternal grandmother, wherein Ms. Burrough states that she "told Erie County Office of Children and Youth workers on Brittany's case that I was against Iarussi adopting Brittany, that I was afraid for Brittany's safety and I told them I wanted to be involved so I could be a watchdog for Brittany's safety."  Although it does not specifically say so, the affidavit may be fairly read as suggesting that Burroughs communicated to Gallagher, and perhaps others at OCY, that she knew Iarussi to have a bad temper and that Iarussi had reportedly been involved in assaulting another adult female.

Even allowing this inference, however, the statements of Ms. Burroughs must be viewed in the context of other undisputed evidence showing that, by all accounts, Brittany was doing relatively well in the home of Iarussi prior to her formal adoption, and Iarussi appeared to be a responsible parent as well as a law-abiding citizen.  As our outline of the background facts illustrates, there were a multitude of social services professionals who had contact with Brittany and/or Iarussi during this time.  Szklenski met with Brittany regularly up until May of 2001 in connection with Brittany's Wraparound Team, sometimes on a weekly basis.  In October of 2000 she reported to the juvenile court that Brittany was "safe and secure" in Iarussi's home; never did Szklenski indicate otherwise to OCY or the court.  Despite her stated concerns about

Iarussi's stability in early 2001, she never formed a belief that Brittany was in danger while under Iarussi's care.  In face, she specifically denied having such concerns when asked by Gallagher.  Sherry Lacey, another member of the Wraparound Team, could not recall any team meetings where concerns were expressed by a team member regarding Brittany's safety while in Iarussi's home, nor did Lacey have such concerns. Her own impression was that Brittany seemed happy to be living with Iarussi and Iarussi appeared to genuinely care about Brittany.  Sheila Baldwin, who was Brittany's CASA during this time, likewise supported Brittany's placement with Iarussi; at no point during her appointment did she believe Brittany to be at risk of physical harm in that setting, nor could she recall such concerns being expressed either by Wraparound Team members or Brittany's biological mother, who was also represented by counsel.[18]  In addition, Brittany was separately represented by a court-appointed guardian ad litem during this time frame; there is no evidence to suggest that the GAL ever expressed concerns about Brittany's placement with Iarussi or opposed the adoption.  In November of 2000, Brittany was examined by Dr. Ziegler for the purpose of her making a placement recommendation to the court.  Dr. Ziegler found that, after living with Iarussi for nearly five months, Brittany was making a very good adjustment.  Dr. Ziegler found no evidence at that time that Brittany was being victimized by Iarussi in any way.

---

[18] Although Baldwin testified that she had not seen Badach's written home study, nothing in the record suggests that she was denied access to this document.  On the contrary, Baldwin has acknowledged that she had access to all of Brittany's records from medical providers, OCY and the court, and she was copied on Gallagher's June 9, 2000 report wherein Gallagher specifically advised the juvenile court that a home study was being prepared by Badach.  Moreover, while Gallagher testified that she felt there was information in Badach's written report that was important, she was not sure that she would have included any of that information in her own reports to the court.

In the course of her evaluation, Dr. Ziegler reviewed and relied upon a September 2000 psychological evaluation of Brittany performed by Martha Eichenlaub, which also provided no basis for concerns about safety issues in Iarussi's home.  Finally, Badach's home study was generally very favorable to Iarussi and portrayed her as a caring and capable mother.  It included references from four individuals, including one from Plaintiff Victoria Hayes, which were all uniformly supportive of Iarussi's desire to care for Brittany, and Badach herself never felt concerned for Brittany's safety.

Hayes maintains that she was pressured by Iarussi to provide the reference, but she does not deny that she painted a highly favorable picture of her sister. Furthermore, while Hayes claims that OCY should have done more to investigate Iarussi's fitness to parent, Hayes herself never disclosed to OCY the negative information about her sister which she now claims the Agency should have independently discovered.

In sum, given all of the information that was available to Gallagher, we do not believe that the evidence relied upon by Plaintiffs, even when construed collectively and in the light most favorable to them, is sufficient to support a finding of foreseeability. Simply stated, the undisputed evidence as a whole does not reasonably support the conclusion that the risk of harm which ultimately befell Brittany at Iarussi's hands was sufficiently "concrete," prior to her adoption, as to put Gallagher on notice of that harm.

Given that fact, foreseeability also cannot be shown with respect to Defendant Vallone, Gallagher's supervisor.  The evidence submitted by the parties shows that Vallone had no greater involvement in Brittany's placement, nor access to any greater information, than Gallagher had.  Since Gallagher cannot be found, on this record, to

have had an awareness of a sufficiently concrete risk of harm to Brittany as would support liability under a state-created danger theory, the same holds true for Vallone.

Similarly, foreseeability of harm cannot be demonstrated with respect to Defendant Hughes, who replaced Gallagher in 2001 as the OCY case worker handling Brittany's adoption.   The only additional evidence cited by Plaintiffs as it relates to Hughes concerns OCY's presumed failure to obtain an updated home study report and Hughes' alleged lack of familiarity with Brittany's case file.

Plaintiffs point to a July 31, 2001 order entered by the orphan's court which directed that a home study be performed and submitted to the court "to verify the statements of the [adoption] Petition and to provide such other facts as will give the Court full knowledge of the desirability of the proposed adoption."  (Pls.' Ex. vol. 2 [116-2] at p. 32.)  Notwithstanding this order, there is nothing in the record to confirm that an updated home study was ever obtained.  When deposed, Hughes could not recall whether Badach's home study was ever updated, nor could he recall whether he ever read Badach's original home study.  He testified that,

> ... normally, I would say always when the paperwork is filed by the caseworker to the court staff to schedule the adoption hearing, I know we have to have current clearances.  It would be returned to a caseworker if they weren't current.  But I don't specifically recall, you know, it being updated.  But it would just be an assumption of mine that they were.

(Pls.' Ex. Vol. 2 [116-2] at p. 30.)  Presumably, Hughes' assumption that updated clearances were obtained was based on the fact that Brittany's adoption was approved just weeks following the court's July 31, 2001 order.

Nevertheless, assuming for the sake of argument that OCY never obtained an

updated home study – or at least updated clearances –  for Iarussi, and assuming

further that Hughes never reviewed Badach's original home study, these omissions do

not have any material bearing on the issue of foreseeability.  Specifically, OCY's failure

to obtain an updated home study for Iarussi and/or Hughes' failure to review the original

home study, if indeed such failures occurred, do not logically bolster the existence of a

concrete risk of harm to Brittany, nor do they reflect an awareness on the part of the

Hughes of such risk.

In the same vein, Hughes' statement at the August 22, 2001 adoption hearing

that Brittany was a perfectly normal, healthy child with no particular problems is of no

legal moment relative to the issue of foreseeability.  (*See* Pls.' Ex. Vol. 2 [116-2] at 17.)

Although Plaintiffs point to this statement as evidence that Hughes was "totally

unfamiliar with Brittany's background or serious mental retardation" (Pls.' Mem. in Opp.

to Mot. for Summ. Judg. [117] at p. 9), it must be noted that Hughes elsewhere

represented to the court at the very same hearing that Brittany was receiving Social

Security disability benefits for mental retardation; thus he was clearly aware of Brittany's

mental handicap.  (See Pls.' Ex. Vol. 2 [116-2] at p. 18.)  More to the point, however,

this evidence has no bearing on the foreseeability prong, as it does not logically

buttress the conclusion that Iarussi posed a risk of harm to Brittany.

Thus, this Court finds that the undisputed evidence of record cannot support a

finding of a foreseeable risk of harm to Brittany prior to her adoption.  For this reason

alone, Plaintiffs' state-created danger claim based upon the pre-adoption conduct of

Gallagher, Vallone and Hughes cannot survive summary judgment.

(ii).    *Deliberate Indifference*

In addition to the lack of foreseeable harm, the record here cannot support an

inference of deliberate indifference on the part of the Defendants who were

instrumental in facilitating Brittany's placement with Iarussi.  The Third Circuit has

stated that, "in the state-created danger context, deliberate indifference may not require

a state actor's actual knowledge of a risk of harm 'when the risk is so obvious that it

should be known.'" *Navolio v. Lawrence County*, No. 10-1820, 2011 WL 162059 at *5

(3d Cir. Jan. 19, 2011) (quoting *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006)).

Assuming that a patently obvious risk of harm to the victim will suffice, such

cannot be established on this record for largely the same reasons that we discussed

above in concluding that the record does not support a showing of foreseeable harm.

The key facts relied on by the Plaintiffs – i.e., Gallagher's failure to explore Iarussi's

unspecified personal "issues" and the nature of Iarussi's disability, her additional failure

to investigate Iarussi's mental health history or Burroughs' claim that Iarussi had a

violent temper, her refusal to request that Iarussi undergo a psychological evaluation,

and the alleged failure to obtain an updated home study in 2001 – collectively

demonstrate, at most, simple negligence on the part of Gallagher, Vallone and/or

Hughes based on their failure to have conducted a more thorough investigation into

Iarussi's suitability as a placement resource.  These failures, however, do not establish

a reasonable inference that Gallagher, Vallone or Hughes were deliberately indifferent

to a known or patently obvious risk of harm to Brittany by virtue of recommending

Brittany's continued placement with Iarussi.

This is particularly true in light of several facts which stand unrebutted on this

record.  The first is the fact that it was Brittany's own mother who had identified Iarussi as a placement option based on Iarussi's apparently uneventful history of having cared for Brittany since her infancy.

The second is the collective body of evidence (Rosemary Burroughs' claims notwithstanding) which suggests that, as of August 2001, Iarussi was generally viewed as a suitable care-giver for Brittany.  As we have discussed, this evidence came from a variety of social services and court-appointed professionals who had the benefit of regular contact with Brittany and/or Iarussi between 1999 and 2001 and who were all presumed to be acting with Brittany's best interests in mind.

Third, and related, is the fact that Brittany's initial placement with, and subsequent adoption by, Iarussi were not events as to which OCY had unilateral discretion or control; rather these events occurred only as a result of rulings made by the juvenile and orphans' court with input from a variety of professionals acting in Brittany's best interests.  The juvenile court found, at least twice – on November 21, 2000 and again on May 7, 2001 – that Brittany's placement with Iarussi was necessary and appropriate and that she was safe there.  (Defs.' Ex. 24 [96] at ¶¶ 29-30.) Significantly, the November 2000 ruling was apparently made after the court had the benefit of:  (i) Szklenski's October 16, 2000 report outlining factors that favored Brittany's reunification with her mother as well as factors that favored Brittany's continued placement with Iarussi; (ii) OCY's disclosure at the November 3, 2000 court hearing that certain Wrap Team members opposed the termination of Brittany's mother's parental rights; (iii) argument from the attorney representing Brittany's biological mother, who advocated an alternative placement option for Brittany, and (iv)

the report of Dr. Ziegler, which favored continued placement with Iarussi.[19]

Fourth is the unfortunate fact that Brittany had few desirable placement options available to her during this time frame.  For obvious reasons, it was the goal of the juvenile court system to move Brittany toward an appropriate permanent placement.  However, Brittany's foster mother was apparently unable to offer Brittany a permanent

---

[19] The Court recognizes it is Plaintiffs' theory that Badach's written report was never submitted to the juvenile and/or orphans' court judges handling Brittany's case.  Presumably, it is Plaintiffs' theory that the courts would not have approved Brittany's placement with Iarussi or her adoption, had they had the benefit of Badach's study.

We find such a theory untenable as a matter of law, given the record before us.  First, there does not appear to be a genuine dispute as to this issue:  while Badach testified that her report was submitted to the juvenile court, Gallagher's testimony was that she was unsure whether it had been sent, as she could not find a cover letter in OCY's file to that effect.  Because we do not have the benefit of the state court record, this issue cannot be definitively resolved.  However, we may take judicial notice of the fact that, as a matter of Pennsylvania statutory law, homestudy and "preplacement reports" are a mandated component of adoption proceedings.  *See generally* 23 Pa.C.S.A. § 2530 (discussing the requirement that a home study be completed prior to placement of a child in the home of a prospective adoptive parent, but allowing interim placement under certain conditions).  As a general matter, they are required to be submitted as a part of the prospective parent's report of intention to adopt where the adoption involves a non-relative.  *See* 23 Pa.C.S.A. § 2531(a) and (b)(7); *id.* at § 2701(2).  Thus, we can accept Plaintiff's theory only if we are willing to indulge the assumption that the juvenile and/or orphans' court acted in derogation of Pennsylvania law.

Even if it can reasonably be inferred, however, that the courts of Erie County acted without the benefit of Badach's report, it is speculative to assume that those courts would have ruled differently with respect to Brittany's placement if only they had reviewed the contents of that report.  We are unwilling to engage in such speculation.

Finally, insofar as this issue bears on the Defendants' alleged deliberate indifference, we note there is no evidence to support the idea that Gallagher or anyone else at OCY deliberately withheld Badach's report from the court or other interested parties.  On the contrary, Gallagher disclosed the existence of the study being performed by Badach in her June 9, 2000 report to the juvenile court, and both Brittany's GAL and CASA were copied on this report, along with the attorney representing Brittany's mother.  Accordingly, if it can be assumed that the juvenile and orphans' courts were without the benefit of Badach's report, this fact does not undermine our conclusion that the record fails to support a finding of deliberate indifference on the part of Gallagher, Vallone, and Hughes.

home.  Although Brittany's biological mother had expressed a desire to be unified with all of her children, it was not unreasonable for OCY to have concerns about the suitability of this option, considering the mother's past history of neglect, her prior actions in exposing her children to a known sexual perpetrator, her limited skills, resources and financial means, and the fact that she would be tasked with caring for multiple children, some of whom had special needs.  In addition, while there was some discussion in late 2000 about the possibility of placing Brittany with a family relative, that option was opposed by Brittany's CASA, Sheila Baldwin.  Specifically, Baldwin wrote to the juvenile court on November 22, 2000 to encourage Brittany's continued placement with Iarussi, in whose home she was reportedly "thriving."  Baldwin emphasized that Brittany's permanency plan had not been "haphazard" but, rather, the result of much thought and preparation on the part of various professionals acting on Brittany's behalf.  (Defs.' Ex. 6 [78] at p. 5.)  Baldwin wrote to the court again on December 12, 2000 to express her view that Brittany should remain with Iarussi, as she was emotionally bonded to Iarussi and was being "lovingly cared for" by her.  (*Id*. at p. 6.)  The letter advised that a Family Preservation Specialist had considered the alternative placement source for Brittany but was against it because the family did not have enough space for Brittany.  (*Id*.)  Copies of this correspondence were sent both to Gallagher and to Brittany's guardian ad litem.  There is no evidence to suggest that the GAL ever objected or expressed a different view to the court.  In sum, Brittany' placement with Iarussi in 2000-2001, as compared to her other available choices at that time, appeared to many to be her best reasonable alternative.

Fifth is Szklenski's representation that, during the time period when Iarussi

82

exhibited agitation and instability, Gallagher pointedly asked her whether she believed

Brittany was in any danger and Szklenski replied that she did not think so.  According to

Szklenski, Gallagher specifically advised her that, if any members of the Wraparound

Team had concerns for Brittany's safety, those concerns should expressed and OCY

would act upon them.

In context of this unrebutted evidence, it cannot reasonably be said that

Gallagher, Vallone, or Hughes displayed deliberate indifference to a patently obvious

risk of harm to Brittany's safety and welfare by advocating her continued placement with

Iarussi and/or by failing to investigate Iarussi's qualifications more thoroughly.  For this

reason as well, Plaintiffs' substantive due process claim fails.[20]


b)    Post-adoption Conduct

Defendants Valimont and Joseph were the two OCY agents primarily involved in

handling the reports of suspected abuse which arose following Brittany's adoption.  To

the extent that Plaintiffs are also attempting to base their state-created danger claim on

this aspect of OCY's involvement, the claim cannot survive summary judgment.

Plaintiffs theorize in their brief that Valimont and Joseph "took the course of least

resistence" in investigating the post-adoption reports of suspected abuse so as not to

disturb Brittany's placement with Iarussi.  (Pls.' Mem. In Opp. to Mot. for Summ. Judg.

[117] at pp. 22-23.)  In particular, Plaintiffs criticize these Defendants for never having

---

[20] Defendants Gallagher, Hughes, and Vallone have also moved for summary judgment on the independent ground of absolute immunity with respect to their actions taken during Brittany's placement and adoption.  In light of our disposition of this pending motion, we need not address this particular argument.

personally met with any of the officials at Brittany's school who were making reports of suspected abuse, for allegedly unilaterally cancelling the school meeting which was scheduled to occur on April 28, 2004, for failing to timely follow up on the consents for release of medical information that Iarussi had signed on March 9, 2004, and for failing to complete a written Interim Risk Assessment until after Brittany's death.  Plaintiffs characterize the response of Valimont and Joseph as "deliberate indifference" which "directly caused Brittany to suffer injuries on an ongoing basis at the hands of Iarussi and Linda Fisher, her paramour" until Brittany's death on May 9, 2004.  (*Id*. at p. 23.)

It is questionable whether the foregoing misconduct, which sounds more in negligence, could establish "deliberate indifference," as is required for purposes of Plaintiffs' state-created danger claim, given Valimont's substantial, documented activity relative to the post-adoption referrals she handled.  *See, e.g., J.H. v. City of Philadelphia*, Civil Action No. 06-2220, 2008 WL 3983269 at *9 (E.D. Pa. Aug. 19, 2008) (recognizing that, to be held liable under the state-created danger theory, an official's actions must be the result of more than mere negligence; rather, the state actor "must make deliberate, callous decisions which evince a willingness to ignore a known, foreseeable danger") (citing *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 910-11 (3d Cir. 1997)).

Even if the conduct of Valimont and Joseph could be fairly described as exhibiting deliberate indifference, however, this would not salvage Plaintiffs' state-created danger claim because their alleged misconduct fails to establish an affirmative act on their part which rendered Brittany more vulnerable to danger than if they had not acted at all.  *Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007); *Bright, supra*, 443

84

F.3d at 281-82.  Plaintiffs have alleged only that Valimont and Joseph were deliberately indifferent to Brittany by virtue of their inaction – *i.e.*, their failure to protect Brittany from harm perpetrated by Iarussi, which is precisely the kind of claim precluded under *DeShaney*.  *See Bright*, 443 F.3d at 282 (court noting that it has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised") (citations omitted).

In *Bennett v. City of Philadelphia*, 499 F.3d 281 (3d Cir. 2007), the Third Circuit Court of Appeals recently reiterated this principle in a case not factually dissimilar to this one.  *Bennett* involved a claim brought under § 1983 against the City of Philadelphia, its human services agency and several individual agents by the surviving siblings of a child who had been beaten and killed after her mother entrusted all of the children to an unfit and abusive care-giver.  A parallel suit was brought by the deceased child's estate. The decedent's siblings asserted a state-created danger claim on the theory that, by closing its dependency case file on the children, the agency had rendered the children more vulnerable to harm by their mother and her acquaintances because it had allegedly cut the children off from a private source of aid.  Finding no factual support for this theory, the court of appeals affirmed summary judgment for the defendants.

Upon reviewing the elements of a state-created danger claim, the *Bennett* court noted that it had consistently adhered to the pronouncements in *DeShaney* by requiring plaintiffs to allege affirmative acts on the part of state officials that constitute a "but for cause" of the risks they faced; mere "failures to act," the court noted, cannot form the basis of a valid § 1983 claim.  499 F.3d at 287-88 (discussing *Kaucher v. County of*

*Bucks*, 455 F.3d 418, 433 n. 10 (3d Cir. 2006) and other supporting case law.)  The court recounted its prior ruling in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006), wherein it had rejected the theory that a police officer's knowledge of a danger to the victim by itself creates an affirmative duty to protect the victim from that harm.  "No affirmative duty to protect arises from the State's knowledge of the individual's predicament," the court had written.  *See* 499 F.3d at 288 (quoting *Bright*, 44 F.3d at 284).  Rather, "[l]iability requires affirmative state action; mere 'failure to protect an individual against private violence does not violate the Due Process Clause.'"  *Id*. (quoting *Bright*, *supra*, at 284).  The *Bennett* court concluded that there was no material issue of fact to establish that the agency had used its authority to create an opportunity for the children to be abused that would not have existed absent its intervention.  499 F.3d at 289.  Nor, it found, had "action in the constitutional sense" been taken by the children's case worker, since nothing he did was the "but for" cause of harm to the decedent child.  *Id*.

Like the defendants in *Bennett*, Valimont and Joseph are not alleged to have done anything that made Brittany more vulnerable to Iarussi's abuse than if they had not acted at all.  Stated differently, their actions (or, more accurately, their inactions) were not the "but for" cause of Brittany's endangerment.  Accordingly, under the teachings of *DeShaney, Bright,* and *Bennett*, Valimont and Joseph were under no constitutional duty to protect Brittany from harm, whatever their responsibilities under state law may have been.

We reach this conclusion in full recognition of the fact that other agents of OCY

were involved in advocating Brittany's placement with Iarussi.  Two considerations compel it.

For one, substantive due process principles do not allow us to impute the constitutional duty to rescue, which may arise from one state agent's culpable, affirmative conduct, to another state agent who has not acted in any affirmative way to create the danger at hand.  As to this point, we are persuaded by the Tenth Circuit's decision in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001).  In that case, the court considered a §1983 claim brought against various social workers who had allegedly been responsible for removing two young children from their mother's custody and facilitating placement with the father.  After the father killed the male child, the social workers were sued under a state-created danger theory.  In relevant part, the *Currier* court dismissed the claims against one particular social worker, Regina Sentell, whose only involvement concerned the investigation of abuse allegations which had arisen *after* the father had been awarded physical and legal custody of the children.  The plaintiffs in *Currier* did not contend that Sentell was personally involved in creating the danger to the children; instead, they claimed only that Sentell "was constitutionally required to rescue the children because she was aware that her fellow co-workers had created the danger."  242 F.3d at 920-21.  The *Currier* court rejected this theory and held that Sentell had no constitutional duty to rescue.  Quoting *Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1237 (10th Cir. 1999), the court observed that "state officials may be liable for injuries caused by a private actor where *those officials* created the danger that led to the harm."  242 at 921 (emphasis in the original).  Thus,

87

under the principle espoused in *Currier*, which we find to be correct, only officials who created the danger in question can acquire a constitutional duty to rescue the victim. Accordingly, even if we were to conclude on this record that Gallagher, Vallone and Hughes were culpable under a state-created danger theory such that they acquired a constitutional duty to rescue Brittany from her abusive home environment, this constitutional duty could not be imputed to Valimont and Joseph absent some culpable, affirmative conduct of their own.

Of course, this Court has already determined that Gallagher, Vallone, and Hughes are *not* culpable under state-created danger principles as a matter of law. This brings us to our second point, which is that liability under a state-created danger theory cannot be premised upon non-culpable affirmative conduct that is later followed by allegedly conscience-shocking *inaction*. In this regard we are instructed by the Third Circuit's ruling in *Walter v. Pike County, Pa.*, 544 F.3d 182, 196 (3d Cir. 2008). In that case, the court of appeals considered the viability of a state-created danger claim brought by the estate of an individual who had been killed by man accused of sexually molesting the decedent's daughters. Before his death, the decedent, Michael Walter, had been allowed, with the permission of a local police chief and the district attorney's office, to participate in the 2001 arrest of one Joe Stacy with the plan that Walter would extract a confession from Stacy about Stacy's alleged sexual assault of Walters' daughters. Stacy did make certain inculpatory statements to Walter and was arrested. The following year, as Stacy's criminal trial date drew near and Walter was set to testify against him, Stacy, who was out on bail, began to engage in increasingly menacing behavior toward the police chief, a fact which was not disclosed to Walter. Prior to the

88

trial date, Stacy wound up shooting and killing Walter. Walter's estate subsequently sued the police chief as well as the district attorney and an assistant district attorney alleging, among other things, that the defendants had violated Walter's substantive due process rights by (1) involving him in Stacy's arrest and confession and (2) failing to warn Walter in 2002 when Stacy began stalking the police chief.

In reviewing the lower court's partial grant of summary judgment, the Court of Appeals concluded that the record could not support a finding that defendants had acted with deliberate indifference toward Walter's safety in planning and effecting Stacy's 2001 arrest and confession. 554 F.3d at 192, 193. In addition, the court ruled that the defendants could not be liable for their alleged inactions in later failing to have Stacy rearrested, failing to seek revocation of his bail, or failing to warn Walter of Stacy's menacing behavior or arrange protection for him because this conduct did not constitute affirmative action on the part of the state. *Id*. at 194. The court acknowledged that the latter events "did not occur in a vacuum," and that "the threat posed by Stacy in 2002 was likely due in part to the circumstances of his arrest in 2001," *id*. at 915, but it concluded that there could be no state-created danger liability because of the fact that the defendants' actions in 2001 were not conscience-shocking. Assuming, as the district court had found, that (i) the defendants had affirmatively used their authority in 2001 by allowing Walter to become involved in eliciting a confession from Stacy, and (ii) the defendants were deliberately indifferent in 2002 when they failed to warn the Walter family of Stacy's menacing behavior, the court of appeals concluded that this would not establish liability under a state-created danger theory. As the court explained,

these findings would not amount to a constitutional violation – they would not establish that the defendants committed a *culpable* act, only that they acted in 2001 and then, months later, shocked the conscience through inaction.

544 F.3d at 196 (emphasis in the original).  *See also Bright*, 443 F.3d at 284 (rejecting argument whereby plaintiff "[sought] to bring the law enforcement delay within the scope of the state-created danger doctrine by pointing to an affirmative action of the state which preceded it").

Such is the situation here as it pertains to the allegedly conscience-shocking post-adoption behavior of Valimont and Joseph.  Even if we were to assume that Plaintiffs could establish deliberate indifference on the part of Valimont and Joseph with respect to their failure to more aggressively investigate the post-adoption referrals of abuse, this would be insufficient to establish a viable due process claim because there does not exist on this record any *culpable*, affirmative state action that created Brittany's danger.  We have previously determined that the record in this case will not support a finding of deliberate indifference to a foreseeable risk of harm on the part of Gallagher, Vallone or Hughes.  Like the plaintiffs in *Walter*, then, Plaintiffs in this case have established, at most, that OCY acted non-culpably in 2000-2001 to facilitate Brittany's placement with Iarussi and then, years later, engaged in allegedly conscience-shocking behavior through inaction.  For these reasons as well, Plaintiffs' substantive due process claim, as set forth in Count I of the Complaint, cannot survive summary judgment.

2. Count II: Negligent Supervision

We next consider Count II of the complaint, which asserts a § 1983 claim against Defendants OCY, Liebel, Adams, Leasure, and the "other individual Defendant supervisors" (presumably Vallone and Joseph) premised on their alleged failure to properly train and supervise the other individual Defendants in their handling of Brittany's case.  "In order to establish supervisory liability, [a plaintiff] must show that [the defendant] 'participated in violating [her] rights, or that he directed others to violate them, or that he, as the person in charge ..., had knowledge of and acquiesced in his subordinates' violations.'"  *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (*quoting Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir.1995)).

Insofar as Plaintiffs' claims relate to Defendants Liebel, Adams, and Leasure, no evidence has been offered to establish their personal involvement in the handling of Brittany's case at any time prior to her death.  Moreover, Plaintiffs have failed to establish, as a predicate to supervisory liability, that Brittany's constitutional rights were violated.  Accordingly, summary judgment is warranted in favor of these Defendants.

Insofar as Plaintiffs' claims under Count II relate to Defendants Vallone or Joseph, the record *does* support their knowledge and personal involvement in the handling of Brittany's case.  Once again, however, for the reasons previously discussed, we have found that the conduct of these Defendants does not support liability under a state-created danger theory.  Accordingly, summary judgment is warranted for these Defendants as well.

3. Count V: Municipal Liability

Count V of the Complaint asserts a § 1983 claim against OCY and Defendant Liebel based on a theory of municipal liability. "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (*citing Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978)). "Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Id.*

To withstand summary judgment, plaintiffs must demonstrate not only the existence of a policy or custom, but also its connection to the alleged constitutional injury. A government's policy is established when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990) (*quoting Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Id*. (*quoting Monell*, 436 U.S. at 690, 98 S. Ct. 2018). *See also Iverson v. City of Philadelphia*, 213 Fed. Appx. 115, 118-19 (3d Cir.  Jan. 12, 2007).

Because we have determined that the record here does not support the existence of a Fourteenth Amendment violation under Plaintiffs' state-created danger theory, there can be no basis upon which to find liability on the part of OCY or its Director, Liebel.  *See Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) (holding that where no constitutional violation was found to exist, there could be no finding of municipal liability against the city, and recognizing that "[t]his conclusion follows naturally from the principle that municipal liability will only lie where municipal action actually caused an injury") (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) for the proposition that a City "may be held liable if its policy actually causes injury").  Moreover, Plaintiffs have failed to establish on this record that any agency policy or custom was the moving force behind Brittany's harm.  Consequently, summary judgment will be entered in favor of the Defendants as to Count V.

B.    Plaintiff's Claim Under the Pennsylvania Survival Statute

Plaintiffs' sole remaining state law cause of action at this point is their claim in Count VI for relief and damages under the Pennsylvania Survival Act.  Defendants move for summary judgment as to this count on the ground that the Pennsylvania Wrongful Death and Survival Act, 42 Pa. C.S.A. §§ 8301 and 8302 were enacted to allow the survival of viable causes of action for bodily injury to a deceased, beyond the life of the victim, but did not create any new theory of liability.  Thus, Defendants argue, the Plaintiffs here must state all the elements of a valid tort theory in order to maintain a claim under those statues.

Defendants correctly point out that this Court previously dismissed Plaintiffs'

substantive state law claims for gross negligence and negligence per se on the basis

that Defendants were immune from these claims under Pennsylvania's Political

Subdivisions Tort Claims Act ("PSTCA"), 42 Pa.C.S.A. §§ 8541-8542.  *See Hayes v.*

*Erie County Office of Children and Youth*, 497 F. Supp. 2d 684, 704-08 (W.D. Pa.

2007).  Thus, it would seem that there is no remaining tort theory in this case that is

legally viable.

Plaintiffs' only response to this argument is that the Defendants' request for

summary judgment should be denied because their motion claimed only that Plaintiffs

had failed to state a claim under the survival statute, whereas their brief argues for

summary judgment on the basis of immunity under the Political Subdivision Tort Claim

Act.  According to Plaintiffs, summary judgment should be denied on Count VI because

Defendants' argument as to the applicability of the Political Subdivision Tort Claim Act

is being raised for the first time in Defendants' brief, but not their accompanying motion.

It is clear from the foregoing that Plaintiffs have not meaningfully joined issue on

the merits of Defendants' request for summary judgment as it relates to Count VI.

Plaintiffs' argument in opposition to summary judgment on this particular claim is

unpersuasive and, therefore, the requested relief will be granted.


## IV.  CONCLUSION

The suffering which Brittany Legler was forced to endure in her short and tragic

life is difficult to fathom.  Repeatedly, and through no fault of her own, Brittany was

failed by the most important adult figures in her life, a trend which culminated in the

incomprehensible and pointless cruelty inflicted by her adoptive mother.  From a human

94

perspective, this case is heartrending and will not soon be forgotten.

From a legal perspective, however, it is critical to acknowledge that the harm which befell Brittany, and for which the Plaintiffs now seek to recover, was inflicted by a private individual.  When a plaintiff seeks to hold government actors responsible for the alleged violation of federal constitutional rights arising out of harm caused by private individuals, the law imposes a very stringent standard, permitting liability only under limited circumstances which cannot reasonably be found to exist on this record.  Were it otherwise – were municipalities, states, and public bodies to be held constitutionally liable for every instance in which they failed to protect citizens from harm inflicted by non-govenmental parties, the liability, as our circuit court of appeals has observed, "would be unlimited."  *Bennett, supra*, 499 F.3d at 289.  This stringent legal standard means that, in many instances, individuals who are harmed by private violence will find no redress under federal constitutional tort principles.  But, as, the Third Circuit Court of Appeals has cautioned:

> ... it is not the role of the courts, certainly not the federal courts, to rectify the failures that do happen.  That is the responsibility of the citizens of the body politic, who elect the leaders of the executive branch of the respective city, state or municipality.  If the public raises its voice and demands accountability, and is willing to use the ballot to support those demands, then change and improvement can and will occur. ...

499 F.3d at 289-90.

For the reasons set forth at length herein, the Defendants' motion for summary judgment will be granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES HAYES and )
VICTORIA L. HAYES, )
Administrators of the Estate of )
BRITTANY LEGLER, Deceased, )
                               )    Case No. 1:06-cv-234-SJM
         Plaintiffs, )
                               )
       v. )
                               )
ERIE COUNTY OFFICE OF )
CHILDREN AND YOUTH, *et al.,* )
                               )
         Defendants. )

## ORDER OF JUDGMENT

AND NOW, *to wit*, this 29th day of March, 2011, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendants' motion for summary judgment [71] be, and hereby is, GRANTED.  JUDGMENT is hereby entered in favor of the Defendants and against the Plaintiffs, Charles and Victoria Hayes.

                                       s/     Sean J. McLaughlin

                                       SEAN J. McLAUGHLIN
                                       United States District Judge

cm:    All counsel of record.